No. 23-2849

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

———————————

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

## CHRISTOPHER JORDAN,

*Defendant-Appellant.*

———————————

On Appeal from the U.S. District Court for the
Northern District of Illinois, Hon. Edmond E. Chang
No. 1:19-cr-00669-4

---

## OPENING BRIEF OF APPELLANT CHRISTOPHER JORDAN

---

Megan Cunniff Church
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 450-6716

James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
AKIN GUMP STRAUSS HAUER
 & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000
jbenjamin@akingump.com

*Counsel for Appellant Christopher Jordan*

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2849

Short Caption: United States v. Christopher Jordan

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Christopher Jordan

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Akin Gump Strauss Hauer & Feld LLP; MoloLamken LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ James J. Benjamin, Jr.    Date: 10/4/2023

Attorney's Printed Name: James J. Benjamin, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✔    No ☐

Address: Akin Gump Strauss Hauer & Feld LLP

One Bryant Park, New York, NY 10036

Phone Number: (212) 872-8091    Fax Number: (212) 872-1002

E-Mail Address: jbenjamin@akingump.com

rev. 12/19 AK

**Save As**    **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2849</u>

Short Caption: <u>United States v. Christopher Jordan</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Christopher Jordan

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Akin Gump Strauss Hauer & Feld LLP; MoloLamken LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/ Megan Cunniff Church</u>    Date: <u>9/28/2023</u>

Attorney's Printed Name: <u>Megan Cunniff Church</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>MoloLamken LLP</u>

    <u>300 North LaSalle Street, Chicago IL 60654</u>

Phone Number: <u>(312) 450-6716</u>    Fax Number: <u>(847) 440-2692</u>

E-Mail Address: <u>mchurch@mololamken.com</u>

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2849

Short Caption: United States v. Christopher Jordan

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   Christopher Jordan

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Akin Gump Strauss Hauer & Feld LLP; MoloLamken LLP

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and
      N/A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
      N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
   N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
   N/A

Attorney's Signature: /s/ Parvin D. Moyne     Date: 10/4/2023

Attorney's Printed Name: Parvin D. Moyne

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [ ]     No [✔]

Address: Akin Gump Strauss Hauer & Feld LLP

   One Bryant Park, New York, NY 10036

Phone Number: (212) 872-1076     Fax Number: (212) 872-1002

E-Mail Address: pmoyne@akingump.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2849

Short Caption: United States v. Christopher Jordan

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Christopher Jordan

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Akin Gump Strauss Hauer & Feld LLP; MoloLamken LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Anne M. Evans      Date: 10/4/2023

Attorney's Printed Name: Anne M. Evans

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: Akin Gump Strauss Hauer & Feld LLP

One Bryant Park, New York, NY 10036

Phone Number: (212) 872-8042      Fax Number: (212) 872-1002

E-Mail Address: aevans@akingump.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF ISSUES................................................................1

STATEMENT OF THE CASE ................................................................2

    A.    Superseding Indictment, Severance, and Dismissal of
        Conspiracy Counts ................................................................4

    B.    Pretrial Rulings ................................................................5

        i.    Post-2010 Compliance and CME Materials ................5

        ii.    Jordan's Statement to the FBI................6

    C.    Trial ................................................................6

        i.    Compliance Policies and CME Rules................8

        ii.    Jordan's Statement to the FBI................9

        iii.    Jury Instructions and Jury Deliberations ................10

    D.    Sentencing................10

SUMMARY OF ARGUMENT ................................................................11

    A.    Impeachment of Compliance and CME Witnesses ................11

    B.    Denial of the Defense Rule 106 Motion ................12

    C.    Denial of the Good-Faith Instruction and the Response to
        the Jury Note ................................................................13

STANDARD OF REVIEW ................................................................13

ARGUMENT................................................................14

I.    THE DISTRICT COURT ERRED BY CONSTRAINING
    JORDAN'S CROSS-EXAMINATION OF THE
    GOVERNMENT'S COMPLIANCE AND CME WITNESSES ........14

    A.    Applicable Law ................................................................14

    B.    Discussion ................................................................15

        i.    The District Court Abused its Discretion by
            Excluding the Proffered Compliance and CME
            Evidence Under Rule 403 ................15

        ii.    The District Court's Error Was Not Harmless................26

II.    THE DISTRICT COURT ERRED BY DENYING JORDAN'S
    MOTION TO ADMIT A RELEVANT, EXCULPATORY
    PORTION OF HIS ORAL STATEMENT TO THE FBI ................31

    A.    Background ................................................................31

    B.    Discussion ..................................................................39

          i.    The District Court Abused its Discretion by
                Excluding the Omitted Portion of Jordan's
                Statement to the FBI .......................................39

          ii.    The District Court's Error was Not Harmless ................42

III.    THE DISTRICT COURT ERRED BY DENYING JORDAN'S
       REQUEST FOR A GOOD-FAITH INSTRUCTION .........................44

IV.    THERE WAS INSUFFICIENT EVIDENCE THAT JORDAN
       KNOWINGLY PARTICIPATED IN A SCHEME TO
       DEFRAUD ......................................................................52

CONCLUSION..............................................................................53

CERTIFICATE OF COMPLIANCE .............................................54

CIRCUIT RULE 30(D) STATEMENT .........................................55

CERTIFICATE OF SERVICE ......................................................56

CIRCUIT RULE 30(A) APPENDIX..............................................57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988)...................................................................................36

*Chambers v. Mississippi*,
    410 U.S. 284 (1973)...................................................................................15

*Ciminelli v. United States*,
    598 U.S. 306 (2023)...................................................................................50

*Cleveland v. United States*,
    531 U.S. 12 (2000).....................................................................................50

*Dutton v. Evans*,
    400 U.S. 74 (1970).....................................................................................15

*Kelly v. United States*,
    140 S. Ct. 1565 (2020)..............................................................................50

*McNally v. United States*,
    483 U.S. 350 (1987)...................................................................................50

*Neder v. United States*,
    527 U.S. 1 (1999).......................................................................................26

*Nelson v. City of Chicago*,
    810 F.3d 1061 (7th Cir. 2016) ..........................................................27, 42

*Public Service Co. of Indiana, Inc. v. Bath Iron Works Corp.*,
    773 F.2d 783 (7th Cir. 1985) ......................................................23, 24, 29

*Skilling v. United States*,
    561 U.S. 358 (2010)...................................................................................50

*State v. Warren*,
    732 A.2d 1017 (N.H. 1999) ..............................................................38, 39

*Thompson v. City of Chicago*,
    722 F.3d 963 (7th Cir. 2013) ................................................................14

*United States v. Boros*,
    668 F.3d 901 (7th Cir. 2012) ...............................................................14

*United States v. Boswell*,
    772 F.3d 469 (7th Cir. 2014) ...............................................14, 24, 29

*United States v. Buckner*,
    91 F.3d 34 (7th Cir. 1996) ...................................................................14

*United States v. Chanu*,
    40 F.4th 528 (7th Cir. 2022) ...........................................3, 13, 15, 48

*United States v. Chaparro*,
    956 F.3d 462 (7th Cir. 2020) ...................................................*passim*

*United States v. Ciesiolka*,
    614 F.3d 347 (7th Cir. 2010) ...............................................................13

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) .................................................................3

*United States v. Cruse*,
    805 F.3d 795 (7th Cir. 2015) ...............................................................47

*United States v. Faruki*,
    803 F.3d 847 (7th Cir. 2015) ...............................................................38

*United States v. Flotron*,
    2018 WL 1790828 (D. Conn. Apr. 15, 2018)..................................15

*United States v. Glover*,
    101 F.3d 1183 (7th Cir. 1996) .................................................*passim*

*United States v. Haddad*,
    10 F.3d 1252 (7th Cir. 1993) .............................................36, 37, 39

*United States v. Irorere*,
    228 F.3d 816 (7th Cir. 2000) ...............................................................47

*United States v. James*,
  464 F.3d 699 (7th Cir. 2006) ................................................................. 14

*United States v. LeFevour*,
  798 F.2d 977 (7th Cir. 1986) ............................................. 38, 39, 42

*United States v. Meyer*,
  157 F.3d 1067 (7th Cir. 1998) ............................................................ 48

*United States v. Pacilio*,
  85 F.4th 450 (7th Cir. 2023) ................................................................ 15

*United States v. Paladino*,
  401 F.3d 471 (7th Cir. 2005) ....................................................... 37, 42

*United States v. Sutton*,
  801 F.2d 1346 (D.C. Cir. 1986) .................................................... 38, 39

*United States v. Velasco*,
  953 F.2d 1467 (7th Cir. 1992) ............................................. 12, 36, 37

*United States v. Walker*,
  652 F.2d 708 (7th Cir. 1981) .............................................. 36, 37, 38

*United States v. Williams*,
  900 F.3d 486 (7th Cir. 2018) ............................................................. 26

*United States v. Yarrington*,
  640 F.3d 772 (7th Cir. 2011) ........................................................ 13, 36

*Washington v. Texas*,
  388 U.S. 14 (1967) ................................................................................ 15

**Statutes**

18 U.S.C. § 371 ........................................................................................... 1

18 U.S.C. § 1343 ......................................................................................... 1

18 U.S.C. § 1962 ......................................................................................... 1

18 U.S.C. § 3231 ......................................................................................... 1

28 U.S.C. § 1291 ......................................................................................... 1

**Other Authorities**

21A Wright & Miller, Fed. Prac. & Proc. Evid. § 5077.2 (2d ed. Apr.
  2023 update)....................................................................................37, 38

Fed. R. Evid. 106 ........................................................................12, 35, 36

Fed. R. Evid. 403 ..................................................................................14

William J. Bauer Pattern Crim. Jury Instrs. 6.10 (7th Cir. 2020) ....................45, 48

## JURISDICTIONAL STATEMENT

The government charged Christopher Jordan with RICO conspiracy, in violation of 18 U.S.C. § 1962(d); conspiracy to commit price manipulation, wire fraud affecting a financial institution, commodities fraud, and spoofing, in violation of 18 U.S.C. § 371; and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343.  The district court had original jurisdiction under 18 U.S.C. § 3231.  Prior to trial, the government moved to dismiss the conspiracy counts.  A jury found Jordan guilty of the single remaining count, wire fraud affecting a financial institution.  The district court entered a judgment of conviction on September 19, 2023.

Jordan filed a timely notice of appeal.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.    Whether the district court erred by blocking Jordan from impeaching the government's witnesses with compliance policies and exchange rules demonstrating that banks and the Chicago Mercantile Exchange ("CME") did not put traders on notice that spoofing was prohibited until after Jordan's departure from Wall Street.

II.   Whether the district court erred by denying Jordan's motion to admit a relevant, exculpatory portion of his statement to the FBI.

III.    Whether the district court erred by refusing to administer a good-faith jury instruction.

IV.    Whether there was sufficient evidence that Jordan knowingly participated in a scheme to defraud.

## STATEMENT OF THE CASE

### *Background*

Christopher Jordan worked as a precious metals trader at JPMorgan from 2006 until December 2009, and at Credit Suisse from March to August 2010. As part of his job, he routinely bought and sold gold and silver futures contracts on the CME. At that time, the futures markets were transitioning from the traditional model of open-outcry trading on an exchange floor to an electronic platform called "Globex" that was increasingly dominated by computer algorithms. Tr. 268-70 (A1356-58).[1] Algorithms possessed many advantages over human traders, such as speed and the ability to process vast amounts of information. Tr. 347, 1022 (A1364, 1833).

To counterbalance these advantages, Jordan sometimes used a trading tactic called "spoofing" to achieve good execution on his orders. Spoofing, the practice

---

[1] "Tr." refers to the trial transcript, relevant portions of which are included in the separate Circuit Rule 30(b) Appendix filed together with this brief; "App." refers to the Circuit Rule 30(a) Appendix that is bound with this brief; "A" refers to the separate Circuit Rule 30(b) Appendix filed together with this brief; "GX" and "DX" refer to government and defense exhibits, respectively; and "ECF No." refers to proceedings in the district court that are not included in either appendix.

of placing a bid or offer with the unconditional intent to cancel the order before execution, *see United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017), took advantage of the algorithms' propensity to speedily jump ahead of Jordan's orders. Tr. 636-37 (A1500-01). As an example of the spoofing strategy, if Jordan wanted to buy 25 silver futures contracts, he might take the following steps: (1) place a small-side iceberg order to buy 25 contracts at the best bid price; (2) place a large-side fully visible order to sell 100 contracts at the best offer price; (3) watch the algorithms react to the sell order by crossing the spread to execute against the small-side 25-lot buy order; and then (4) cancel the large-side 100-lot sell order.[2]

When Jordan was trading, no bank compliance policies or exchange rules identified spoofing as a prohibited trading practice. In July 2011 – about a year after Jordan left Credit Suisse – the Dodd-Frank Act's anti-spoofing provision became effective. Thereafter, JPMorgan, Credit Suisse, and the CME revised their respective policies, rules, and training materials to state that spoofing was a prohibited trading practice. *See, e.g.*, DX 21 (A296-300); DX 35 (A365-465); DX 37 (A491-577).

### *FBI Interview*

On November 5, 2018, nine years after Jordan left JPMorgan, two FBI

---

[2] An iceberg order is an order to buy or sell multiple contracts, as to which only a small portion of the total order is visible to other market participants at any given time (like the tip of an iceberg). Tr. 357-61 (A1367-71); *see also United States v. Chanu*, 40 F.4th 528, 533 (7th Cir. 2022).

agents knocked on the door of his parents' home in New Jersey, where he was then living. Tr. 544-45 (A1438-39). Jordan voluntarily submitted to a lengthy interview, during which agents asked him about his trading activity from JPMorgan. In response to questioning, Jordan admitted that he had engaged in spoofing and explained that he had done so to outperform algorithms and obtain good execution for his boss at JPMorgan; that all of his orders were at risk of execution; that he was adapting to new circumstances in the early days of electronic trading, without guidance from JPMorgan; and that he did not think what he was doing was wrong. *See* A248-49 (FBI interview report).

### Proceedings in the District Court

A. Superseding Indictment, Severance, and Dismissal of Conspiracy Counts

On October 16, 2021, the government filed a second superseding indictment against Jordan and co-defendants Gregg Smith, Michael Nowak, and Jeffrey Ruffo. A99-145. On April 3, 2022, the district court ordered Jordan's trial to be severed. A146. The co-defendants were tried first. On August 10, 2022, a jury acquitted Smith, Nowak, and Ruffo on the two conspiracy counts but convicted Smith and Nowak on the substantive counts pending against them. A147. On October 13, 2022, the district court granted the government's motion to dismiss the conspiracy counts against Jordan, leaving a single count of wire fraud affecting a financial institution. A182.

B. <u>Pretrial Rulings</u>

   i. <u>Post-2010 Compliance and CME Materials</u>

Before trial, the government indicated its intention to introduce compliance policies and CME rules that were in effect while Jordan worked at JPMorgan and Credit Suisse. A148-59. The asserted relevance of these documents was to establish that Jordan knowingly engaged in prohibited conduct.

In response, the defense sought to admit a limited number of compliance and CME documents, all of which post-dated Jordan's time on Wall Street, to use in cross-examination of the government's witnesses to establish that the pre-existing policies and training materials *did not* put traders on notice that spoofing was prohibited. A160-81. For example, the defense sought to offer DX 21, JPMorgan's first policy to prohibit spoofing, which came into effect in September 2012, nearly three years after Jordan stopped trading at the bank. A296-300. Similarly, the defense sought to offer DX 35, which came into effect in August 2012, more than two years after Jordan left Credit Suisse, and was the first version of the Credit Suisse compliance manual to prohibit spoofing.[3] A365-465. At the pretrial conference, the district court excluded these exhibits because "after the fact" changes to bank policies, exchange rules, and associated training materials

---

[3] Other proffered defense compliance and CME exhibits were DX 22 (A301-02), DX 25 (A303-04), and DX 92 (A889-909) (JPMorgan documents); DX 34 (A305-64) and DX 36 (A466-90) (Credit Suisse documents); and DX 37 (A491-577) and DX 42 (A873-83) (CME documents).

could confuse the jury and inject a mistake of law defense that the district court viewed as "a serious specter in this case." App. 55-58, 60-61, 72. The district court reiterated that "a mistake of law is looming over this trial, and I'm trying to dispel it as much as I can." App. 57; *see also* A230 ("there is a substantial risk that the jury would apply a risk mistake-of-law defense [sic] by inferring that federal criminal law (that is, the wire-fraud statute) did not prohibit spoofing before Dodd-Frank").

    ii.  Jordan's Statement to the FBI

Before trial, the defense moved, pursuant to Fed. R. Evid. 106, to admit Jordan's statement in the FBI interview that he "did not think what he was doing was wrong." A231-43. The district court denied the motion, observing that "mistake of law is *not* a defense to a wire-fraud charge." App. 10-11.

C. Trial

Jordan's trial commenced on December 1, 2022 and the case went to the jury on December 7, 2022. At trial, it was undisputed that Jordan spoofed. The government presented dozens of charts showing that Jordan used the four-step strategy to spoof while he worked at JPMorgan and Credit Suisse. GX 75 (A1084-1223); GX 76 (A1224-97). The government also presented expert testimony from Kumar Venkataraman, Ph.D., who opined that Jordan placed large-side orders for the purpose of inducing algorithms to cross the spread and execute against Jordan's

resting iceberg orders, and not for the purpose of getting filled on the large-side orders.  Tr. 1067-69 (A1836-38).

The government presented testimony from a representative of Quantlab, an algorithmic trading firm, to the effect that Quantlab's algorithms would likely have reacted to Jordan's large-side spoof orders by crossing the bid-offer spread to execute against Jordan's small-side iceberg orders.  Tr. 1008-13 (A1825-30).  The government also offered Bloomberg chats showing that Jordan openly discussed his spoofing strategy while working at JPMorgan, including with a senior executive named Ray Eyles.  GX 5 (A955-58); GX 6 (A959-64); GX 7 (A965-71); GX 8 (A972-74); Tr. 530-40; Tr. 561 (A1454); Tr. 671-86 (A1525-37).

The defense did not meaningfully contest any of this evidence and readily conceded that Jordan spoofed at JPMorgan and Credit Suisse.  Tr. 247-48, 1344-49 (A1341-42, 1905-10).[4]  The main dispute at trial concerned Jordan's state of mind.  In order to establish criminal intent, the government relied heavily on two categories of disputed evidence:  (1) compliance policies and exchange rules; and

---

[4] Although Jordan's spoofing was uncontested, the evidence at trial showed that all of Jordan's spoof orders were fully at risk of execution.  Specifically, the defense established that the large-side orders were overwhelmingly placed at the top of the order book, where they were at greatest risk of execution; that their median duration was greater than one second – an ample amount of time to expose the orders to risk of execution; and that they were at least partially executed approximately 9.4% of the time, a higher rate than the market average execution rate for similarly sized orders, which was 2.5%.  DX 95 (A910-42); Tr. 1206-16 (A1858-68).  The defense also established that the CME permitted traders to cancel orders at any time, and that Jordan's order-cancellation rates of 36% (for gold orders) and 48% (for silver orders) were substantially lower than the comparable market-wide cancellation rates of 87% (gold) and 91% (silver).  DX 95 (A910-42); Tr. 1183-89 (A1849-55).

(2) testimony from an FBI agent about the November 2018 interview.[5]

    i.  <u>Compliance Policies and CME Rules</u>

At trial, the government featured the testimony of Mark Catana and David King, compliance officers from JPMorgan and Credit Suisse, respectively, as well as Erin Middleton, the global head of rules and regulatory outreach at the CME. These witnesses testified that the general language of bank compliance policies and exchange rules in 2009 and 2010 put traders on notice that spoofing was prohibited. Tr. 705-10, 715-16 (King) (A1547-52, 1557-58); Tr. 759-62, 774-75 (Catana) (A1601-04, 1616-17); Tr. 920-35 (Middleton) (A1752-67). In turn, the government argued that Jordan acted with criminal intent because he knowingly violated bank policies and exchange rules.

On cross-examination, the defense attempted to impeach the government's witnesses. With respect to Catana and King, defense counsel elicited that the

---

[5] The government also offered excerpts of testimony from a two-day CFTC deposition that Jordan gave in September 2010, after he had left JPMorgan and Credit Suisse and nearly a year before Dodd-Frank became effective. GX 55 (A1051-70); GX 56 (A1071-79); Tr. 516-28, 619-56 (A1417-29, 1483-1520). At the time, the CFTC was pursuing an industry-wide investigation of allegations that banks were carrying large open short positions in silver futures contracts to depress the price of retail silver products (the "Silver Investigation"). A293-95. In September 2013, the CFTC announced that it had closed the Silver Investigation because there was no "viable basis to bring an enforcement action with respect to any firm or its employees," *see id*., and it was not until five years later, in 2018, that the Department of Justice began a separate criminal investigation of Jordan. Tr. 480-81 (A1386-87). At trial, the government argued that, in a brief colloquy at the tail end of the two-day deposition in 2010, the CFTC asked Jordan whether he spoofed and that Jordan falsely denied doing so. *See* Tr. 1319-23, 1381-82 (A1880-84, 1942-43). In response, the defense argued that the CFTC's questions were ambiguous and confusing, and that Jordan had otherwise been fully transparent about his spoofing conduct. *See* Tr. 1346, 1348-54 (A1907, 1909-15).

company policies in effect during Jordan's employment provided traders with
explicit notice of other prohibited trading practices (e.g., wash trades and painting
the tape), but never mentioned spoofing throughout the entire period of Jordan's
trading.  Tr. 732 (King) (A1574); Tr. 795-96, 831, 833-37, 840-47, 867-68 (Catana)
(A1637-38, 1663, 1665-69, 1672-79, 1699-1700).  Defense counsel also elicited
from the compliance witnesses that their banks' policies could have included
specific language prohibiting spoofing at that time.  Tr. 734-35 (King) (A1576-77);
Tr. 798-99, 848, 868 (Catana) (A1640-41, 1680, 1700).  But the district court
barred defense counsel from eliciting the most important point – that the banks *did
in fact* update their policies to explicitly prohibit spoofing after Jordan left Wall
Street.  The district court similarly constrained the defense from cross-examining
Middleton, the government's CME witness.

    ii.  <u>Jordan's Statement to the FBI</u>

     On direct examination, FBI Special Agent Jonathan Luca testified about
portions of the November 2018 interview.  The heart of Luca's direct testimony
was that Jordan admitted placing orders "which he intended to cancel," and that
Jordan explained that he had done so "in order to mislead the market, to
outperform the algorithms, and to make – and to get the best possible fills for his
boss, Ray Iyles [*sic*]."  Tr. 506 (A1407).  On cross-examination, the defense was
not permitted to ask Luca about Jordan's statement that he "did not think what he

was doing was wrong." In its jury addresses, the government repeatedly characterized Jordan's statement as a "confession."

### iii. Jury Instructions and Jury Deliberations

The defense requested that the district court include a good-faith instruction, consistent with this Circuit's Pattern Jury Instructions. A212-13. The district court denied the request on grounds that it posed "the risk of misleading jurors into thinking that a defense along the lines of 'mistake of law' is viable, when it is not." App. 16. During deliberations, after the jury had been out for a day and a half, the jurors asked for clarification about the definition of "knowingly," which had been defined in the jury charge. Tr. 1394-95 (A1951-52). Over a defense objection, the district court instructed the jury that "the definition of 'knowingly' . . . does not mean that the defendant must be aware of whether his alleged conduct violated federal law." App. 17-19. About an hour later, the jury returned a guilty verdict. A292; Tr. 1408-09 (A1965-66).

### D. Sentencing

At a sentencing hearing held on September 15, 2023, the district court determined that the advisory Sentencing Guidelines range was 51-63 months. A1979-80. The district court sentenced Jordan to a term of six months' imprisonment followed by 18 months of supervised release. App. 1-8.

10

## SUMMARY OF ARGUMENT

In its zeal to stamp out the specter of a "mistake of law" defense, the district court committed a series of errors that resulted in a one-sided and distorted presentation of evidence and a jury charge that effectively nullified Jordan's theory of defense.

A. Impeachment of Compliance and CME Witnesses

The district court abused its discretion in barring the defense from using post-2010 documents to cross-examine the government's compliance and CME witnesses. Far from confusing the jury, *see* App. 55-56, the proffered evidence would have provided essential context for Jordan's state of mind – the central disputed issue at trial. Nor was the district court's concern about mistake of law, *see* App. 55-57, 61, 72, a valid basis to truncate the cross-examination of the government's witnesses. The defense never argued mistake of law – and made that intention clear to the district court. The district court was free to order less restrictive steps such as a cautionary instruction or redacting unnecessary portions of the exhibits. Cross-examination is the heart of our adversary system, and impeachment by contradiction is a classic technique. In a criminal case, the defense should be afforded ample grounds to challenge and test the government's witnesses.

11

B. <u>Denial of the Defense Rule 106 Motion</u>

In a series of decisions going back to *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996), this Court established a four-part test for determining admissibility under Federal Rule of Evidence 106, known as the "Rule of Completeness."  Assuming a showing of relevance, the district court must ask: "(1) whether the additional evidence explains the evidence already admitted; (2) whether it places the admitted evidence in its proper context; (3) whether its admission will serve to avoid misleading the trier of fact; and (4) whether its admission will 'insure a fair and impartial understanding of all of the evidence.'" *Id*. (quoting *United States v. Velasco*, 953 F.2d 1467, 1475 (7th Cir. 1992).  Here, the omitted portion of Jordan's statement to the FBI – that he "did not think what he was doing was wrong" – satisfied this four-part test and should have been admitted.  In straining to justify the exclusion of the evidence, the district court held that the omitted portion of Jordan's statements did not "factually" clarify the statement and was instead an impermissible attempt to introduce a mistake of law defense.  App. 10-11.  The district court's reasoning was unsound and resulted in the very outcome that Rule 106 was intended to prevent:  one party gaining unfair advantage by leveraging the hearsay rule to materially change the meaning of a critical piece of evidence.

C. <u>Denial of the Good-Faith Instruction and the Response to the Jury Note</u>

The good-faith instruction is an essential part of this Circuit's Pattern Jury Instructions and has been given in other spoofing cases including *United States v. Bases*, 18-cr-48 (N.D. Ill. Aug. 2, 2021), ECF No. 623 at 28; *United States v. Coscia*, 14-cr-551 (N.D. Ill. Nov. 3, 2015), ECF No. 85 at 24, and *United States v. Flotron*, 17-cr-220 (D. Conn. Apr. 24, 2018), ECF No. 234 at 1318-19. Although this Court affirmed the denial of the good-faith instruction in *Chanu*, the Court cautioned that "this opinion should not be read to preclude the inclusion of such an instruction in a future case." 40 F.4th at 543. Here, because good faith was at the heart of Jordan's defense, and because the proposed instruction was legally correct and factually supported, the district court should have given it. The district court denied the good-faith instruction because of a concern about "the risk of misleading jurors into thinking that a defense along the lines of 'mistake of law' is viable, when it is not." App. 16. This reasoning was faulty and prejudicial.

## STANDARD OF REVIEW

This Court reviews a district court's evidentiary rulings, including those under Rules 106 and 403, for abuse of discretion. *United States v. Yarrington*, 640 F.3d 772, 780 (7th Cir. 2011); *United States v. Ciesiolka*, 614 F.3d 347, 356 (7th Cir. 2010).

Where a defendant requests a jury instruction, this Court reviews *de novo* the district court's refusal to give that instruction. *United States v. James*, 464 F.3d 699, 707 (7th Cir. 2006).

## ARGUMENT

## I. THE DISTRICT COURT ERRED BY CONSTRAINING JORDAN'S CROSS-EXAMINATION OF THE GOVERNMENT'S COMPLIANCE AND CME WITNESSES

### A. Applicable Law

Fed. R. Evid. 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." For exclusion to be warranted under Rule 403, "the prejudicial effect of the offered evidence must *substantially* outweigh its probative value." *United States v. Buckner*, 91 F.3d 34, 37 (7th Cir. 1996). Moreover, the "amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses. '[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote.'" *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) (quoting *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012)); *see also United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014). In reviewing a district court's

application of Rule 403, an appellate court should be mindful that the "right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation and helps assure the 'accuracy of the truth-determining process.'" *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (quoting *Dutton v. Evans*, 400 U.S. 74, 89 (1970)); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) (a criminal defendant has a fundamental "right to confront the prosecution's witnesses for the purpose of challenging their testimony.").

B. Discussion

   i. The District Court Abused its Discretion by Excluding the Proffered Compliance and CME Evidence Under Rule 403

It is well-settled that evidence of corporate compliance policies and training materials can be relevant to a defendant's state of mind. *United States v. Pacilio*, 85 F.4th 450, 464-66 (7th Cir. 2023) (testimony of CME representatives and bank compliance officers was relevant to the defendants' intent in a spoofing case); *Chanu*, 40 F.4th at 533 (discussing bank compliance and CME evidence in a spoofing case); *United States v. Flotron*, 2018 WL 1790828, at *2 (D. Conn. Apr. 15, 2018) (admitting UBS training materials in spoofing case "on the ground that it is relevant and appropriate for the Government to introduce evidence concerning defendant's training with respect to prohibited trading activities"). Consistent with these precedents, the government featured evidence of compliance policies and exchange rules as a core part of its case against Jordan. Testimony from

15

JPMorgan, Credit Suisse and CME witnesses comprised a substantial portion of the government's case, *see* Tr. 698-742 (King) (A1540-84); Tr. 742-99, 815-914 (Catana) (A1585-1641, 1647-1746); Tr. 915-90 (Middleton) (A1747-1822), and the government discussed the compliance and CME evidence in its opening statement and its closing argument. *See* Tr. 243-44 (opening) (A1337-38); Tr. 1326-28, 1334 (main summation) (A1887-89, 1895); Tr. 1374, 1384-85 (rebuttal summation) (A1935, 1945-46).

In direct response to the evidence that the government placed before the jury, the defense sought to admit a limited number of compliance and CME documents during the cross-examinations of Catana, King, and Middleton. This evidence would have impeached the government's witnesses by demonstrating that, contrary to their testimony, the policies and rules that were in effect in 2009 and 2010 *were not* sufficient to place traders such as Jordan on notice that spoofing was prohibited. The logic is straightforward. If the open-ended rules against manipulation, fraud, and conduct "inconsistent with just and equitable principles of trade" that were in effect in 2009 and 2010 were – as the government's witnesses testified – clearly adequate to put traders on notice that spoofing was impermissible, then why did the banks and CME amend their policies and rules, years after Jordan's departure from Wall Street, to specifically define and prohibit

16

spoofing?  Because of the district court's evidentiary ruling, the jury never had the opportunity to consider this question.

On direct examination, Mark Catana, the government's compliance witness from JPMorgan, testified at length about GX 95, a one-page April 2009 JPMorgan Policy entitled "Avoiding Market Manipulation."  Tr. 755-70 (A1599-1606).  This policy contained a generic definition of market manipulation ("one or more trades . . . to create an artificial market price – i.e., a price not determined by supply and demand") followed by eleven bullet points describing prohibited trade practices.  GX 95 (A1316).  The list included "Corners or squeezes," "Price leadership," "Wash Sales or Parking," "Marking the Close," and "Fictitious Trades (Painting the Tape or Rigged Sales)," but it *did not* include spoofing.  Nevertheless, Catana testified on direct examination that the policy prohibited spoofing in 2008 and 2009:

> Q.    Has that type of trading [spoofing] ever been allowed under JPMorgan's policies?
>
> A.    No, because whether it's labeled as spoofing or not, what I just described would always have been manipulative and deceptive.
>
> Q.    Would it have been prohibited under JPMorgan's policies in 2008?
>
> A.    Yes.  It would have been prohibited for those reasons because it would have been deceptive and manipulative and, on the basis of the terms in this policy, would have been prohibited.
>
> Q.    And I assume the same answer for 2009?

17

A.    Correct.

Tr. 760 (A1602).  When the prosecutor asked Catana "how is it that a policy can prohibit spoofing when it doesn't use that phrase?", Catana explained the policy "lays out fundamental principles that we expect traders to abide by.  And market manipulation is a broad concept that includes many different strategies."  Tr. 762 (A1604).

On cross-examination, Catana admitted that in 2008 and 2009, JPMorgan's compliance policies and training materials did not contain the word "spoofing" or any definition of spoofing, and that JPMorgan was capable of drafting policies that would define and describe spoofing.  Tr. 795-96, 798-99, 831, 848, 867-68 (A1637-38, 1640-41, 1663, 1680, 1699-1700).  He also acknowledged that the 2009 anti-manipulation policy contained a list of specifically prohibited practices that did not include spoofing.  Tr. 833-37, 840-47 (A1665-69, 1672-79).  However, he repeated his contention that the general definition of manipulation was sufficiently broad to encompass spoofing.  *See* Tr. 831 (A1663) ("this is a principles-based document that sets forth the general rules that traders should observe.").  The defense was left with no further means of contradicting Catana's testimony.

The defense sought to impeach Catana by confronting him with JPMorgan documents including DX 21, a bank compliance policy entitled "Anti-Fraud, Anti-

18

Manipulation and Other Prohibited Trade Practices." The effective date of DX 21, September 15, 2012, was nearly *three years* after Jordan's departure from JPMorgan. *See* A296. In contrast to the 2009 policy about which Catana testified, the 2012 policy contained black-and-white language that, *for the first time*, identified spoofing as a prohibited trading strategy under JPMorgan's policies: "**Spoofing**. Bidding or offering with the intent to cancel the bid or offer before execution (commonly referred to as "spoofing") is prohibited." A298; *see also* A297 ("This is the first version of this policy."). The probative value of DX 21 is obvious. It would have undermined Catana's testimony and rebutted the government's theory of *mens rea*. But the district court excluded the evidence.

Similar unfairness occurred during the testimony of David King. On direct examination, King testified about GX 34 and 35, two different versions of Credit Suisse's compliance manual that were in effect in 2010, when Jordan briefly worked at the bank. As with the 2009 JPMorgan anti-manipulation policy, both versions of the 2010 Credit Suisse compliance manuals contained open-ended language prohibiting market manipulation, along with a bullet-point list of specific trade practices that did not include spoofing. *See* GX 34 (A975-1012); GX 35 (A1013-50); Tr. 703-05, 707-10 (A1544-47, 1549-52). Under questioning from the prosecutor, King testified that the 2010 compliance documents prohibited spoofing even though the word "spoofing" does not appear.

Q.    Now, the word "spoofing" never appears in this policy, right?

A.    Not to my knowledge.

Q.    So how can a policy prohibit spoofing if it doesn't actually use the word?

A.    There are components of spoofing that would be covered under the prohibitions in this procedure.

Q.    And would those be the components like placing a non-bona fide order?

A.    Yes.

Q.    And is that because it's deceitful conduct?

A.    Yes.

Tr. 706-07 (A1548-49). On cross-examination, King conceded that the 2010 Credit Suisse compliance documents did not define, describe, or mention spoofing, and that Credit Suisse was capable of drafting policies that specifically addressed spoofing. Tr. 732, 734-35 (A1574, 1576-77). But the district court precluded the defense from impeaching King with documents including DX 35, an August 2012 version of the Credit Suisse compliance manual that amended the prior version to include, for the first time, a prohibition on spoofing.[6]

---

[6] DX 35 came into effect in August 2012, two years after Jordan left Credit Suisse. *See* A365. It contained a new section 6.16 entitled "Disruptive Trading and Manipulation," which provided, in relevant part: "CSSU employees are prohibited from engaging in disruptive practices. Such disruptive trading practices includes the following: . . . Any activity that is considered 'spoofing' (i.e. bidding or offering with the intent to cancel the bid or offer before execution)." A402.

The same pattern unfolded during the testimony of Erin Middleton.  On direct examination, the government walked Middleton through five different subsections of CME Rule 432, an exchange rule entitled "General Offenses" that was in effect when Jordan worked at JPMorgan and Credit Suisse.  *See* Tr. 925-32 (A1757-64).  The subsections were:  (B)(1) (fraud and bad faith), (B)(2) (conduct inconsistent with just and equitable principles of trade), H (manipulation and fraud), Q (conduct detrimental to the interest or welfare of the exchange), and T (dishonorable or uncommercial conduct).  *See id.*; *see also* GX 63 (A1080-83).  In response to the prosecutor's questions, Middleton testified that each of these subsections prohibited spoofing even though none of them contained the word "spoofing."  Tr. 926-33 (A1764-65).  More generally, Middleton testified that in 2009 and 2010, CME rules required traders to place "bona fide" orders, which she defined as orders that "represent a true intent to buy or sell a particular price or quantity."  Tr. 920 (A1752).  However, the government offered no CME rule requiring orders to be "bona fide" in 2009 and 2010, or to corroborate Middleton's definition of the term.

On cross examination, Middleton conceded that none of the cited subsections of Rule 432 used the word "spoofing" or described or defined the practice of placing a bid or offer with the intent to cancel it before execution.  Tr. 955-56 (A1787-88).  She likewise admitted that the language of Rule 432 is

general in nature and that the CME could have added language specifically focused on spoofing. Middleton further admitted that the first time the CME publicly took the position that Rule 432 applied to spoofing was in January 2012, in a notice of disciplinary action against a trader named Charles Martell. Tr. 977-80 (A1809-12); *see* DX 40 (A871-72). This was about a year and a half after Jordan left Credit Suisse. Finally, Middleton testified that in 2009 and 2010, the CME did not have a rule that said orders had to be "bona fide," and that the phrase "bona fide" does not appear in the text of Rule 432. Tr. 985-86 (A1817-18).

However, the defense was precluded from impeaching Middleton with two CME documents that would have undermined her testimony. The first, DX 37, was a June 2012 compliance training presentation to Credit Suisse traders that was delivered by Robert Sniegowski, Middleton's predecessor at the CME. A491-577. The June 2012 presentation, which post-dated Jordan's departure from Credit Suisse by nearly two years, defined spoofing as bidding or offering with the intent to cancel before execution and identified it as a prohibited trading practice. No such presentations were given during the years that Jordan was trading. *See* Tr. 967-69, 980-81 (A1799-1801, 1812-13). The second defense exhibit was DX 42, a CME Market Regulation Advisory Notice dated August 29, 2014. A873-83. This notice announced the adoption of CME Rule 575, a new CME rule that specifically banned spoofing and was the first CME rule to contain the phrase "bona fide."

Both of these defense exhibits would have had substantial probative value in impeaching Middleton's testimony, but the district court blocked the defense from using them.

In *Public Service Co. of Indiana, Inc. v. Bath Iron Works Corp.*, 773 F.2d 783 (7th Cir. 1985), this Court set aside a jury verdict in similar circumstances, in which one party was precluded from introducing later-in-time documents that would have contradicted the adversary's characterization of earlier documents. In *Bath Iron Works*, a dispute over allegedly defective "conical heads" that were installed in a coal pulverizing mill, the plaintiffs claimed that the defendant did not follow the plans that it had been given in 1979 for welding the conical heads. *Id*. at 786. In response, the defendant asserted that the 1979 plans were insufficiently detailed and sought to introduce a subsequent set of plans, prepared in 1983, that contained detailed instructions that were not found in the 1979 plans. *Id*. at 787. The district court excluded the later-in-time evidence. *Id*. On appeal, this Court held that "evidence that the 1983 plans prepared by plaintiffs . . . did include more detailed grinding instructions certainly appears to make less probable plaintiffs' contention that Bath should have known how to grind the heads from the 1979 plans without such instructions." *Id*. at 791. The Court held that the 1983 plans were relevant to impeach the plaintiffs' witnesses and did not present a risk of confusion or unfair prejudice. *Id*. at 792-93. That specific precedent is consistent

23

with other more general authority recognizing that "introducing contradictory extrinsic evidence is a recognized method of impeachment." *United States v. Chaparro*, 956 F.3d 462, 479 (7th Cir. 2020); *see also Boswell*, 772 F.3d at 476 (contradiction "involves presenting evidence that the substance of a witness's testimony is not to be believed").

In this case, the district court excluded the proffered compliance and CME evidence because of a concern that the jury would be "confused" regarding the viability of "mistake of law" as a legal defense to the wire fraud charge. App. 55-58, 61, 72; *see also* A230. This was an abuse of discretion. On one side of the 403 balance, the proffered defense exhibits were highly probative and directly responsive to the exhibits and testimony that the government placed before the jury. On the other side, the district court assigned far too much weight to the risk of jury confusion regarding mistake of law.

At the pretrial conference, the defense explained that it sought to offer the post-2010 compliance exhibits not to delve into legal concepts, but rather to respond to the government's arguments about the meaning of *bank policies* and *exchange rules*. App. 50-52, 54-55, 58-60, 70-71. When the district court was considering whether to sustain the government's objection to DX 21 – the September 2012 JPMorgan compliance policy – defense counsel explicitly disclaimed any intention to suggest a link between the policy and the Dodd-Frank

Act.  App. 51 ("We do not need to explain why [the policy] was adopted or that it had anything to do with Dodd-Frank").  As defense counsel explained, the purpose of offering the exhibit was simply to establish that JPMorgan's policies changed after Jordan's departure.  App. 51-52 ("it's going to be used to impeach the JPMorgan compliance witness, Mr. Catana, and to rebut the government's contention that spoofing was always against the rule of JPMorgan and that the policies and trainings on this point were always clear."); *see also* App. 54-55, 58-60, 70-71.

During Catana's direct examination, the government elicited testimony about federal laws against market manipulation and the CFTC's efforts to enforce those laws.  *See* Tr. 754, 772 (A1596, 1614).  By contrast, defense counsel cautioned Catana, during cross-examination, that he should not discuss laws that governed traders' conduct at JPMorgan, *see* Tr. 842 (A1674), and instead that he should focus his testimony on JPMorgan's *policies*.  When Catana nevertheless volunteered that spoofing "would be a violation of CFTC rule and policies" as well as JPMorgan's compliance policies, *see* Tr. 885 (A1717), defense counsel asked for a break and immediately expressed concern to the district court about this testimony.  Tr. 885-90 (A1717-22).  At defense counsel's request, the district court struck the testimony.  Tr. 891 (A1723).  Jordan's defense was good faith, not mistake of law.

25

To alleviate any residual concerns about juror confusion, the district court could have pursued less draconian measures such as administering a cautionary instruction or directing the redaction of both parties' compliance exhibits to remove any references to law that the district court believed would confuse the jury. The defense suggested a cautionary instruction, but the district court rejected the proposal. App. 56-57; *see also id*. at 36. Instead, the district court took the unbalanced approach of allowing the government to offer its chosen compliance exhibits, but forbidding the defense from responding in kind. This was error, and it resulted in a one-sided presentation of evidence on a critical and hotly-contested issue.

ii. The District Court's Error Was Not Harmless

"The general test for harmless error at trial is whether it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Chaparro*, 956 F.3d at 482 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). In evaluating whether an erroneous evidentiary ruling justifies a new trial, this Court considers "whether the prosecution's case would have been significantly less persuasive in the mind of the average juror" if the error had not occurred. *Id*. (quoting *United States v. Williams*, 900 F.3d 486, 489 (7th Cir. 2018)). Whether an error is harmless "is evaluated 'in light of the entire record,' and '[w]here there are several errors, each of which is harmless in its own right, a

new trial may still be granted if the cumulative effect of those otherwise harmless errors deprives a litigant of a fair trial.'" *Nelson v. City of Chicago*, 810 F.3d 1061, 1075 (7th Cir. 2016) (internal citations omitted).

The district court's error was not harmless. At trial, the compliance and CME evidence offered by the government was center stage. In a relatively short and streamlined trial, the government called three compliance and CME witnesses, all of whom testified – without equivocation – that the bank policies and exchange rules in place while Jordan worked on Wall Street were sufficient to put traders on notice that spoofing was prohibited. *See* Tr. 705-10, 715-16 (King) (A1547-52, 1557-58); Tr. 759-62, 774-75 (Catana) (A1601-04, 1616-17); Tr. 920-35 (Middleton) (A1752-67). None of the three witnesses ever spoke to Jordan about spoofing – indeed, Catana and Middleton never even laid eyes on him until they entered the courtroom. *See* Tr. 733-34 (King) (A1575-76); Tr. 779, 816 (Catana) (A1621, 1648); Tr. 935-36 (Middleton) (A1767-68). As a result, the witnesses' testimony was based entirely on the language in the compliance documents.

In its summation, the government featured the testimony and exhibits presented by its compliance and CME witnesses:

> Now, there's also substantial evidence offered by the government that Mr. Jordan received numerous trainings about JPMorgan policies and procedures, the policies and procedures at Credit Suisse, and he also reviewed the CME rules. You heard testimony – and there are a number of exhibits on this.

27

Tr. 1326-27 (A1887-88); *see also* Tr. 1327 (A1888) (discussing King's testimony and 2010 Credit Suisse compliance training materials); Tr. 1334 (A1895) ("It's also proven by the compliance policies, the training, the CME rules, and the fact that Mr. Jordan signed certifications attesting to the fact that he attended these trainings and that he read the rules."); Tr. 1374 (A1935) ("Erin Middleton herself destroys the argument that an order conveys nothing more than its size, quantity, duration – location, amount, and price. She said that all orders must have the intent to trade. That is a basic principle of marketplaces, and it's a basic principle on the CME exchanges."); Tr. 1384 (A1945) (the "defendant was trained. You'll see the exhibits, the trainings, the policies, the code of conduct attestations. Take a look for yourself."). Had the defense been able to impeach the government's witnesses with the post-2010 documents, these arguments would have been exposed as specious, and the government's case "would have been significantly less persuasive in the mind of the average juror." *See Chaparro*, 956 F.3d at 482.

In its order denying Jordan's motion for a new trial, the district court asserted that the proffered compliance and CME evidence was cumulative and would not have impeached the witnesses. App. 36-38. The record does not support the district court's assessment. Although the defense was able to establish on cross-examination that the applicable bank policies and exchange rules did not discuss spoofing, and that it would have been possible to draft language that did

discuss spoofing, the defense was unable to complete the impeachment by showing that JPMorgan, Credit Suisse, and the CME *actually did* revise their policies, rules, and training materials after Jordan was gone from the industry.  The difference is critically important.  *See Bath Iron Works*, 773 F.2d at 792; *Chaparro*, 956 F.3d at 479; *Boswell*, 772 F.3d at 476.

In its Rule 33 order, the district court also posited that the evidence would have "opened the door to the jury hearing that the Dodd-Frank Act explicitly banned spoofing effective in July 2011, and yet Jordan continued to spoof up to October 2011, which would have provided more—not less—evidence of intent to defraud."  App. 37.  The record refutes this conclusory assertion.

As alleged in the indictment, Jordan worked at JPMorgan from March 2006 until December 2009; at Credit Suisse from March to August 2010; and at a non-bank day-trading firm called "First New York Securities, LLC" (referred to as "Company D") from June to October 2011.  *See* A104-05.  The indictment charged Jordan with wire fraud affecting a financial institution from January 2008 through October 2011, based on his trading at all three firms.  A140.  However, before trial, the district court granted a defense motion to exclude evidence of Jordan's trading at First New York on statute-of-limitations grounds.  A228-30.  The district court found that because First New York was not a "financial institution" within the meaning of 18 U.S.C. § 20, Jordan's trading there was time-barred.  *See* A229

29

("The wire-fraud charge impermissibly combines the within-limitations trades at financial institutions with the outside-limitations trades at a separate entity.").

In its Rule 33 order, the district court did not explain how the admission of Jordan's proffered post-2010 compliance and CME evidence would have "opened the door" to evidence that Jordan "continued to spoof up to October 2011," notwithstanding the statute-of-limitations problem with the First New York evidence and the court's extensive efforts to keep Dodd-Frank *out* of the trial. App. 37.[7] But even assuming *arguendo* that the district court would have admitted evidence of Jordan's trading at First New York as the "price" of allowing the post-2010 compliance evidence into evidence, the corresponding compliance evidence from First New York – which would surely have been admissible alongside the First New York trading records – would have wound up *bolstering* Jordan's defense, not harming it. This is because – just like JPMorgan and Credit Suisse – *First New York did not update its policies to prohibit spoofing until after Jordan was gone from the firm*.[8] Accordingly, even if the First New York trading had been

---

[7] In its *in limine* ruling excluding the First New York evidence, the district court noted that if Jordan were to argue at trial "that the CME rules and the compliance policies of JPMorgan or Credit Suisse (or both) did not ban spoofing," then the court might allow the government to establish that Jordan spoofed at First New York for the "non-propensity" purpose of establishing Jordan's intent to defraud. *See* A229. At trial, the defense took direct aim at the government's contention that the 2009 and 2010 compliance and CME materials put traders on notice that spoofing was prohibited. At no time, however, did the government or the district court ever suggest that the First New York trading should be received in evidence.

[8] The defense included two First New York compliance documents on its pretrial exhibit list: DX 38 and 39. *See* App. 61; A171. DX 38 was a copy of First New York's "Written

received in evidence, Jordan would have been able to argue persuasively that he was never informed, by anyone, in any context, at any point in time, that spoofing was a prohibited trading practice.

## II. THE DISTRICT COURT ERRED BY DENYING JORDAN'S MOTION TO ADMIT A RELEVANT, EXCULPATORY PORTION OF HIS ORAL STATEMENT TO THE FBI

### A. Background

At 6:14 a.m. on the morning of November 5, 2018 – when Jordan was unemployed and living with his parents – FBI agents knocked on his door as part of a spoofing investigation. A245; Tr. 488, 543-44 (A1390, 1437-38). Jordan got out of bed, came downstairs, and spent about an hour with the agents before leaving to attend an Alcoholics Anonymous meeting. Tr. 494-98, 546-47 (A1396-1400, 1440-41); *see also* A227. After the meeting, Jordan agreed to continue the interview at 3:00 p.m. at a local Starbucks, where he spent two more hours answering questions. A248-51; Tr. 502-03, 508-09 (A1403-04, 1409-10). During both sessions of the interview, FBI Agent Jonathan Luca asked questions, while another agent took notes and later prepared a typewritten interview report known as a "302." Tr. 491-93, 554 (A1393-95, 1447). During the interview, Jordan was

---

Supervisory Procedures" as of November 2010, and DX 39 was a presentation deck entitled "First New York 2011/2012 Annual Compliance Meeting." Neither document said a word about spoofing. *See* DX 38 (A578-841); DX 39 (A842-70).

conversational, polite, and "very candid."  Tr. 496, 547, 551-52 (A1398, 1441, 1444-45).

In the afternoon session, Luca showed Jordan a series of charts depicting Jordan's use of the four-step trading pattern at JPMorgan some nine years earlier. GX 83 (A1298-1315); FBI interview report (A248); Tr. 504-06, 514, 582-87 (A1405-07, 1415, 1461-66).  As reflected on pages four and five of the 302, after being shown these charts Jordan admitted spoofing and provided further explanation in response to Luca's questions:

> Jordan placed 'iceberged' orders on one side and placed a big order that was not 'iceberged' on another side which he intended to cancel. . . . When Jordan was learning how to trade with TT in 2009-2010, he did not know what was going on due to Algorithms placing what he believed to be fake orders.  Jordan could not outperform the Algorithms in the market.

> Jordan explained that when he placed an order with the market, he was taking a risk of the order being executed regardless of the intention behind the order.  Jordan took a risk to put those orders in the market out there and sometimes he got picked off by other traders. In addition, Jordan observed the behaviors of the algorithms that were allegedly placing and canceling orders in the market constantly. Therefore, Jordan had to place orders out in the market with the intent to cancel in order to outperform the algorithms all the time.  Jordan did not think what he was doing was wrong.  Jordan guaranteed that he had done this type of practice as described above to get his real order filled. . . . Jordan traded in the manner described above to get the best price for Eyles.  Spot traders like Jordan had to do what's best for their boss. . . . Jordan admitted to trading in the manner described above which was consistent with spoofing.  Jordan could not attest to the total amount of times he engaged in such activities.  Jordan, at times, spoofed to mislead the market, to outperform algorithms, and to

get the best fill for his boss on the precious metals and the foreign currency market.

A248-49.  Immediately before making these comments, Jordan stated that "when the precious metal market moved to electronic trading, no one knew anything and there was no tutorial.  Jordan stated JPMorgan never coached on the proper way to trade metals."  A248.  This is consistent with the absence of compliance policies or training materials regarding spoofing in 2009 and 2010.

Before trial, the defense moved, pursuant to Fed. R. Evid. 106, for leave to elicit the one-sentence portion of Jordan's statement to the FBI in which he said that he "did not think what he was doing was wrong."  A231-243.  The defense argued that this portion of the statement was highly relevant to Jordan's state of mind, that it satisfied this Court's four-part test under Rule 106, and that its exclusion would mislead the jury.  The district court denied the motion.  App. 9-12.[9]

At trial, the government took full advantage of the district court's ruling.  In its opening statement, the government stated several times that Jordan had "confessed" during the November 2018 interview.  Tr. 234, 242 (A1328, 1336).  On direct examination, under questioning from a prosecutor, Luca recounted a

---

[9] In the Rule 106 motion, the defense reserved the right to seek the admission of additional portions of Jordan's oral statements, depending on the contours of Luca's direct testimony at trial, A241, but the district court mooted the issue when it rejected the Rule 106 motion in its entirety.  Tr. 540-41 (A1434-35).

subset of Jordan's statements from the second part of the interview that did not

accurately reflect the totality of what Jordan had said:

> Q.     Did Mr. Jordan acknowledge that these were, in fact, trades that he
>        had entered?
>
> A.     He did.
>
> Q.     Okay.  And did Mr. Jordan acknowledge that he had placed trades that
>        he intended to cancel?
>
> A.     He did.
>
> Q.     What specifically did he say to you?
>
> A.     So he said that, you know, he had placed orders, small iceberg orders
>        on one side of the market and larger non-iceberg orders on the other
>        side of the market in which he intended to cancel.
>
> Q.     And so Mr. Jordan acknowledged that his trades followed this pattern,
>        this spoofing pattern?
>
> A.     He did.
>
> Q.     Okay.  And did Mr. Jordan explain why he placed orders that he
>        intended to cancel?
>
> A.     He did.
>
> Q.     And what did he say to you?
>
> A.     He said that he placed those orders in order to mislead the market, to
>        outperform the algorithms, and to make – and to get the best possible
>        fills for his boss, Ray Iyles [*sic*].

Tr. 506 (A1407).  Even though Jordan's denial of bad intent was tightly intertwined

in the same paragraph of the 302, the prosecutor did not elicit the fact that Jordan

34

said that he "did not think what he was doing was wrong."  Instead, the prosecutor

asked a leading question suggesting that Jordan had given a "confession."  Tr. 514

(A1415) (Q:  "And this is a set of charts that you were showing Mr. Jordan when

he confessed to misleading the market?"  A:  "That's correct.").  To further cement

this narrative, the prosecutor asked a wrap-up question that left the jury with the

misleading impression that Jordan had not provided any additional explanation

other than the statements summarized by Luca:

> Q.    What happened next?  Did you continue to speak to Mr. Jordan?
>
> A.    Yeah.  We spoke for at least another hour, hour and a half.  At that
> point, because I was confident that Mr. Jordan had admitted to the
> conduct to me, I had shifted the interview into a more cooperation
> mode setting.  And me and Mr. Jordan continued to talk more about
> things that he had witnessed while working on those trading desks
> with regard to other individuals and conduct that I was focused on in a
> larger investigation.

Tr. 508 (A1409).  In its closing argument, the government continued to hammer the

so-called "confession," arguing repeatedly that it was conclusive proof of Jordan's

guilt.  Tr. 1313-15, 1319-20, 1328, 1333-34, 1375, 1383 (A1874-76, 1880-81,

1889, 1894-95, 1936, 1944).

A. <u>Applicable Law</u>

Rule 106 provides:

> If a party introduces all or part of a writing or recorded statement, an
> adverse party may require the introduction, at that time, of any other
> part — or any other writing or recorded statement — that in fairness
> ought to be considered at the same time.

As explained in the advisory committee notes, the rule is intended to avoid "the misleading impression created by taking matters out of context." Fed. R. Evid. 106, advisory comm. note to 1972 Proposed Rule; *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171-72 (1988) ("when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rules 401 and 402."). Rule 106 applies to oral statements. *See, e.g.*, *Yarrington*, 640 F.3d at 780; *United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir. 1993).

Under longstanding precedent, "the test of admissibility under Rule 106 is conjunctive." *Glover*, 101 F.3d, at 1190; *see also Velasco*, 953 F.2d at 1474-75; *United States v. Walker*, 652 F.2d 708, 710 (7th Cir. 1981). First, the proponent must establish that the proffered additional statements are relevant to an issue in the case. *Velasco*, 953 F.2d at 1474-75. Second, if there is a showing of relevance, the district court must admit evidence if it "qualifies or explains the evidence offered by the opponent." *Id.* To determine this, the district court should consider four factors: "(1) whether the additional evidence explains the evidence already admitted; (2) whether it places the admitted evidence in its proper context; (3) whether its admission will serve to avoid misleading the trier of fact; and (4) whether its admission will 'insure a fair and impartial understanding of all of the

evidence.'"  *Glover*, 101 F.3d at 1190 (quoting *Velasco*, 953 F.2d at 1475); *see also Haddad*, 10 F.3d at 1259.

This Court has held that omitted evidence is relevant if it bears on an aspect of the defendant's mental state that is at issue in the case.  For example, in *Walker*, an early case applying Rule 106, this Court held that the excluded statements were relevant to establishing the defendant's purpose in visiting an alleged extortion victim.  652 F.2d at 711-12.  In *Haddad*, a felon-in-possession case, this Court held that the excluded portion of the defendant's statement was relevant to rebut the prosecution's theory that the defendant knew about a gun found in his apartment. 10 F.3d at 1259.  And in *United States v. Paladino*, 401 F.3d 471, 476 (7th Cir. 2005), this Court held that the omitted portions of the defendant's SEC testimony were relevant to rebutting his "guilty knowledge."  Consistent with these precedents, a commentator has observed that "courts will more likely find completeness required when the target of the truncated evidence is the criminal defendant's motive or intent."  21A Wright & Miller, Fed. Prac. & Proc. Evid. § 5077.2 (2d ed. Apr. 2023 update).

In applying Rule 106, this Court has held that omitted statements should be allowed when they are temporally and contextually interconnected with the included statements, such that exclusion would result in a misleading and unfair portrayal.  *See Paladino*, 401 F.3d at 476-77; *Haddad*, 10 F.3d at 1258-59; *Walker*,

652 F.2d at 711-13.  In *United States* v. *LeFevour*, 798 F.2d 977, 981 (7th Cir.

1986), this Court used a scriptural analogy to make the point:

> An example would be accusing the Biblical David of blasphemy for
> saying, 'There is no God,' his full statement being, "The fool hath said
> in his heart, there is no God.'"

Another example is a homicide case where the defendant stabbed the victim and

the prosecution offered his "statement that he was 'sorry' and did not know what

became of the knife used in the assault without the part where he said the victim

pulled a knife on him during a fight."  *See* Wright & Miller § 5077.2 (describing

*State v. Warren*, 732 A.2d 1017 (N.H. 1999)).

    In applying Rule 106 in criminal cases, this Court has noted the difficulty

that a defendant will face if he is forced to confront "the dilemma of allowing the

jury to hear an incomplete picture of the evidence, or of waiving his Fifth

Amendment privilege not to testify in order to correct the mistaken impression

created by the incomplete evidence."  *Glover*, 101 F.3d at 1192 (citing *Walker*, 652

F.2d at 713); *see also United States v. Sutton*, 801 F.2d 1346, 1370 (D.C. Cir.

1986).  For this reason, when applying Rule 106, district courts "should be

sensitive to the defendant's right to present evidence on his own behalf, as well as

his right not to testify."  *Glover*, 101 F.3d at 1192.

    Rule 106 does not create an exception to the rule against hearsay.  *See, e.g.*,

*United States v. Faruki*, 803 F.3d 847, 856 (7th Cir. 2015).  But otherwise

inadmissible hearsay may be offered under Rule 106 if it is necessary to clarify or explain the admitted portion of a statement. *LeFevour*, 798 F.2d at 981; *see also Sutton*, 801 F.2d at 1368-69.

    B. <u>Discussion</u>

        i. <u>The District Court Abused its Discretion by Excluding the Omitted Portion of Jordan's Statement to the FBI</u>

In light of these authorities, the omitted portion of Jordan's verbal statement to the FBI plainly should have been admitted. Jordan's assertion that he "did not think what he was doing was wrong" went directly to his state of mind, which was the central contested issue of the trial, and it easily satisfied all four prongs of this Court's test. *See Glover*, 101 F.3d at 1190; *Haddad*, 10 F.3d at 1259. In excluding the evidence, the district court committed a significant error and gave the government license to misrepresent the substance of Jordan's interview, thus subverting the truth-seeking function of the trial. The effect was much the same as the manslaughter defendant in New Hampshire who admitted stabbing the victim but explained, in the next breath, that the victim had pulled a knife on him. *See Warren*, 732 A.2d 1017. In both cases, the prosecutor excised an inseparable, exculpatory portion of the defendant's statement and thereby transformed it, as if by magic, from a statement of innocence into an admission of guilt. Rule 106 is supposed to guard against this type of unfairness.

In its order denying Jordan's Rule 106 motion, the district court reasoned as follows:

> Nothing about Jordan saying that he did not think he was doing anything 'wrong' *factually* clarifies the to-be-introduced statement that he placed orders with an intent to cancel them. Whether or not Jordan thought he was doing something 'wrong' does not clarify any misleading impression arising out of the statement that he placed orders with an intent to cancel.

App. 10. This was wrong. Jordan's denial of bad intent provided essential "factual clarification" of the single most important issue in the case: whether he possessed *mens rea*. Jordan was *not* charged with spoofing, and because the defense conceded that Jordan spoofed, the question for the jury was *not* whether he placed orders with the unconditional intent to cancel. The key questions, rather, were: (1) whether Jordan knowingly made false statements to other market participants; and (2) whether he acted with the criminal intent to defraud. By excluding Jordan's statement that he "did not think what he was doing wrong," the district court allowed the government to mislead the jury on these pivotal questions, to Jordan's detriment.

In the Rule 106 order, the district court cited the need to stamp out any potential mistake of law defense:

> Jordan's proposed statement itself is ambiguous. . . . Here, to tell the jury that Jordan did not think what he was doing was 'wrong' would invite the jury to speculate about what he meant: not 'wrong' as in legal? Or not 'wrong' as in a permitted business trading response in

the battle against algorithms?  Or not 'wrong' as in not a fraudulent representation?

App. 11.  In its subsequent Rule 33 order, the district court doubled down on this proposition:  "The proposed statement was a purported mistake of law by Jordan— that he did not believe his spoof orders or trading patterns were 'wrong.'  But mistake of law is not a valid defense to wire fraud and allowing the proffered statement would risk confusing the jury into thinking that it is."  App. 39.  These determinations are not supported by the record.

During Jordan's multi-hour interview by the FBI, there was no discussion whatsoever of laws or legal issues.  Nobody present at the FBI interview was a lawyer; there is not a single reference to law or to the Dodd-Frank Act in the entire seven-page 302 report; and, as noted above, the defense disclaimed any intention to argue mistake of law and did not do so at trial.  As is clear from the 302, Jordan's statement that he "did not think what he was doing was wrong" referred to the *business practice* of spoofing in an environment where algorithms had recently transformed the marketplace, Jordan was trying to get his orders filled to achieve good execution, and JPMorgan had not provided guidance or training to the effect that spoofing was a prohibited trading practice.  This is the purpose for which the defense sought to offer the omitted statement, not mistake of law.

As with the compliance and CME evidence, any residual risk of jury confusion could have been addressed with a cautionary instruction.  The district

41

court's overzealous reaction of excluding the evidence was error. *See Glover*, 101

F.3d at 1190; *LeFevour*, 798 F.2d at 981; *Paladino*, 401 F.3d at 476.

ii.  <u>The District Court's Error was Not Harmless</u>

The Rule 106 error was not harmless, especially when considered together

with the exclusion of the defense's compliance and CME evidence. *Nelson*, 810

F.3d at 1075; *see also Chaparro*, 956 F.3d at 482.  At trial, the so-called

"confession" was the centerpiece of the government's case.  In its main

summation, the government made the following argument:

> Moving on to the first, the confession.  The defendant's own statement
> - you've heard the defendant's own statements in the form of a
> confession.  This is direct evidence of the defendant's intent.  And I'm
> not going to go through these slides again and review the testimony a
> second time, but specifically, the defendant confessed to using the
> four-step strategy to mislead the market, to trick others, and to make
> money for his boss.  That is the confession.

Tr. 1319-20 (A1880-81).  *See also* Tr. 1313 (A1874) ("And remember the details of

that confession that you heard from Special Agent Luca.  Mr. Jordan was a willing

participant."); Tr. 1315 (A1876) ("This is direct evidence, members of the jury.

These are statements from the defendant about the defendant's state of mind when

he engaged in the four-step strategy and the purpose behind the four-step strategy

which was to deceive and to cheat others in the market."); Tr. 1334 (A1895) ("The

evidence that Mr. Jordan made a material misrepresentation is proven beyond a

reasonable doubt by again his confession[.]").  In its rebuttal summation, the

government went even further, arguing that the "confession," standing alone, established Jordan's guilt:

> [I]f you believe Agent Luca, this case, it's over. He told you that when confronted -- when confronting the defendant with specific examples of his trading, the defendant confessed. He admitted that he engaged in this four-step pattern to deceive the market. He told him that he spoofed to mislead the market. That's the case. He engaged in a spoofing scheme to mislead the market to make money for himself and the bank. That's fraud.

Tr. 1383 (A1944). In total, the government described Jordan's interview with Luca as a "confession" or stated that he "confessed" no fewer than 21 times in its jury addresses. Tr. 234, 242, 245, 1313-15, 1319-20, 1326, 1328, 1333-34, 1383 (A1328, 1336, 1339, 1874-76, 1880-81, 1887, 1889, 1894-95, 1944).

Had the district court allowed the proposed cross-examination of Luca, the government's arguments about the "confession" would have been, at a minimum, rendered "significantly less persuasive in the minds of the average juror." *Chaparro*, 956 F.3d at 482. [10] But with the benefit of the district court's Rule 106

---

[10] Based on Jordan's statement that he "did not think what he was doing was wrong," the defense would have powerfully argued that Jordan acted with an innocent state of mind. This argument would have been corroborated by evidence that: (a) in 2009 and 2010, markets were in a state of transition and algorithms presented novel execution problems for manual traders such as Jordan; (b) in 2009 and 2010, banks and the CME had not yet identified spoofing as a prohibited trading practice; (c) all of Jordan's spoof orders were fully at risk, and they were executed at a much higher rate than the market-wide average for similarly-sized orders; (d) Jordan was transparent about his spoofing in contemporaneous communications with his supervisor and another trader at a different firm; and (e) trading is a competitive activity in which traders are permitted to conceal their true objectives. On this latter point, CME witness John Scheerer testified that placing an iceberg order was "a way for a trader to try to disguise what he or she is doing to get the best execution." Tr. 361 (A1371); *see also* Tr. 364-67 (A1374-77) (stop loss orders and fill-or-kill orders did not convey a trader's true intention to others in the market).

ruling, the government was able to make its arguments without fear that the defense would puncture the narrative.

The harm is clear in comparison to the separate trial of Jordan's co-defendants. In that case, in its opening statement the government argued that Smith and Nowak should be found guilty because, when they were asked about their alleged spoofing, they denied that they had spoofed as opposed to admitting their conduct and denying that they knew it was wrongful:

> You're going to see in defendants' own words that when Mr. Smith was asked about this type of manipulative trading, he and Mr. Nowak, when asked, they didn't say, "*I didn't think I was doing anything wrong*," or, "*I thought this was okay type of trading*," they instead said they always knew that this type of trading wasn't allowed.
>
> And when you see those statements, I want you to ask yourself, if they thought this type of trading was allowed, why didn't they just say that? They did because they knew it was wrong, and they did it anyways.

*U.S. v. Smith* Tr. 406-07 (A1321-22) (emphasis added). At Jordan's trial, the district court's erroneous Rule 106 ruling prevented the defense from advancing the same argument that the government presented in the trial of the co-defendants.

## III. THE DISTRICT COURT ERRED BY DENYING JORDAN'S REQUEST FOR A GOOD-FAITH INSTRUCTION

The requested good-faith instruction read as follows:

> If the defendant acted in good faith, then he lacked the intent to defraud required to prove the offense of wire fraud affecting a financial institution. A defendant acted in good faith if, at the time he took the actions that the government has charged as being fraudulent, he honestly believed those actions did not involve a materially false or

44

fraudulent pretense, representation, or promise.  A defendant does not have to prove his good faith.  Rather, the government must prove beyond a reasonable doubt that the defendant acted with intent to defraud.

A212.  This language was drawn directly from the Seventh Circuit's Pattern Jury Instructions, *see* William J. Bauer Pattern Crim. Jury Instrs. 6.10 (7th Cir. 2020), and it was consistent with the good-faith instruction that was given in three other spoofing trials, including two in this Circuit.  *See Bases*, 18-cr-48 (N.D. Ill. Aug. 2, 2021), ECF No. 623 at 28; *Coscia*, 14-cr-551 (N.D. Ill. Nov. 3, 2015), ECF No. 85 at 24; and *Flotron*, 17-cr-220 (D. Conn. Apr. 24, 2018), ECF No. 234 at 1318-19. The requested instruction reflected the defense's theory of the case and was well-supported by the evidence at trial.

Because Jordan did not contest that he spoofed, the central issue at trial was whether he possessed the intent to defraud, and *not* – as has been the case in other spoofing trials – whether he had the unconditional intent to cancel his orders before execution.  The evidentiary predicate that Jordan acted in good faith included evidence that:  (1) applicable bank compliance policies and exchange rules did not place Jordan on notice that spoofing was a prohibited trading practice, *see* Tr. 706-07, 795-96 (A1548-49, 1637-38); (2) the CME permitted traders to place orders that did not convey their true intention, including iceberg orders, stop loss orders, and fill-or-kill orders, *see* Tr. 357-67 (A1367-77); (3) Jordan's large orders were at risk of execution, and were in fact executed at a rate higher than the market

45

average for similarly-sized orders, *see* DX 95 (A910-42); DX 97 (A943-54); Tr.
319, 597-99, 605, 1113-14, 1206-16 (A1361, 1468-70, 1473, 1845-46, 1858-68);
(4) Jordan was transparent to his supervisor at JPMorgan and to third parties about
his spoofing, *see* GX 5 (A955-58); GX 6 (A959-64); GX 7 (A965-71); GX 8
(A972-74); Tr. 676, 682, 685-86 (A1530, 1533, 1536-37); (5) Jordan proactively
reached out to compliance when he violated policies that he *had* been informed
about, *see* DX 66 (A884); DX 67 (A885); DX 70 (A886); DX 71 (A887); DX 72
(A888); Tr. 901-12 (A1733-44); and (6) Jordan readily admitted spoofing when
asked about it by the FBI in November 2018, *see* Tr. 506, 551-52, 556-57 (A1407,
1444-45, 1449-50).  Taken as a whole, this body of evidence was more than
sufficient to support a good-faith instruction.

But despite the ample legal and evidentiary support, the district court denied
Jordan's request for a good-faith instruction.  App. 16.  The district court stated that
there was no "upside" to giving the instruction because "[t]he definition of intent to
defraud allows Jordan to make exactly the same argument that he advances,
namely, he honestly believed that he was not making false representations by
placing the alleged large-side orders."  *Id.*  Instead, the district court pointed to a
"downside" to the good-faith instruction, expressing concern that the instruction
"poses the risk of misleading jurors into thinking that a defense along the lines of
'mistake of law' is viable, when it is not."  *Id.* (emphasis omitted).  Later, in

denying Jordan's motion for a new trial, the district court reiterated that the good-faith instruction was "unnecessary and posed a substantial risk of jury confusion" as to whether "a mistake-of-law defense (or a defense akin to it) was viable." *See* App. 42. The district court reached this conclusion despite recognizing the centrality of Jordan's good-faith defense, noting that "one of the defense's main arguments (and subject of testimony) at trial was that Jordan believed his spoofing was allowed during the relevant time period." *See* App. 39 n.4.

The district court determined that the good-faith instruction was "unnecessary to advance the defense of good faith" because Jordan could still argue "the *absence* of an intent to defraud." App. 16. But arguing the absence of intent is not the same as providing the jury an instruction that reflects the defense's theory, as required by the law of this Circuit. *United States v. Cruse*, 805 F.3d 795, 814 (7th Cir. 2015) (a defendant is entitled to a theory-of-defense instruction if: "(1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial") (internal citations omitted); *see also United States v. Irorere*, 228 F.3d 816, 825-26 (7th Cir. 2000) ("[T]here are circumstances where a pattern instruction will be insufficient and where a criminal defendant is entitled to an explicit instruction encapsulating his theory of

defense."). This Circuit's pattern jury instructions recognize the importance of the good-faith instruction in cases such as this one, noting in the comments that the good-faith instruction "*should be used* in cases in which the government must prove some form of 'specific intent,' such as the intent to defraud." *See* William J. Bauer Pattern Crim. Jury Instrs. 6.10, comm. comment (7th Cir. 2020) (emphasis added). This Court has likewise been clear that if there is sufficient evidence to support a defendant's instruction, even if the district court is skeptical, it is better to give the proposed instruction and "let the jury sort it out." *United States v. Meyer*, 157 F.3d 1067, 1076 (7th Cir. 1998).

Although this Court affirmed the denial of the good-faith instruction in *Chanu*, 40 F.4th at 543, the Court made clear that its "opinion should not be read to preclude the inclusion of such an instruction in a future case." *Id.* Good faith was far less central in *Chanu* than in this case. The *Chanu* defendants continued to spoof long after banks and the CME had adopted policies and rules against spoofing, *see id*. at 536 (superseding indictment alleged that the defendants conspired to spoof from 2008 to 2013), and at trial they did not challenge the testimony from the government's compliance and CME witnesses that earlier-in-time policies and exchange rules were understood to prohibit spoofing. *See id*. at 533. Here, by contrast, a core pillar of Jordan's defense was to rebut the testimony of the government's compliance and CME witnesses about the pre-2011 policies

48

and rules.

Notably, the district court in another recent spoofing case, *United States v. Bases*, included a good-faith instruction on similar facts.  In *Bases*, the government objected to the good-faith instruction, but the district court disagreed:

> But if that's the case, then one would never offer a 'good faith' instruction, right?  And I know that's the government's position, that I should never offer a 'good faith' instruction.  But I think that to the extent there's going to be evidence about good faith, and I think the defendants at least intend to present evidence about good faith . . . I think in light of the evidence that I think will come in at trial and will be presented at trial, I think the jury needs – it would be helpful for the jury to know what to do with such evidence.

*Bases*, ECF No. 604 at 19-20; *see also Bases*, ECF No. 642 at 1992-93 ("I'm going to stand firm to the extent that the issue of intent is a central issue in this case. I think that the 'good faith' instruction provides a jury with some much-needed guidance.").

At this point, after five spoofing trials in the Northern District of Illinois, in which two judges provided the good-faith instruction and two did not, the state of the law is at best unclear as to whether a defendant in a fraud case can reasonably expect the district court to provide the good-faith instruction.  At a minimum, affirmance here will leave the district courts in this Circuit with no principled guidance on when a good-faith instruction should be given in connection with a specific intent crime.  The district courts are left free to engage in seemingly arbitrary decision-making, and to effectively bypass the mandate that a defendant

is entitled to have an instruction on his theory of the defense so long as it is supported by law and has foundation in the evidence.

We respectfully submit that if an evidentiary predicate exists, the default should be that the good-faith instruction is to be given; under a contrary approach, the good-faith instruction would be read out of existence. This would run contrary to a series of precedents in which the Supreme Court has repudiated efforts by prosecutors to criminalize unsavory behavior that stretches beyond the elements of federal wire fraud. *See Ciminelli v. United States*, 598 U.S. 306 (2023); *Kelly v. United States*, 140 S. Ct. 1565 (2020); *Skilling v. United States*, 561 U.S. 358 (2010); *Cleveland v. United States*, 531 U.S. 12 (2000); and *McNally v. United States*, 483 U.S. 350 (1987). Affirming the denial of the good-faith instruction in this case – where the language of the instruction was orthodox and the evidentiary predicate was fulsome – would be to swim against this tide.

As jury deliberations unfolded, the need for the good-faith instruction became painfully clear. After almost two days of deliberations, the jury sent the following note: "Your Honor, we need a clarification of 'is aware of the nature of his conduct.'" Tr. 1394 (A1951). The note included a citation to page 19 of the jury instructions, which in turn contained a standard definition of "knowingly":

> A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the

defendant did or said.

*See* Tr. 1394-95 (A1951-52); A271.  Over a defense objection, A287-89; Tr. 1395-96, 1399-1400 (A1952-53, 1956-57), the district court provided the following supplemental instruction:  "In response to your question, I will clarify that the definition of 'knowingly' on page 19 of the jury instructions does not mean that the defendant must be aware of whether his alleged conduct violated federal law." App. 19.

In its order explaining the basis for the supplemental instruction, the district court expressed the view that the phrase "is aware of the *nature* of his conduct," which is contained in the definition of "knowingly," "is capable of broad interpretations that require the government to prove more than the what the mental state of 'knowingly' actually requires," and that in this case, it "could be interpreted to mean whether the Defendant knew that the conduct was unlawful." App. 17.  Based on the "extensive examination" on whether Jordan violated a compliance policy or Rule 432, the district court posited that it was "not a far step at all" to ask whether Jordan had to know that his trading violated the law.  *Id.*

The district court's supplemental instruction transformed the "specter" of mistake of law into reality, and in doing so it caused significant prejudice to Jordan.  The district court had strained throughout the trial to keep the defense from introducing any evidence, or making any argument, that the district court

believed implicated a possible mistake of law defense.  It is hard to imagine what could confuse the jury more than a last-minute supplemental instruction raising (for the first time) that very (supposedly) forbidden issue.  Worse, the supplemental instruction raised the mistake of law issue without any context or further explanation.  Because the jury had been denied any guidance on the meaning of good faith, *see* App. 16, there is a substantial risk that after receiving the supplemental instruction, they could have mistakenly concluded that Jordan's good-faith evidence was irrelevant.  While the good-faith evidence bore on whether Jordan acted with the intent to defraud, the jury could have interpreted the supplemental instruction as guidance from the court that the evidence was offered to show a belief that the trading was legal, which – as the supplemental instruction made clear – would not be a defense.  Had the district court incorporated a good-faith instruction in its jury charge, the risk of such prejudice would have been greatly reduced.

## IV.  THERE WAS INSUFFICIENT EVIDENCE THAT JORDAN KNOWINGLY PARTICIPATED IN A SCHEME TO DEFRAUD

Jordan joins in Point II of Nowak's brief, which argues that the evidence at Nowak's trial did not establish an actionable scheme to defraud because there was insufficient evidence that Nowak made any misrepresentation about an essential element of the bargain with his trading counterparties.  *See* Nowak Br. 22-23, 40-54.  Jordan preserved this argument by presenting a similar argument in his Rule

29 motion, based on the evidence that was presented in his trial, *see* ECF No. 835

at 2-5, and the district court addressed the argument on the merits, see App. 21-27.

## CONCLUSION

For the foregoing reasons, this Court should vacate the judgment of

conviction and remand for a new trial.

Dated:  January 5, 2024

Respectfully submitted,

*/s/ James J. Benjamin, Jr.*

| | |
|---|---|
| Megan Cunniff Church | James J. Benjamin, Jr. |
| MOLOLAMKEN LLP | Parvin D. Moyne |
| 300 North LaSalle Street | Anne M. Evans |
| Chicago, IL 60654 | AKIN GUMP STRAUSS HAUER |
| (312) 450-6716 | & FELD LLP |
| | One Bryant Park |
| | New York, NY 10036 |
| | (212) 872-1000 |
| | jbenjamin@akingump.com |

*Counsel for Appellant Christopher Jordan*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B)(i) and Local R. 32(c) because this brief contains 13,157 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

365 in Times New Roman 14-point font.


*/s/ James J. Benjamin, Jr.*
James J. Benjamin, Jr.

## CIRCUIT RULE 30(D) STATEMENT

I hereby certify, pursuant to Circuit Rule 30(d), that all materials required by Circuit Rule 30(a) and (b) are included in this Appendix or the separate Circuit Rule 30(b) Appendix.

*/s/ James J. Benjamin, Jr.*
James J. Benjamin, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2024, I electronically filed the foregoing brief together with the Circuit Rule 30(a) Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  All participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


*/s/ James J. Benjamin, Jr.*
James J. Benjamin, Jr.

# CIRCUIT RULE 30(A) APPENDIX

# CIRCUIT RULE 30(a) APPENDIX

## TABLE OF CONTENTS

**JUDGMENT**

Judgment (Christopher Jordan), dated September 19, 2023 (ECF No. 935)....App. 1

**ORDERS**

Order on Jordan Rule 106 Motion, dated November 28, 2022 (ECF No. 787)....................................................................................App. 9

Order Summarizing Pretrial Conference Defense Exhibit Decisions (excerpted), dated November 29, 2022 (ECF No. 793)......................................................App. 13

Order on Revised Jury Instructions, dated December 5, 2022 (ECF No. 802)....................................................................................App. 15

Order on Jury Question, dated December 8, 2022 (ECF No. 815)................App. 17

Order Denying Jordan Post-Trial Motions, dated September 14, 2023 (ECF No. 931)....................................................................App. 20

**ORAL RULING**

Excerpts of Transcript of Pretrial Conference on October 26, 2022 (filed October 27, 2022) (ECF No. 749) ...............................................................App. 48

# UNITED STATES DISTRICT COURT
## Northern District of Illinois

|  |  |  |  |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** | |
| **v.** | ) | | |
| | ) | | |
| CHRISTOPHER JORDAN | ) | Case Number: | 1:19-CR-00669(4) |
| | ) | USM Number: | 72870-050 |
| | ) | | |
| | ) | | |
| | ) | Anne M. Evans | |
| | ) | Defendant's Attorney | |

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)        which was accepted by the court.

☒ was found guilty on Count 23 of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18 U.S.C. §1343    Wire Fraud Affecting a Financial Institution | 10/01/2011 | 23ss |

The defendant is sentenced as provided in pages 1 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ All remainng Counts dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

September 15, 2023
Date of Imposition of Judgment

*Edmond E. Chang*
Signature of Judge

Edmond E. Chang, United States District Judge

Name and Title of Judge

September 19, 2023
Date

**App. 001**

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment                                                                                    Judgment – Page 2 of 8

DEFENDANT:  CHRISTOPHER JORDAN
CASE NUMBER:  1:19-CR-00669(4)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Six (6) months as to Count 23 of the second superseding indictment.

☒     The court makes the following recommendations to the Bureau of Prisons: That the defendant be committed to the BOP facility in

Otisville, NY.

☐     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

    ☐     at         on

    ☐     as notified by the United States Marshal.

☒     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☒     before 2:00 pm on 1/9/2024.

    ☐     as notified by the United States Marshal.

    ☐     as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this
judgment.

                                    _____

                                    UNITED STATES MARSHAL

                                By  _____

                                      DEPUTY UNITED STATES MARSHAL

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                                                                   Judgment – Page 3 of 8

DEFENDANT: CHRISTOPHER JORDAN
CASE NUMBER: 1:19-CR-00669(4)

### MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
Eighteen (18) months.

      The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall not commit another Federal, State, or local crime.

☒ (2) you shall not unlawfully possess a controlled substance.

☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b).**]

☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act **(42 U.S.C. § 16913).**

☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

☒ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

### DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in § 3553(a)(1) and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a.**
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall provide financial support to any dependents if you are financially able to do so.

☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)).**

☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555,** as follows: [ ]

☒ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s)) [ ].

☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in felony criminal activity and shall not:
    ☐ visit the following type of places: [ ].
    ☐ knowingly meet or communicate with the following persons:

☒ (7) you shall refrain from ☒ any or ☐ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08; or ☐ [ ]), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.

☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.

☒ (9) ☒ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
    ☒ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
    ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify: [ ].)

**App. 003**

DEFENDANT:  CHRISTOPHER JORDAN
CASE NUMBER: 1:19-CR-00669(4)

☐ (10)   (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling _____ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period _____ .

☐ (11)   (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of _____ months.

☐ (12)   you shall work in community service for _____ hours as directed by a probation officer.

☐ (13)   you shall reside in the following place or area: _____ , or refrain from residing in a specified place or area: _____ .

☒ (14)   you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. As an exception, you may travel without advance approval to New Jersey, New York, Illinois, and Rhode Island. For those states, you must merely notify the probation office 24 hours in advance of travel. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15)   you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment.  You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16)   ☒   you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified:           ,
       ☒ at home    ☐ at work    ☐ at school    ☐ at a community service location
       ☒ other reasonable location specified by a probation officer. The Probation Office may propose, among other places, a workplace visit. But if the Defendant objects to a proposed location, then the Defendant may file, within seven (7) days of being notified of the location, a written objection with the Court.
       ☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17)   you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18)   you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
    ☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances and other activities specifically approved by the court.
    ☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
    ☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
    ☐ from the times directed by the probation officer; or ☐ from __ to __.
    ☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
    ☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20)   you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21)   (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations.  If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22)   you shall satisfy such other special conditions as ordered below.

☐ (23)   You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release.  You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 935 Filed: 09/19/23 Page 5 of 8 PageID #:21926
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                     Judgment – Page 5 of 8

DEFENDANT: CHRISTOPHER JORDAN
CASE NUMBER: 1:19-CR-00669(4)

pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24)   Other:

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

☐ (1)   if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2)   you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☐ (3)   you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed  hours.

☐ (4)   you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☐ (5)   you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☐ (6)   you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☐ (7)   within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☐ (8)   you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9)   you shall participate in a sex offender treatment program. The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

  ☐   You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

  ☐   The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

  ☐   You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

  ☐   You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

  ☐   You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2)**, regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

  ☐   You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

  ☐   This condition does not apply to your family members:          [Names]

  ☐   Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer. Prior to accepting any form of employment, you shall seek the

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                                                     Judgment – Page 6 of 8

DEFENDANT:  CHRISTOPHER JORDAN
CASE NUMBER:  1:19-CR-00669(4)

approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

☐    You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐    You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☐  (10)    you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒  (11)    you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐  (12)    you shall pay to the Clerk of the Court $_____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☐  (13)    if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐  (14)    You shall observe one Reentry Court session, as instructed by your probation officer.

☐  (15)    Other: _____

**App. 006**

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 935 Filed: 09/19/23 Page 7 of 8 PageID #:21928
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties                                                                    Judgment – Page 7 of 8

DEFENDANT:  CHRISTOPHER JORDAN
CASE NUMBER:  1:19-CR-00669(4)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $100.00 | $.00 | $.00 | $.00 | $.00 |

☐    The determination of restitution is deferred until          . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

      If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐    Restitution amount ordered pursuant to plea agreement $

☐    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**.  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐    The court determined that the defendant does not have the ability to pay interest and it is ordered that:

      ☐          the interest requirement is waived for the          .

      ☐          the interest requirement for the          is modified as follows:

☐    The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**App. 007**

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                   Judgment – Page 8 of 8

DEFENDANT:  CHRISTOPHER JORDAN
CASE NUMBER:  1:19-CR-00669(4)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒   Lump sum payment of $100.00 due immediately.

        ☐   balance due not later than            , or

        ☐   balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐   Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐   Payment in equal        (*e.g. weekly, monthly, quarterly*) installments of $        over a period of        (*e.g., months or years*), to commence        (*e.g., 30 or 60 days*) after the date of this judgment; or

**D** ☐   Payment in equal        (*e.g. weekly, monthly, quarterly*) installments of $        over a period of        (*e.g., months or years*), to commence        (*e.g., 30 or 60 days*) after release from imprisonment to a term of supervision; or

**E** ☐   Payment during the term of supervised release will commence within        (*e.g., 30 or 60 days*) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
|---|---|---|---|

\*\*See above for Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.\*\*

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**App. 008**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 1:19-CR-00669-4 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHRISTOPHER JORDAN. | ) | |
| | ) | |

ORDER

After the pretrial conference, Defendant Christopher Jordan filed a motion to
introduce a statement that he made to FBI agents during the second part of his No-
vember 5, 2018, interview with the agents. R. 754, Def.'s Br. at 1. In particular, the
government expects to introduce that, during the interview, Jordan said (among other
things) that "Jordan had to place orders out in the market with the intent to cancel
in order to outperform algorithms all the time." *Id.* at 3. Jordan wants to introduce,
contemporaneous with the agent's testimony about the interview, that Jordan next
said, "Jordan did not think what he was doing was wrong." *Id.* Jordan relies on Fed-
eral Rule of Evidence 106, often referred to as the "rule of completeness," to contend
that the proposed additional statement must be admitted along with the rest of the
agent's testimony. *Id.* at 4–10. Rule 106 requires the contemporaneous introduction
of a statement "that in fairness ought to be considered at the same time" as another
part of the statement. Fed. R. Evid. 106. For the reasons explained in this Order,
Jordan's offered statement does not satisfy the rule, so the motion is denied.

As a threshold matter, the government argues that Jordan is just re-arguing
to introduce a statement that he already unsuccessfully sought to admit during the
much-earlier briefing on the *Bruton* issues. R 760, U.S. Resp. at 3. That is technically
true. But the defense now puts a different spin on the argument, divorced from the
*Bruton* issues, so there is no fair reason to apply forfeiture now, even if ideally the
argument would have been presented earlier.

This time around, in relying on Evidence Rule 106, Jordan primarily cites to
*United States v. Paladino*, 401 F.3d 471, 476 (7th Cir. 2005), to argue that "omitted
evidence is relevant if it bears on an aspect of the defendant's mental state that is at
issue in the case." Def.'s Br. at 4. Of course that proposition might very well satisfy

**App. 009**

Rule 106 in the abstract. But the statements at issue in *Paladino* (and the other cited cases) are quite different from what Jordan offers here.

There, the omitted statements outright altered the meaning of the introduced statements to the point of misleading the jury. First, the defendant (Paladino) denied having prior knowledge that certain funds were investor-supplied funds rather than trade proceeds. 401 F.3d at 476. At a deposition, Paladino testified that "I learned that this money that's been coming in was investment money, and I was totally surprised because I assumed this whole time that this was trade money." *Id.* Despite the expression of surprise and the affirmative declaration that Paladino had assumed that the funds were trade money, the trial court allowed the government to clip the deposition testimony as only "I learned that this money that's been coming in was investment money." *Id.* As the Seventh Circuit explained, the clipped statement misleadingly suggested that Paladino had previous knowledge of the fraud—*when* Paladino learned about the origin of the money was crucial, yet that timing aspect of the deposition answer was clipped away. *Id.*

The second clipped statement in *Paladino* also altered the meaning of deposition testimony. The government tried to prove that Paladino had seen a "secured investor program agreement" *during* the time frame of the fraud scheme. 401 F.3d at 476. During the deposition, Paladino acknowledged that the agreement "looks familiar," but he added "that he hadn't seen it until after the scheme had ended and the SEC had filed suit." *Id.* The trial court allowed the government to introduce only the "looks familiar" part of the testimony, again suggesting—in a misleading way—that Paladino was conceding that he knew about the document during the scheme. *Id.* Quite naturally, the Seventh Circuit concluded that the omissions cast the introduced statements in a *factually* misleading light, thus posing the Rule 106 problem. *Id.* at 476–77.

No similar problem applies to omitting Jordan's proposed statement. Jordan tries to draw an analogy to *Paladino* by contending that Jordan's statement—that he did not think he was doing anything "wrong"—corrects a misimpression. Def.'s Br. at 5–6. But the omitted statements in *Paladino* provided *factual* clarification on the timing of when the defendant there learned about the source of the funds and about the agreement. Nothing about Jordan saying that he did not think he was doing anything "wrong" *factually* clarifies the to-be-introduced statement that he placed orders with an intent to cancel them. Whether or not Jordan thought he was doing something "wrong" does not clarify any misleading impression arising out of the statement that he placed orders with an intent to cancel. Remember that mistake of

2

law is *not* a defense to a wire-fraud charge, and willfulness is not an element of that crime. Of course, the government still must convince the jury that an (unconditional) intent to cancel amounts to an intent to defraud, but none of this bears on whether Jordan gets to introduce the omitted statement under Rule 106.

One more point is worth making: unlike the omitted statements in *Paladino*, Jordan's proposed statement itself is ambiguous. In *Paladino*, the defendant's omitted deposition answers would have unambiguously informed the jury about the timing of when he learned the crucial facts. Here, to tell the jury that Jordan did not think what he was doing was "wrong" would invite the jury to speculate about what he meant: not "wrong" as in legal? Or not "wrong" as in a permitted business trading response in the battle against algorithms? Or not "wrong" as in not a fraudulent representation? This is not to say that Rule 106 requires perfect clarity from the omitted statement, but it does require that the statement help correct a potential misimpression, not inject more confusion.

What remains without Rule 106's support, then, is that Jordan is seeking to introduce a hearsay statement—a *backward*-looking statement about his state of mind (not his present state of mind at the time of the FBI interview) to prove the truth of the assertion. The motion must be denied.

The Court hastens to add two caveats: first, the government cannot argue—or even imply—that Jordan failed to deny during the FBI interview that he did not know what he was doing was "wrong." And if Jordan introduces other admissible evidence that he did not know what he was doing was wrong, again the government cannot imply that he failed to present that assertion during the FBI interview. Arguments or hints along those lines will open the door for Jordan to elicit that he did in fact tell the FBI he did not think he was doing anything wrong.

Second, if Jordan elects to testify and he testifies that he did not think he was doing anything wrong, then almost surely he will be able to introduce the otherwise omitted statement as a prior consistent statement under Rule 801(d)(1)(B)(i) or (ii). It is difficult to imagine a scenario in which the government's cross-examination of Jordan would not trigger the conditions for admission under either (i) or (ii) of that subsection. *See* Fed. R. Evid. 801(d)(1)(B)(i) (recent fabrication), (ii) (to rehabilitate

3

**App. 011**

credibility when attacked on another ground). Setting aside those two caveats, the motion is denied.

ENTERED:


        s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 28, 2022

4

**App. 012**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:19-CR-00669-4 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| CHRISTOPHER JORDAN | ) | |

ORDER

This Order contains the exhibits chart with the decisions made at the October 26, 2022 pretrial conference on the objected-to defense exhibits and provides a more detailed discussion on a few sets of exhibits.

**Exhibit Nos. 21, 22, 24, 33, 34, 37–39, and 92.** The defense offers various JPMorgan compliance policies for use in cross-examining Mark Catana, a JPMorgan compliance representative. R. 749[1], Jordan PTC Tr. 41:19–25. The defense argues that it is inaccurate to suggest that the policies at JPMorgan, Credit Suisse, and the CME always prohibited spoofing, that is, placing an order with the unconditional intent to cancel. *Id.* at 42:8–11. The defense offers these exhibits to show there were subsequent changes in the policies of these various entities. *Id.* at 42:11–15.

The exhibits are excluded because they represent after-the-fact (that is, after the trades at issue in this case) evidence that poses a serious Rule 403 risk of confusing the jury into thinking that mistake of law is a defense and that the government must show willfulness in this alleged *fraud* case (which does not require a showing of willfulness). There is no way to introduce the exhibits without injecting the Dodd-Frank Act into the case, along with the accompanying explanations of that statute, distracting the jury and wasting substantial time. The government of course must prove intent to defraud (as well as all the other elements of wire fraud), but there is no need to prove that Jordan knew that the alleged conduct was illegal.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

**Exhibit Nos. 40–41.** The defense offers the CME notice of disciplinary action against Martell and the CME enforcement action against Coscia in 2013. *Id.* at 53:2–17. These enforcement actions concern CME Rule 432 and spoofing-related conduct. *Id.* at 53:18–19. The defense anticipates using these exhibits during the cross-examination of Erin Middleton. *Id.* at 53:17–18.

These exhibits are allowed because the conduct at issue does appear to be similar as what is alleged here, and thus may be used to impeach the CME witness on what subsections of the CME's rules are allegedly violated by spoofing. *Id.* at 58:22–59: 3. These exhibits are relevant to the issue of whether CME Rule 432 did in fact address spoofing. *Id.* at 59: 9–10.

**Exhibit Nos. 47 and 48.** These exhibits are portions of the CFTC glossary (Exhibit 48 is the 2008 version of the glossary and 47 is the current version). *Id.* at 69:1–3; *id.* at 69:12–13. The defense anticipates using these glossary terms for impeachment of either Scheerer's or Middleton's testimony on CME rules that allegedly covered spoofing. *Id.* at 70:11–15. Although there are reasons to believe that the glossary, with its disclaimers, is not the most persuasive piece of impeachment, it is allowed just as it was during the *Smith* trial because of its modest relevancy in defining the terms at issue.

**Exhibit Nos. 66–67, 70–72.** The defense offers theses exhibits as specific instances of Jordan self-reporting his own trading to JPMorgan compliance personnel. *Id.* at 77:12–14. Consistent with the *Smith* trial, these exhibits are allowed as relevant to Jordan's state of mind, because he arguably would not draw attention to his own trades if he was committing a fraud. The Rule 403 concerns are not substantial enough to prevent their admissibility.

ENTERED:

     s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: November 29, 2022

**App. 014**

**U**NITED **S**TATES **D**ISTRICT **C**OURT
**FOR THE N**ORTHERN **D**ISTRICT OF **I**LLINOIS
**E**ASTERN **D**IVISION

UNITED STATES OF AMERICA      )
     )
     )    No. 1:19-CR-00669
v.      )
     )    Judge Edmond E. Chang
     )
CHRISTOPHER JORDAN      )

**O**RDER

This Order accompanies Court Set 1 of the revised jury instructions to explain the edits and decisions reflected in the Court's revisions. (The pagination numbering refers to the page numbers on the bottom of the pages of Court Set 1, rather than to the PDF page number.)

**Opinion Testimony (page 13).** Right now, Court Set 1 includes Agent Jonathan Luca on the list of opinion witnesses. But if the defense does not want to include him on the list, the Court will consider that request during the instructions conference.

**Elements—Stipulations to Nos. 4 and 5 (page 19).** The Court simply points out that the stipulations on the fourth and fifth elements have not been read to the jury yet.

**Paragraph on Statute of Limitations (page 22).** Court Set 1 edited the proposed instruction so that "and/or" now is simply "or" in the phrase "while he was working at JPMorgan or Credit Suisse." The government need not prove that the scheme to defraud stretched across both banks so long as it proves that the defendant participated in the alleged scheme at some point after August 22, 2009.

**Intent to Defraud (page 23).** Court Set 1 adopts the Pattern Instruction the definition of intent to defraud. It is true, as the defense contends, that federal-fraud offenses are often referred to in the case law as "specific" intent crimes. But that is legal-ese, intended (no pun intended) to distinguish specific-intent crimes from general-intent crimes, that is, from crimes that only require having a general intent to

1

**App. 015**

commit the *act* at issue without an additional underlying mental state. Here, the Pattern definition of intent to defraud already incorporates the additional underlying mental state, that is, an intent "to deceive or cheat." Adding the otherwise-undefined word "specific" would only confuse the jury.

**Good Faith (Request 26).** Court Set 1 removes Request 26, which is the defense's request for a good-faith instruction. In the trial of Jordan's co-defendants earlier this year, the Court took the same approach as the district court in *Vorley*—that is, rejecting the proposed instruction—and the *Vorley* decision was affirmed in *United States v. Chanu*, 40 F.4th 528, 543 (7th Cir. 2022). Jordan argues that his defense is different from that of the co-defendants, but for purposes of this instruction, there is really no distinction. Here, like the earlier trial, the good-faith instruction is unnecessary to advance the defense of good faith because Jordan can still argue the *absence* of an intent to defraud. *Id.* at 543. The definition of intent to defraud allows Jordan to make exactly the argument that he advances, namely, he honestly believed that he was not making false representations by placing the alleged large-side orders. So there is no *upside* to giving the good-faith instruction.

Like the earlier trial, there is a *downside* to the good-faith instruction because it poses the risk of misleading jurors into thinking that a defense along the lines of "mistake of law" is viable, when it is not. There has been plentiful cross-examination suggesting that the defendant was not on sufficient notice that the conduct now known as spoofing violated his employers' compliance policies or CME Rule 432. So, just as in the earlier trial, given the trial evidence and lines of questioning, the jury might misinterpret this instruction as exculpating the Defendant if he did not understand what he did was a violation of the law—which is not a valid defense. Sometimes the good-faith instruction will be appropriate. But not here. Request 26 is excluded.


                                                    s/Edmond E. Chang
                                            Honorable Edmond E. Chang
                                            United States District Judge


DATE: December 5, 2022

**App. 016**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 1:19-CR-00669-4 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| CHRISTOPHER JORDAN | ) | |

**ORDER**

On consideration of the in-court arguments this evening and on review of the written arguments regarding the jury question, R. 813, 814, the Court remains convinced that the jury is most likely asking whether the Defendant must know that his alleged conduct was in violation of federal law or, indeed, even in violation of bank compliance polices or CME Rule 432.

The phrase that the jury excerpted from the definition of "knowingly"—"is aware of the *nature* of his conduct" (emphasis added)—is capable of broad interpretations that require the government to prove more than the what the mental state of "knowingly" actually requires. Specifically, the "nature" of conduct could be interpreted to mean whether the Defendant knew that the conduct was unlawful (that is, "willful" in the spectrum of traditional criminal mental states) or even whether the conduct violated a compliance policy or CME Rule 432. There was extensive examination on whether the Defendant's conduct violated a policy or Rule 432, and as the Court noted earlier, it is not a far step at all to then ask whether the Defendant must know that the alleged conduct violated federal law. The answer is clearly no: willfulness is not required for a wire-fraud conviction. Indeed, the Seventh Circuit has affirmed a definition of "knowingly" that included the explanation: "To act knowingly does not mean that a defendant had to realize he was violating the law." *See United States v. Brown*, 739 F.2d 1136, 1144 & n.5 (7th Cir. 1984).

Indeed, as it stands, the jury only has an instruction explaining that violation of a compliance policy or Rule 432 does not necessarily mean that federal law was violated. The jury does *not* have the converse—and accurate—statement that a violation of federal law does not necessarily require the jury to find that the Defendant

1

**App. 017**

knew that he was violating a compliance policy or Rule 432 (or, for that matter, that the conduct actually violated a policy or the Rule). Although there is no need to go that far in answering the jury's question, it is appropriate to dispel the likely source of conclusion on whether the defendant needed to know that he was violating federal law. The attached response adopts the edits proposed by the defense's backup argument in R. 813 at 4–5.

The Defendant's proposed alternative interpretations of the gist of the jury's question are not realistic. To the defense's thinking, the jury is asking "whether the government is required to prove that Mr. Jordan knew that his conduct involved a scheme to make statements that were false and fraudulent (i.e., the first element of wire fraud affecting a financial institution), or that he had the intent to deceive or cheat in order to obtain money or property from the alleged victim (i.e., the second element)." R. 813 at 3. But the first alternative is explicitly addressed in the instructions (the Defendant must "knowingly devise[] or participate[] in a scheme to defraud," R. 801 at 18) and the second alternative is not sensible because if a person acted with the *intent* to deceive or cheat, then of course that person *knew* that he had the intent to deceive or cheat.

In light of the probable import of the question, the Court will give the attached response. There is no need for further in-court argument on December 9, 2022.

ENTERED:


      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: December 8, 2022

2

**App. 018**

**Response to Jury Note of December 8, 2022**

Dear Jury:

In response to your question, I will clarify that the definition of "knowingly" on page 19 of the jury instructions does not mean that the defendant must be aware of whether his alleged conduct violated federal law. Having said that, I remind you that the government must prove beyond a reasonable doubt all of the elements of wire fraud affecting a financial institution, including (1) that the defendant knowingly devised or participated in a scheme to defraud, which is defined on pages 20–21 of the instructions; and (2) that he acted with the intent to defraud, which is defined on page 22 of the instructions and requires that he act "knowingly with the intent to deceive or cheat the alleged victim in order to obtain money or property from the alleged victim or to cause the potential loss of money or property to the alleged victim." I also remind you that you should consider the jury instructions as a whole.

_____

Honorable Edmond E. Chang
United States District Judge

DATE: December 9, 2022

3

**App. 019**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-CR-00669-4 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHRISTOPHER JORDAN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

In December 2022, a jury found Christopher Jordan guilty of wire fraud. R. 816; R. 818, Jury Verdict at 2.[1] Jordan moves for acquittal under Criminal Rule 29 and for a new trial under Criminal Rule 33. R. 834, Jordan Mot. Judgment of Acquittal; R. 837, Jordan Mot. for New Trial. For the reasons discussed in this Order, the motions are denied.

### I. Rule 29 Motion for Acquittal

### A. Legal Standard

At the close of evidence in a federal criminal jury trial, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant can file or renew a motion for acquittal after a guilty verdict. Fed. R. Crim. P. 29(c). To prevail on a motion for acquittal, a defendant "must show that when viewing all the evidence in the light most favorable to the government, no rational jury could have

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

found the essential elements of the offense[] beyond a reasonable doubt." *United States v. Ghilarducci*, 480 F.3d 542, 546 (7th Cir. 2007). A jury verdict may be reversed "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (cleaned up).[2] The Seventh Circuit has described this stringent standard as "a nearly insurmountable hurdle" to obtaining a judgment of acquittal. *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (cleaned up).

The Seventh Circuit has also held, under limited circumstances, that "where the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Harris*, 942 F.2d 1125, 1129–30 (7th Cir. 1991) (cleaned up). This principle "applies when the evidence is woefully inadequate to establish an element of the offense." *United States v. Persfull*, 660 F.3d 286, 294 (7th Cir. 2011) (cleaned up). If there is evidence in the record, either direct or circumstantial, to support each element of a crime, then the principle does not apply. *Id.*

## B. Analysis

The charges in this case arose out of Jordan's commodity-contracts trades when he worked for JPMorgan and Credit Suisse. For trial, Jordan was severed from his three co-defendants, and the jury found Jordan guilty of wire fraud affecting a financial institution (Count 23), which required the government to prove:

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

1.  The defendant knowingly devised or participated in a scheme to defraud, as charged in the indictment;

2.  The defendant did so with the intent to defraud;

3.  The scheme to defraud involved a materially false or fraudulent pretense, representation, or promise;

4.  For the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate or international wire communications to take place in the manner charged; and

5.  The scheme affected a financial institution.

R. 804, Court Set 2—Revised Jury Instructions at 18.

Jordan moves for acquittal against his conviction. In seeking a judgment of acquittal, Jordan argues that the evidence would not permit a rational jury to conclude that he: (1) knowingly participated in a "scheme to defraud" under the wire fraud statute; (2) made a false statement to trading counterparties; and (3) acted with the criminal intent to defraud. *See* R. 835, Jordan Mot. Judgment of Acquittal Br. In addressing each of these arguments, the Court considers the weight of the evidence presented at trial, including: Jordan's trading patterns; the testimony of the two banks' compliance officers and a CME officer; the testimony of an actual trading counterparty of Jordan's; the testimony of FBI Supervisory Special Agent Jonathan Luca; and the expert testimony of Professor Kumar Venkataraman. When viewing the evidence in the light most favorable to the guilty verdict, the evidence at trial was more than sufficient for a rational jury to find, beyond a reasonable doubt, that Jordan was guilty of wire fraud.

3

**App. 022**

Before getting to Jordan's arguments, the Court highlights some of the evidence the jury saw and heard at trial. A central piece of evidence at trial was Jordan's trading patterns, which provided solid circumstantial evidence that Jordan placed orders with an unconditional intent to cancel, with the most prevalent patterns involving four steps. The first step involved Jordan placing a genuine order on one side of the market; second, Jordan placed deceptive orders on the other side of the market; third, the genuine orders were filled; and fourth and finally, Jordan canceled the deceptive orders. *See* R. 821, Trial Tr. at 556; R. 822, Trial Tr. at 1057–60, 1062–66; R. 823, Trial Tr. at 1126. The government presented evidence of 68 episodes (from 2009 to 2010) of Jordan employing this trading pattern. *See, e.g.*, R. 822, Trial Tr. at 1067–69, 1072; Govt. Exhs. 75, 76, 84. Professor Venkataraman—an expert in financial-market structure, electronic-trading strategies, and market manipulation—identified 2,900 more examples of episodes following the four-step pattern from the same period of time. *See* R. 822, Trial Tr. at 1071–74. The sheer volume of trading sequences following this pattern alone supports a rational juror inferring that Jordan intended to cancel his orders before execution.

When viewed in the light most favorable to the guilty verdict, and crediting the testimony of the government's witnesses, the other evidence offered by the government adds ready support for the verdict. The government offered testimony from Travis Varner, the director of training at Quantlab, who testified that Quantlab was influenced by Jordan's spoof orders into trading at certain prices and times. R. 822, Trial Tr. at 1004, 1009–14. What's more, the government introduced evidence of

4

Jordan lying to the Commodity Futures Trading Commission (CFTC)—that is, testi-
mony that Jordan originally denied to the CFTC placing orders that he did not intend
to execute and denied engaging in trading for the purpose of influencing the price on
COMEX—and made statements that were inconsistent with his later interview with
FBI Agent Luca. R. 821, Trial Tr. 521–22, 524–27; 692–93; Govt. Exh. 56 at 151–53,
156. Indeed, at trial, Agent Luca testified that Jordan admitted to engaging in spoof-
ing, that is, placing orders on the market that he intended to cancel, and placing those
orders in order to mislead the market. R. 820, Trial Tr. 506–08; R. 821, Trial Tr. at
555–60, 566–68, 689. This testimony, among other evidence, is more than enough
evidence on which the jury could rationally return its guilty verdict. The Court now
addresses Jordan's specific arguments.

### 1. Knowing Participation in Scheme to Defraud

Jordan argues that the evidence did not sufficiently show that he engaged in a
scheme to defraud because "when the counterparties accepted [Jordan's] orders, they
got exactly what they bargained for: valid CME futures contracts, bought or sold, at
a given price, for a given quantity." Jordan Mot. Judgment of Acquittal Br. at 2–3.
Jordan further contends the evidence falls short because there was "no testimony or
evidence that any of [Jordan's] trading counterparties ever lost money as a result of
his spoof orders." *Id.* at 4.

But, as an initial matter, the law does not require that the government prove
any counterparties lost money or did not get precisely "what they bargained for" due
to Jordan's spoof orders. Spoofing by itself qualifies as a scheme to defraud, absent

the counterparties incurring any loss. The Seventh Circuit has explained that placing large orders with an intent to cancel those orders (essentially a "scheme to pump and deflate the market through the placement of large orders") is deceitful. *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017). And, in 2022, the Seventh Circuit confirmed—in a case that presented similar conduct to Jordan's, spoofing in the precious-metals futures markets—that manual spoofing "aligns with the plain meaning of 'scheme to defraud.'" *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022).

Binding precedent also undermines Jordan's contentions that his conduct did not constitute a scheme to defraud because the counterparties did not incur a loss or got their end of the bargain. *See, e.g.*, *United States v. Leahy*, 464 F.3d 773, 786–87 (7th Cir. 2006) (explaining that wire fraud "do[es] not require the government to prove either contemplated harm to the victim or any loss"); *United States v. Fard*, 775 F.3d 939, 944 (7th Cir. 2015) (same); *United States v. Nayak*, 769 F.3d 978, 980 (7th Cir. 2014) (explaining that fraud liability can arise from the benefit to the *defendant*, not just the harm to the *victim*).

Also, Jordan's contention that the transaction prices at issue here were "the result of the independent judgment of [his] sophisticated transaction counterparties" is unpersuasive. Jordan Mot. Judgment of Acquittal Br. at 4. The obvious retort is that those supposedly "independent judgments" were tainted by the false statement of supply and demand that Jordan's spoof orders created in the market. *See, e.g.*, R. 822, Trial Tr. 1001–02, 1004, 1009–10, 1013 (Varner testified that Quantlab had been influenced by Jordan's spoof orders into trading at certain prices and times and that

Quantlab's algorithms were designed to assume any order placed on the CME was "bona fide"). For the same reason—sufficient evidence that Jordan's spoof orders created a false supply and demand in the market and caused the counterparties to transact at those artificial prices—the Court rejects Jordan's point that the counterparties were "only" deprived of information (Jordan's intent to cancel the order). In reality, Jordan made material misrepresentations to the counterparties. In sum, given the binding precedent that the government was not even required to prove that the victims incurred a loss, along with the evidence of the misrepresentations to the market, a rational jury could have readily concluded that Jordan knowingly engaged in a scheme to defraud.

Finally, Jordan attempts to neutralize the binding precedent—namely, the Seventh Circuit's decision in *Chanu*—by arguing that he was convicted under a "right to control" theory of fraud, and thus *Ciminelli* would control. *See Ciminelli v. United States*, 598 U.S. 306 (2023); Jordan Mot. Judgment of Acquittal Br. at 4–5; R. 854, Jordan Reply Mot. Judgment of Acquittal at 1–2. At the time of the briefing, *Ciminelli* was pending before the Supreme Court, but it has since been decided in May 2023. There, the Supreme Court held the "right-to-control theory is not a valid basis for liability" under the wire-fraud statute. *Ciminelli*, 598 U.S. at 309. But the outcome of *Ciminelli* does not bear on Jordan's conviction at all. Nothing in the superseding indictment, jury instructions, or anything else would have presented the jury with a right-to-control theory. Instead, the superseding indictment charged, and the jury was asked, to determine whether Jordan knowingly made a false representation,

7

**App. 026**

which also could be accomplished by a material omission or concealment of material information. R. 804 at 20. No control theory of any kind was presented.

### 2. Material Misrepresentations to Market Participants

Next, a rational jury could easily conclude that Jordan by spoofing made material misrepresentations to market participants. Jordan's main argument on this element is that the government was required to prove (but allegedly did not) that "in 2009 and 2010, the CME prohibited placing orders with the intent to cancel before execution." Jordan Mot. Judgment of Acquittal Br. at 6–7. Jordan then contends that absent the evidence that such a rule existed and "was widely understood in the market" during the relevant period, it was irrational for a counterparty to "have assumed that an order placed on the CME implicitly reflected a genuine interest to trade." *Id.* at 7.

But again, as with Jordan's scheme-to-defraud argument, binding precedent forecloses his argument here. The Seventh Circuit has already held that spoof orders indeed can constitute implied misrepresentations. *Chanu*, 40 F.4th at 541. *Chanu* quite sensibly explained that "by obscuring their intent to cancel," the spoofing defendants "advanced a quintessential 'half-truth' or implied misrepresentation—*the public perception of an intent to trade and a private intent to cancel in hopes of financial gain.*" *Id.* (emphasis added) (holding that spoofing defendants' actions "amounted to a scheme to defraud by means of false representations or omissions"); *see also United States v. Vorley*, 420 F.Supp.3d 784, 802 (N.D. Ill. 2019), *aff'd sub nom. Chanu*, 40 F.4th 528 (explaining spoof orders are "active misrepresentation[s] of the true

8

**App. 027**

supply and demand for the commodities that were the subject of the Spoofing Orders that renders the market price of the commodity less accurate").[3]

Jordan tries to distinguish *Chanu* by emphasizing that the charged trading in that case "extended past the effective date of Dodd-Frank," so the defense there did not argue that there were no clear policies or rules forbidding spoofing during the relevant period. Jordan Reply Mot. Judgment of Acquittal at 3. But this distinction does not account for the fact that, first, *Chanu* made no distinction between the spoofs that happened pre- and post-Dodd-Frank. Second, the defendants in *Chanu* actually did explicitly challenge the applicability of the wire-fraud statute (which predated Dodd-Frank by several decades) to spoofing. 40 F.4th at 539. The Seventh Circuit soundly rejected that challenge. *Id.* at 540–42.

When viewing the evidence in the light most favorable to the guilty verdict, the evidence at trial was more than sufficient for a rational jury to find that Jordan's spoof orders were implied misrepresentations to other market participants about Jordan's intent to trade. The government presented testimony supporting that (1) orders implicitly represent a genuine intent to trade, (2) this representation was widely understood during the relevant period, and (3) an order placed without that genuine intent to trade constitutes an implied misrepresentation. *See, e.g.*, R. 822, Trial Tr.

---

[3]Jordan also acknowledges that *Chanu* held that spoof orders "can constitute actionable implied misrepresentations" under the wire-fraud statute, but argues *Chanu* was wrongly decided. Jordan Mot. Judgment of Acquittal Br. at 6 n.2. But Jordan does not describe why *Chanu* was wrongly decided as to the misrepresentation element; perhaps he is simply preserving the issue. If Jordan is basing this contention on *Ciminelli*, the Court rejects that *Chanu* is not binding on this issue for the same reasons already explained: Jordan was not charged or convicted under a "right-to-control" theory. *See supra* Section I.B.1.

1000–02 (Varner testified that bona fide orders means "orders placed in the market with the intent to trade" and that Quantlab "assume[s] all the orders are bona fide in the market"); Govt. Exh. 56 at 151–53, 156; R. 821, Trial Tr. 521–22, 524–27, 692–93 (evidence of consciousness of guilt based on Jordan's false denials to the CFTC that he placed orders without the intent to execute them and engaged in trading for the purpose of influencing the price on COMEX).

For one, CME witness Erin Middleton testified that CME rules barred precious metals traders on NYMEX and COMEX, including Jordan, from placing orders with the intent to cancel because "when you submit an order that you do not intend to trade, it can provide [] false information to the marketplace." *See* R. 822, Trial Tr. 920, 924, 927, 934–35 (testifying that every order needs to be bona fide, which means "need[s] to represent a true intent to buy or sell a particular price or quantity" and that this rule existed during the relevant period). Middleton explained how spoofing communicates a "false interest of prices and quantities" to other market participants. *Id.* at 924. And the banks' compliance officer-witnesses, David King (Credit Suisse) and Mark Catana (JPMorgan), testified at trial that spoofing (and "manipulative or deceitful market conduct" and "market manipulation") violated bank policies during the relevant period. *See* R. 821, Trial Tr. 703–06 (King testified that Credit Suisse, during Jordan's employment, forbade traders from "placing an order with the intent to cancel"); *id.* at 760–62 (Catana testified that JPMorgan's policies, during the relevant period, barred spoofing whether it was labeled as such or not).

10

In addition to presenting testimony from the CME witness and the banks' compliance officers, the government presented expert testimony to show that spoof orders qualified as implicit misrepresentations. Professor Venkataraman testified that buy orders implicitly "convey[ed] their intent or their interest in buying the commodity under the terms of the order." R. 822, Trial Tr. at 1055; *see also id.* at 1056–57 (explaining that a spoof order "represents false trading interest" and entails the spoofing trader injecting "[f]alse information" into the market); *id.* at 1066–67 (explaining that, based on a review of Jordan's trading during the relevant time period, that there was "an expectation in the market that orders which are placed have been placed with the intent to execute them"). The evidence readily showed that the spoof orders qualified as misrepresentations. Jordan is unfortunately fooling himself if he thinks that either the law or the facts supported the notion that traders could willy-nilly enter orders into the market with an unconditional intent to cancel them. No market could long survive if traders could just enter bogus orders to trick others into thinking there is more supply or demand than there really is.

### 3. Intent to Defraud

Moving on, Jordan also contends that the government failed to prove that he acted with the requisite intent to defraud. Jordan Mot. Judgment of Acquittal Br. at 9–13. Jordan first argues that the government did not call a witness who spoke with Jordan about Jordan's contemporaneous understanding of the CME rules or the Banks' compliance policies; and second, that the government mischaracterized Jordan's statements to Agent Luca and the CFTC. *Id.*

11

**App. 030**

The evidence at trial was more than enough for a rational jury to conclude that Jordan acted with the intent to defraud market participants. As described above, the government presented testimony from compliance-officer and expert witnesses to show that spoofing is inherently deceptive. *See, e.g.*, R. 821, Trial Tr. at 710 (King), 759 (Catana); R. 822, Trial Tr. at 1057 (Venkataraman testified that one spoofs "in order to mislead investors by injecting misleading information about demand and supply in the market."). Also, the government presented evidence that the banks for which Jordan worked trained traders (including Jordan) that they could not trade in order to mislead the market, which is exactly what spoofing is. *See* Govt. Exh. 33 at 3 (Credit Suisse training slide deck, shown to Jordan as a new hire, instructing that "[e]mployees may not engage in transactions or other activities to: … [c]reate a false or misleading appearance of active trading…. Employees should not disseminate false or misleading information to the effect that the price of a security will or is likely to rise or fall."); R. 821, Trial Tr. at 718–9 (King testified that the prohibition against market manipulation and deceitful market conduct was one of the first things that Jordan was trained on when he joined Credit Suisse). There is no requirement that the government present testimony from a witness who actually spoke with Jordan about his contemporaneous understanding of CME rules or the banks' compliance policies. And, in any event, Jordan's private-chat messages (discussed next) and Jordan's statements to Agent Luca and the CFTC do sufficiently prove intent to defraud.

The government presented Jordan's October 2009 chat messages, in which Jordan stated he would be using his "lead pipe" to "whack[] this thing," and these

messages were sent on the same day (October 15, 2009) that Jordan used the four-step spoofing strategy at least 18 times. R. 821, Trial Tr. at 689–92; Govt. Exhs. 9, 10, 83; *see also* Govt. Exh. 7 at DOJ-0000009935 (Apr. 2009: "every order i do is ice-berged it funny actualy i show 1 lot then when i need to get filled i will bid or offer size infront of it then boom"); Govt. Exh. 5 at DOJ-0000002489 (Oct. 2008: "every time it looks bid, I offer 300 lots and it comes off); Govt. Exh. 8 at DOJ-0000018190 (Sept. 2009: "they take my hidden offer every time, as i bid in front of it."). Also, at trial, Agent Luca testified that these chats described how Jordan spoofed in order to mis-lead other market participants. *See*, *e.g.*, R. 821, Trial Tr. 531–32 (explaining Govt. Exh. 5: "He's placing an offer for 300 lots, and he's pushing the price down"), 538 (explaining Govt. Exh.7: "[Jordan] is saying that he spoofs in order to get an order filled when he needs to"), 539–40 (explaining Govt. Exh. 8: "[Jordan] has an iceberg on the offered side of the market because he's selling, and then he's placing a large bid on the other side of the market to push the market into his hidden offer").

Turning to Jordan's contention that the government mischaracterized Jordan's statements to Agent Luca and the CFTC to prove intent, the record does not bear out that argument. With the lens of crediting the evidence in favor of the guilty verdict, a juror could find that Jordan indeed told Agent Luca during their interview that Jordan placed the spoof orders in order to mislead the market—by using the term "fake" to describe the orders—and that this evinced Jordan's intent to defraud. Agent Luca testified that Jordan admitted that the orders were "fake." *See* R. 820, Trial Tr. 506–08; *see also* R. 821, Trial Tr. at 555, 560, 689; R. 821, Trial Tr. at 526 (testifying

13

that Jordan used the term "fake" to describe his spoof orders); *see United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir. 1988) ("Matters of witness credibility, absent extraordinary circumstances, are solely for the jury to evaluate.") (cleaned up). It is true that misleading the market is not *exactly* a confession that he "intended to defraud" market participants. But viewing the evidence in the light most favorable to the guilty verdict, a rational jury could conclude misleading the market is highly relevant to proving an intent to defraud.

Lastly, the evidence shows that, in 2010, Jordan lied to the CFTC when he was asked about his spoof orders. Jordan denied placing orders that he did not intend to execute and denied knowing who was placing "flash orders" in the market. *See* Govt. Exh. 56 at 151–53, 156. Those answers were inconsistent with Jordan's admissions to Agent Luca during the FBI interview. R. 821, Trial Tr. at 521–22, 525–26 (Luca testified that Jordan told him he placed orders he intended to cancel and used the term "fake" to describe his spoof orders). Jordan's false denials to the CFTC show consciousness of guilt on intent to defraud.

Jordan also argues that the evidence fell short on fraudulent intent because CME rules and the banks' compliance policies did not explicitly use the word "spoofing." This argument fails. Again, a rational jury could find, first, that the CME rules and the banks' policies barred placing orders with the intent to mislead the market or to cancel them before execution; and second, that traders, like Jordan, knew of this prohibition. Finally, Jordan's argument that his conduct was the mere common practice of "camouflag[ing] [his] intentions and strategies" (and so misleading the market

14

is not the same as fraudulent intent) is also unpersuasive. Jordan Mot. Judgment of Acquittal Br. at 12. Jordan was convicted for making false representations of supply and demand. This was no mere trading strategy—it was fraud.

Taken all together, the evidence of Jordan's trading patterns, Venkataraman's expert testimony, the admissions to Agent Luca, testimony of a victim, and the banks' and CME compliance officers' testimony—along with Jordan's own statements in private-chat messages—readily supports the conviction. Indeed, even if the evidence was not viewed in the light most favorable to the guilty verdict, the weight of the evidence solidly supported the convictions given the circumstantial evidence of the unconditional intent to cancel the orders and to defraud market participants.

## II. Rule 33—Motion for New Trial

### A. Legal Standard

The standard for granting a new trial is more lenient than the one for granting a motion for an outright acquittal. Federal Rule of Criminal Procedure 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." But the standard is still high: "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Morales*, 902 F.2d 604, 605–06 (7th Cir. 1990) (cleaned up). Motions for a new trial should be granted only in exceptional circumstances: "[I]f the judge believes there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted—he has the power to set the verdict aside even if he does not think that he made any erroneous rulings at the trial." *Id.*; *see also United*

15

**App. 034**

*States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012) (Rule 33 is "reserved for only the most extreme cases, and we approach such motions with great caution." (cleaned up)).

## B. Analysis

### 1. Post-Dodd Frank Compliance and CME Materials

Jordan challenges the pretrial decision to exclude post-Dodd-Frank bank compliance and CME documents, which he argues would have supported the notion that traders were not put on notice that spoofing was barred until years after he spoofed. R. 838, Jordan Mot. for New Trial Br. at 7–14. According to Jordan, the decision to exclude those materials prevented him from effectively impeaching government witnesses—mainly, the banks' compliance officers (Catana and King) and CME officer Middleton—on their testimonies that the banks and the CME prohibited spoofing during the relevant period.

This argument is still meritless. First, it bears noting that the Court instructed the jury that even if there was evidence that Jordan violated the banks' policies or CME rules, then "that violation would not, standing alone, be sufficient to convict the defendant." Court Set 2—Revised Jury Instructions at 16 ("Charged Offense Distinguished from Compliance and Rules"); R. 822, Trial Tr. at 929; *see United States v. Puckett*, 405 F.3d 589, 599 (7th Cir. 2005) (presuming jurors "attend closely the particular language of the trial court's instructions in a criminal case … and follow the instruction given them") (cleaned up). So the banks' policies and the CME rules were not stand-ins for the elements of wire fraud.

16

**App. 035**

There was no error in excluding the post-Dodd-Frank evidence. As the Court explained in its November 2022 post pretrial-conference order, the excluded exhibits "represent after-the-fact (that is, after the trades at issue in this case) evidence that poses a serious Rule 403 risk of confusing the jury into thinking that mistake of law is a defense." R. 793, Pretrial Conference Order at 1. The introduction of those materials risked injecting the Dodd-Frank Act into the case (and accompanying explanations of it), which in turn risked confusing the jury and also "wasting substantial time." *Id.* At the pretrial conference itself, the Court explained the grounds for excluding the proposed evidence, explaining that introducing after-the-fact materials risked "get[ting] into the Dodd-Frank quagmire" and the "imperfect mistake of law defense[,] which [the Court] think[s] is a serious specter in this case." R. 749, Pretrial Conf. Tr. at 46. As this Court explained, the risks—especially of the jury "taking Congress' opinion that [the wire fraud statute and the other fraud statutes] was not sufficient"—posed by the materials could not be resolved by a limiting jury instruction. *Id.* at 48. Allowing the materials with a limiting jury instruction would not sufficiently mitigate the various risks posed by the materials.

What's more, Jordan cannot show that the trial outcome would have been different if he had been allowed to introduce the post-Dodd-Frank evidence—the evidence essentially repeated testimony that he already elicited from witnesses on multiple cross-examinations. *United States v. Reed*, 2 F.3d 1441, 1451 (7th Cir. 1993) (defendants seeking new trials must show prejudice, not as a matter of speculation, but as a demonstrable reality); *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir.

17

2019) ("The applicable standard under Rule 33 requires a new trial only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict.") (cleaned up). As a threshold matter, the Court agrees with the government that the exclusion was not prejudicial because allowing the materials in would have opened the door to the jury hearing that the Dodd-Frank Act explicitly banned spoofing effective in July 2011, and yet Jordan continued to spoof up to October 2011, which would have provided more—not less—evidence of intent to defraud. *See* R. 744, Mots. in Limine Order at 4–5.

Moreover, the Court emphasized at the pre-trial conference that the defense would have ample opportunity (which the defense took at trial) to cross-examine the government's witnesses on the absence of explicit "spoofing" language in the CME rules and the banks' policies. *See* Pretrial Conf. Tr. at 47–48. At trial, the defense vigorously crossed multiple government witnesses on the lack of "spoofing" language in the CME rules and in bank policies during the relevant period. *See, e.g.*, R. 821, Trial Tr. at 732–35 (King), 795–99 (Catana); R. 822, Trial Tr. at 855–63, 867–68, 892, 896 (Catana), 955–61 (Middleton). At trial, Catana, King, and Middleton all conceded on direct examination (even before cross) that the banks' policies and CME rules did not explicitly use the word "spoofing." *See* R. 821, Trial Tr. at 706 (King), 762 (Catana); R. 822, Trial Tr. at 932 (Middleton). Given the government witnesses' testimonies on direct and cross, the post-Dodd-Frank evidence would have cumulatively repeated a fact already stated by the witnesses at trial and not have been used as impeachment material. So, in addition to the post-Dodd-Frank evidence being properly

18

excluded on Rule 403 grounds, Jordan has failed to show that the exclusion has prejudiced him.

## 2. 2018 Statement to FBI

Jordan next challenges the Court's decision to exclude something that he said during the 2018 FBI interview, namely, that he did not think what he was doing was wrong. R. 838, Jordan Mot. for New Trial Br. at 4–5. Jordan also argues that the exclusion was "highly prejudicial" because (1) Agent Luca testified at trial on his interview of Jordan "without facing cross-examination regarding the interview's exculpatory portions" and (2) the exclusion enabled the government to repeatedly mischaracterize Jordan's admitted statement to the FBI as a "confession." *Id.* at 4–5, 14–15.

There was no error in excluding the statement. First, the statement was properly excluded under the bar against hearsay, because it was a "*backward*-looking statement about his state of mind … to prove the truth of the assertion." R. 787, Rule 106 Order at 3 (emphasis in original). Nothing happened during trial to remove the statement from the ban against hearsay.

Second, Evidence Rule 106 did not justify the introduction of the statement. Rule 106 is supposed to clear up confusion or to provide proper context. Here, instead the statement posed a substantial risk of jury confusion. In the pretrial decision denying Jordan's Rule 106 argument, *see* R. 787, the Court reasoned:

> Nothing about Jordan saying that he did not think he was doing anything 'wrong' *factually* clarifies the to-be-introduced statement that he placed orders with an intent to cancel them. Whether or not Jordan thought he was doing something 'wrong' does not clarify any misleading impression arising out of the statement that he placed orders with an intent to cancel. Remember that

19

**App. 038**

mistake of law is *not* a defense to a wire-fraud charge, and willfulness is not
an element of that crime.

*Id.* at 2–3 (emphases in original). That same reasoning applied at trial and remains

true today. The proposed statement was a purported mistake of law by Jordan—that

he did not believe his spoof orders or trading patterns were "wrong." But mistake of

law is not a valid defense to wire fraud and allowing the proffered statement would

risk confusing the jury into thinking that it is. *See United States v. Blagojevich*, 794

F.3d 729, 739 (7th Cir. 2015) ("The wire-fraud statute requires a specific intent to

defraud but *not* willfulness or any other proxy for knowledge of the law.") (emphasis

in original) (cleaned up). For this reason, the statement neither clarifies nor contex-

tualizes Jordan's other statements made during the interview. Instead, it risked in-

jecting into trial the erroneous notion that a mistaken understanding of the law is a

viable defense to wire fraud.

At trial, the Court's concern over an imperfect mistake-of-law defense proved

to be warranted. As addressed in more detail later (*see infra* II.B.4), during delibera-

tions, the jury submitted a question on the jury instructions' definition of "know-

ingly." The note supports the validity of the Court's concern (and propriety of the

exclusion) that the statement posed a risk of jury confusion on mistake of law.[4] Re-

latedly, despite Jordan arguing that there was no risk of jury confusion because

---

[4]In its brief, the defense contends that the Court "introduce[d] mistake of law into the
case, for the first time, in response to an ambiguous jury note." But, as explained later, the
note made clear the jury was confused about the meaning of the term "knowingly," namely,
whether or not Jordan needed be "aware of the nature of this conduct." And, as explained,
one of the defense's main arguments (and subject of testimony) at trial was that Jordan be-
lieved his spoofing was allowed during the relevant time period.

neither party raised the mistake-of-law defense at trial (and that the defense disa-
vowed any intent to raise such a defense), one of the defense's central arguments was
very close to a mistake of law, that is, that Jordan believed his spoof orders were a
permitted trading practice during the relevant time period. *See, e.g.*, R. 824, Trial Tr.
at 1349, 1351 (defense arguing in closing, "[a]s long as you're within the rule, it's fair
game."), 1357 ("There is no evidence, zero evidence, nothing to support the theory
that Chris Jordan knew that spoofing was a violation of Rule 432"); R. 822, Trial Tr.
at 855–63, 867–68, 892, 896, 955–61 (defense crossing government compliance wit-
nesses on point that the word "spoofing" was not expressly cited in 2008–10 compli-
ance policies and CME rules).

Rule 106 does not compel the conclusion that the statement was improperly
excluded. Rule 106, based on the common-law doctrine of completeness, allows "a
party against whom a fragmentary statement is introduced [to] demand that any
other part of the statement be admitted *as would be necessary to clarify or explain the
portion already received…."* *United States v. Glover*, 101 F.3d 1183, 1189 (7th Cir.
1996) (emphasis added). The statement, however, does not clarify or explain the por-
tions of the interview allowed at trial—that Jordan intended to cancel orders in order
to mislead the market. To the contrary, for the reasons already discussed, the state-
ment, if introduced, would have likely raised more questions and risked confusing the
jury.

Next, the Court turns to Jordan's argument that the government mischarac-
terized certain of Jordan's statements to the FBI as a "confession." *See* Jordan Mot.

21

for New Trial Br. at 16. This argument is unpersuasive. Agent Luca testified at trial repeatedly—on direct, cross-examination, and redirect—that Jordan said he placed orders with the intent to cancel them in order to "mislead" the market. *See, e.g.*, R. 820, Trial Tr. at 506–07; R. 821, Trial Tr. at 566, 568, 689. Though the defense articulates its qualms about the label "confession," a rational person could characterize Jordan telling an FBI agent that he entered orders with the "intent to cancel them" in order to "mislead the market" as a confession to spoofing. R. 820, Trial Tr. at 507; R. 821, Trial Tr. at 516, 521–22, 526, 689. It bears noting that the defense had ample opportunity (which it took) to challenge the use of the term "confession" at trial. Defense counsel challenged the label in cross-examining Agent Luca and during the defense closing argument. R. 821, Trial Tr. at 557–61; R. 824, Trial Tr. at 1350 (in closing argument, defense argued that "the government has repeatedly characterized Chris' statements to Mr. Luca as a confession. That is not correct. A confession is to a crime. Chris did not confess to a crime. He admitted spoofing.").

### 3. Request for Good Faith Instruction

Jordan reargues that the Court should have given the jury a "good faith" instruction. Jordan Mot. for New Trial Br. at 19–21; *see* R. 802, Order on Jury Instructions at 2. As reflected in its December 5, 2022 Order on the Jury Instructions, the Court appropriately rejected the proposed good-faith instruction, adopting the same rationale as the district court in *Vorley*, which was affirmed in *Chanu*. Order on Jury Instructions at 2; *Chanu*, 40 F.4th 528, 542–43 (holding the district court did not err in rejecting a good-faith instruction on a wire fraud charge); *see also United States v.*

22

*Mutuc*, 349 F.3d 930, 936 (7th Cir. 2003) (explaining good-faith instruction was unnecessary where the jury was separately instructed to make a finding on whether the defendant acted knowingly and with the intent to deceive as "it is impossible to intend to deceive while simultaneously acting in good faith").

In this case, a good-faith instruction was unnecessary and posed a substantial risk of jury confusion. First, the instruction was not needed because the defense could (and did) advance this argument through arguing an absence of an intent to defraud. The Court's rationale for rejecting the instruction pre-trial remains true today: there was no upside to giving the instruction because "[t]he definition of intent to defraud allows Jordan to make exactly the argument that he advances, namely, he honestly believed that he was not making false representations by placing the alleged large-side orders." Order on Jury Instructions at 2.[5]

Second, the instruction risked confusing jurors into thinking a mistake-of-law defense (or a defense akin to it) was viable, which it is not. *See Blagojevich*, 794 F.3d at 739. This risk was further validated by the defense's arguments and testimony elicited at trial, including defense counsel crossing the banks' and CME witnesses on whether Jordan was on notice that spoofing violated the banks' policies and CME's

---

[5]The defense argues that the evidence in *Chanu* was so different from this case that *Chanu* does not apply. R. 855, Jordan Reply to Mot. for New Trial Br. at 6. The defense contends that in *Chanu*, the charged trading extended past the effective date of Dodd-Frank and thus the defense there did not argue there were no clear policies and CME rules against spoofing during the relevant period. *Id.* But this distinction does not change that the instruction was unnecessary given the other instructions on "knowingly" and "intent," as well as the risk of confusing jurors into thinking that the mistake-of-law defense is viable (a risk perhaps more prominent here than in *Chanu* given the trial testimony and arguments in this case).

23

**App. 042**

rules during the relevant period. In other words, given the arguments and testimony at trial, a good-faith instruction would have risked the jury erroneously conflating Jordan intending to defraud with Jordan knowing that he was acting in violation of the law.

Jordan's attempts to distinguish his case from his co-defendants' case are not persuasive. As the Court explained, there is no material distinction between Jordan's defense and his co-defendants' defense so as to warrant giving a good-faith instruction in the former trial and disallowing it in the latter. *See* Order on Jury Instructions at 2. Like the earlier trial, "the good-faith instruction [was] unnecessary to advance the defense of good faith" because Jordan could argue (and *did* argue) the absence of an intent to defraud. *Id.* And, in fact, it could be argued the risk at Jordan's trial of mistake-of-law defense confusion was higher given defense counsel's arguments at trial that the banks' policies and CME rules did not explicitly bar spoofing during the relevant period and that Jordan was not on notice of a spoofing prohibition. Indeed, the defense presentation also shows why Jordan did not suffer any prejudice from the denial of the good-faith instruction. The trial record reflects that Jordan was able to vigorously present his argument that he had no intent to defraud, and the given instructions directly allowed him to argue that point to the jury.

### 4. Response to Jury Question

Finally, Jordan takes issue with the supplemental instruction delivered in response to a jury question during deliberations about the meaning of the term "knowingly." On December 8, 2022 at 4:20 p.m., the jury sent a note requesting clarification

24

of the term "knowingly," and particularly the clause "is aware of the nature of his conduct." *See* R. 812; R. 815, Order on Jury Note; R. 825, Trial Tr. at 1394. After discussing the note with the parties, the Court gave the jury the following supplemental instruction:

> In response to your question, I will clarify that the definition of 'knowingly' on page 19 of the jury instructions does not mean that the defendant must be aware of whether his alleged conduct violated federal law. Having said that, I remind you that the government must prove beyond a reasonable doubt all of the elements of wire fraud affecting a financial institution, including (1) that the defendant knowingly devised or participated in a scheme to defraud, which is defined on pages 20–21 of the instructions; and (2) that he acted with the intent to defraud, which is defined on page 22 of the instructions and requires that he act 'knowingly with the intent to deceive or cheat the alleged victim in order to obtain money or property from the alleged victim or to cause the potential loss of money or property to the alleged victim.' I also remind you that you should consider the jury instructions as a whole.

R. 815, Response to Jury Note on Dec. 8, 2022 at 3.

The Seventh Circuit has instructed that trial courts have "an obligation to dispel any confusion quickly and with concrete accuracy" and described supplemental instructions as a proper means of addressing a jury's confusion. *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003). "[T]he necessity, extent, and character of any supplemental instructions to the jury are matters within the discretion of the district court." *United States v. Franco*, 874 F.2d 1136, 1143 (7th Cir. 1989) (cleaned up).

The Seventh Circuit considers three factors in evaluating supplemental instructions: "(1) whether the instructions as a whole fairly and adequately treat the issues; (2) whether the supplemental instruction is a correct statement of the law; and (3) whether the district court answered the jury's question specifically." *United*

*States v. Carani*, 492 F.3d 867, 874 (7th Cir. 2007) (cleaned up). Here, the supplemental instruction meets all three requirements. For the second requirement, the instruction—which includes that "knowingly … does not mean that the defendant must be aware of whether his alleged conduct violated federal law"—is an accurate statement of the law. *See Blagojevich*, 794 F.3d at 739.

As for the third requirement, the Court limited the supplemental instruction to addressing the jury's question specifically. Contrary to Jordan's contention that the jury instructions "adequately explained the meaning of 'knowingly,'" the note makes clear that the jury was confused about the phrase "is aware of the nature of his conduct" under "knowingly." *See* R. 812; R. 825, Trial Tr. at 1394. The Court's interpretation that the jury was most likely asking whether Jordan must know his alleged conduct violated federal law (or CME Rule 432 or the Banks' policies) was not "entirely speculative," as Jordan describes, but instead based on the ambiguity in the term "nature," as well as the arguments and testimony presented at trial. Indeed, as discussed earlier, "[t]here was extensive examination on whether the Defendant's conduct violated a policy or Rule 432 and … it is not a far step at all to then ask whether the Defendant must know that the alleged conduct violated federal law." Order on Jury Note at 1–2 (explaining how the defense's proposed alternative interpretations of the jury's question were unrealistic, as one was "explicitly addressed in the instructions" and the other nonsensible as "intent to deceive or cheat" would of course encompass knowledge of that intent). It was entirely appropriate for the Court

26

to comply with its obligation of dispelling the jury's likely source of confusion "quickly and with concrete accuracy." *Sims*, 329 F.3d at 943.

Finally, on the first requirement, the supplemental instruction fairly and adequately addressed the question presented by the jury's note. The note reflected that the jury was confused on whether Jordan needed to be "aware of the nature of his conduct." The Court acted properly in addressing the confusion by clarifying (in an understandable way to the jurors) that "knowingly" does not require that Jordan "be aware of whether his alleged conduct violated federal law." R. 815, Response to Jury Note on Dec. 8, 2022 at 3. This instruction balanced addressing the raised jury confusion on "knowingly" (with the correct law), while at the same time reminding the jury of the statute's other requirements, including that Jordan acted "with the intent to defraud." *Id.* And, out of an abundance of caution, the Court reminded the jurors of the government's burden of proof (proving beyond a reasonable doubt *all* the elements of wire fraud) and that the instructions be considered as a whole. *Id.*; *United States v. He*, 245 F.3d 954, 959 (7th Cir. 2001) (noting that precautions in a supplementary instruction like reminding the jury to consider the other elements of the crime "help to establish that the jury instructions as a whole were a fair and adequate treatment of the issues in this case."). The supplemental instruction was proper and is not a basis for granting a new trial.

27

**App. 046**

### III. Conclusion

The motions for acquittal and new trial are denied.


ENTERED:


                                    s/Edmond E. Chang
                              Honorable Edmond E. Chang
                              United States District Judge

DATE: September 14, 2023

28

**App. 047**

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 1 of 117 PageID #:12057

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3      UNITED STATES OF AMERICA,          )
                                           )
 4                    Plaintiff,           )
                                           )
 5             v.                          )  No. 19 CR 00669-4
                                           )
 6      CHRISTOPHER JORDAN,                )  Chicago, Illinois
                                           )  October 26, 2022
 7                    Defendant.           )  9:30 a.m.

 8                        TRANSCRIPT OF PROCEEDINGS
                            Pretrial Conference
 9                BEFORE THE HONORABLE EDMOND E. CHANG

10      APPEARANCES:

11      For the Plaintiff:        U.S. Department of Justice
                                  Criminal Division, Fraud Section
12                                BY:  MR. MATTHEW F. SULLIVAN
                                       MS. LUCY JENNINGS
13                                     MR. CHRISTOPHER FENTON
                                  1400 New York Avenue, NW
14                                Washington, D.C. 20530
                                  (202) 353-6200
15                                matthew.sullivan2@usdoj.gov
                                  lucy.jennings@usdoj.gov
16                                christopher.fenton@usdoj.gov

17

18      Court Reporter:          Judith A. Walsh, CSR, RDR, F/CRR
                                  Official Court Reporter
19                                219 South Dearborn Street, Room 2118
                                  Chicago, Illinois 60604
20                                (312) 702-8865
                                  judith_walsh@ilnd.uscourts.gov
21

22

23

24

25
```

2

```
 1   For the Defendant:          MOLOLAMKEN, LLP
                                 BY:  MS. MEGAN C. CHURCH
 2                               300 North LaSalle Street
                                 Suite 5350
 3                               Chicago, Illinois 60654
                                 (312) 450-6716
 4                               mchurch@mololamken.com

 5                               AKIN GUMP STRAUSS HAUER & FELD, LLP
                                 BY:  MR. JAMES J. BENJAMIN, JR.
 6                                    MS. PARVIN MOYNE
                                      MS. ANNE M. EVANS
 7                                    MR. SEAN NOLAN
                                 One Bryant Park, Suite 4100
 8                               New York, New York 10036
                                 (212) 872-1000
 9                               jbenjamin@akingump.com
                                 pmoyne@akingump.com
10                               aevans@akingump.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 23-2849   Document: 30   Filed: 01/05/2024   Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 41 of 117 PageID #:12097

41

1   in light of the exhibits for the current trial, we can

2   withdraw 7 and 10.  And then 8 and 11 relate to Mr. Edmonds,

3   and 9 and 12 relate to Mr. Flaum.  So we can withdraw those as

4   well in light of the resolution related to Mr. Edmonds and

5   Mr. Flaum.

6               THE COURT:  Okay.  Great.

7               Okay.  Then the next objected to, it looks like 18.

8               MS. CHURCH:  Your Honor, I think we can focus us on

9   some of these compliance materials.  So we will withdraw on

10  behalf of Mr. Jordan Defense Exhibits 18, 19, 20, 23, 24, 26,

11  28, and 29.  I'll give everyone a second to catch up.

12              So these are the JPMorgan compliance documents that,

13  you know, we think we can eliminate in order to streamline the

14  trial.  And so we've done our very best to focus in on what we

15  think is most relevant which are the four remaining objected-

16  to exhibits relating to the JPMorgan compliance.  And those

17  are Defense Exhibits 21, 22, 25, and then slightly out of

18  order, 92.

19              So taking, I think, what gives us 21 first, and

20  overall, this kind of -- this analysis applies to these

21  materials.  The Defense Exhibit 21 is the September 2012

22  market manipulation policy, and then 22 is the November 2012

23  compliance bulletin that announces this policy.

24              These documents are absolutely critical to our

25  defense for our cross-examination of Mr. Catana who we expect

1   as well as, you know, the overall timeline.  So just to take a

2   step back for a sense -- for a second, your Honor,

3   Mr. Jordan's defense has never been presented in any of the

4   other spoofing trials in this building or elsewhere.  He is

5   the only defendant whose trading that is at issue at trial

6   occurred pre-2011.

7           And we think that the government's witnesses that we

8   expect are going to testify are simply wrong when they say

9   that their policies and the rules at JPMorgan, Credit Suisse,

10  and at the CME always prohibited spoofing, placing an order

11  with the intent to cancel.  So the changes in their rules and

12  how they went about teaching and training traders on these

13  rules is absolutely critical to the jury understanding what

14  was and wasn't actually taught to Mr. Jordan, which goes to

15  his intent.

16          So Defense Exhibit 21 is the first JPMorgan policy to

17  explicitly prohibit spoofing.  It was adopted in 2012 after

18  Dodd-Frank.  We obviously understand your Honor's ruling.  We

19  do not need to explain why it was adopted or that it had

20  anything to do with Dodd-Frank, but that is when it was issued

21  to JPMorgan traders.

22          And it's going to be used to impeach the JPMorgan

23  compliance witness, Mr. Catana, and to rebut the government's

24  contention that spoofing was always against the rules of

25  JPMorgan and that the policies and trainings on this point

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 43 of 117 PageID #:12099

43

1    were always clear.

2        This is also, this -- on Page 2 of this document it

3    says, "This is the first version of this policy."  That is

4    something that the jury should understand when comparing the

5    prior versions of the JPMorgan compliance policies that apply

6    to traders because there was nothing clearly set out.  There

7    was no express prohibition on placing an order with the intent

8    to cancel.  So and Page 1 is where it references that the firm

9    has adopted this anti-fraud, anti-manipulation, and other

10   prohibited practices policy and references spoofing.

11       And then Defense Exhibit 22 is the compliance

12   bulletin where JPMorgan is informing its traders about this

13   policy which stands in stark contrast to the earlier versions

14   of the compliance policies and bulletins to which the

15   government has no objection.  We all agree that these are

16   relevant to Mr. Jordan's state of mind and whether or not

17   possessed the intent to defraud.

18       But the fact that JPMorgan came out and adopted this

19   policy, issued this bulletin, and later as we get into another

20   exhibit, trained its traders on this policy, that certainly

21   impeaches the testimony of Mr. Catana that this was always, in

22   fact, the policy at JPMorgan and that this is what was

23   understood and that the traders were trained on.

24       THE COURT:  Okay.  The response?

25       MS. JENNINGS:  I guess my response, your Honor, falls

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 44 of 117 PageID #:12100

44

1    into two pieces.  With respect to the -- it appears to me the

2    sole purpose of these is only for impeachment.  If that's the

3    case, they're certainly free to cross-examine Mr. Catana about

4    what the policies that existed at the time Mr. Jordan worked

5    there don't say, right.

6         It doesn't talk about the fact that it's not

7    explicit, but to then introduce documents that postdate

8    Mr. Jordan's employment at JPMorgan by years to show that

9    distinction, that doesn't sort of -- it doesn't -- it's hard

10   to reconcile that particularly in light of the Court's order

11   last night.

12        The second concern is that if Mr. Catana, for

13   instance, was allowed to be cross-examined on these documents,

14   he's not essentially allowed to explain the reason behind

15   those changes which was Dodd-Frank.  So it's impossible to

16   divorce Dodd-Frank, which as of this point in time is not

17   going to be permitted during cross-examination and the

18   government's case in chief from these documents because the

19   dates, especially these 2012 ones and beyond, are in direct

20   response to the Dodd-Frank anti-spoofing prohibitions.

21        And so being able to cross-examine but then, you

22   know, on redirect not being able to sort of get out or have

23   Mr. Catana even on cross explain the reason, it leaves just a

24   sort of gaping hole and I think would create significant sort

25   of confusion separate and apart from just the general 403

Case: 23-2849     Document: 30     Filed: 01/05/2024     Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 45 of 117 PageID #:12101

45

1  concerns here about introducing policies that were not

2  applicable to the defendant in this case.

3       MS. CHURCH:  Your Honor, we also think -- just to

4  respond briefly to that, we understand that we can

5  cross-examine Mr. Catana on what the policies don't say, but

6  it's critical for the jury to actually see what JPMorgan does

7  which is provide clear guidance when it has a policy that it

8  prohibits.  And that is what is shown in these later

9  documents, not only the policies, the manuals and the

10 training.

11      What we also think is important is that these are

12 business records of JPMorgan that the jury, should they want

13 to see them, should they want to compare back when they're

14 deliberating, what does one policy say versus another, they

15 should be able to do that.  And that is why it's also

16 important that these documents not only be admitted, which we

17 believe we can do through the JPMorgan witness or 902(11)

18 certification and publish, but that the jury have the

19 opportunity to review those portions.

20      We're not going to belabor this.  We've focused on

21 four specific policies for JPMorgan so as not to create a

22 whole sideshow, but it's actually critical to the point of

23 whether or not Mr. Jordan intended to defraud because their

24 theory is that the rules and regulations always prohibited

25 this conduct and that he violated these rules knowingly and,

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 46 of 117 PageID #:12102

46

1    therefore, he intended to deceive.

2         If these rules and regulations later came out and

3    said, "This is what our policy is and this is our first

4    policy," that's critical for the jury to understand.

5         THE COURT:  Mr. Jordan will have the opportunity to

6    cross on the absence of explicit language in the compliance

7    policies of both Chase and presumably Credit Suisse as well.

8    And there is a significant 403 problem to then introduce these

9    after-the-fact changes in the policies because I think the

10   government is right that in order for the witnesses to then

11   explain on redirect why did these policies then become

12   explicit, will get into the Dodd-Frank quagmire, and it does

13   pose the risk of the -- this imperfect mistake of law defense

14   which I think is a serious specter in this case.

15        The jury will decide whether or not to -- first, of

16   course, they have to decide that Mr. Jordan actually did put

17   bids and offers into the market with the unconditional purpose

18   and intent to cancel them.  If that fact is established, then

19   the jury still needs to decide whether or not that is a --

20   that constitutes a misrepresentation and constitutes a fraud.

21   So they will still have to decide that.

22        The problem with introducing this after-the-fact

23   evidence and spiralling into a Dodd-Frank explanation is then

24   the jury is -- I believe there is a very serious risk that the

25   jury will then get confused on, well, wait, wire fraud did not

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 47 of 117 PageID #:12103

47

1     cover this.  And that is just not an accurate statement of the

2     law.  At the very least, the jury can find that it covered

3     this.  So these after-the-fact policies are excluded.  So

4     that's 21, 22, 25, and was it 92?

5              MS. CHURCH:  Yes, your Honor.

6              THE COURT:  All right.

7              MS. CHURCH:  Your Honor, I understand your ruling but

8     just wanted to raise as a possibility a limiting instruction

9     that the Court can give to the jury about whether or not the

10    conduct, you know, wire fraud was not dependent on Dodd-Frank

11    or something along those lines that can certainly be crafted.

12             Dodd-Frank -- I mean, we would, of course, not object

13    if the government on redirect went on to simply explain there

14    was the passage of a law so, therefore, we made this change,

15    but that certainly goes to what was explained previously.  And

16    if we can craft a jury instruction that illuminates for them

17    that this is not the deciding -- you know, this is not

18    determinative but this is information that they can consider

19    in evaluating the credibility of what these witnesses have

20    said was clear to the traders prior to 2011, that would allow

21    the jury to understand and to really question what -- the

22    accuracy of the information of what these witnesses are

23    telling the jury.

24             THE COURT:  You will be able to vigorously

25    cross-examine them on the absence of explicit language and

1    possibly, depending on what the witnesses say, explicit

2    training on spoofing and whether it was even known as spoofing

3    at the time.  And if you have evidence of it, you can also

4    introduce how common it -- a practice it was factually.

5          But the serious risk of Dodd-Frank is that the jury

6    will, and we're all co-equal branches, but it's basically

7    taking Congress' opinion that wire fraud was not -- and the

8    other fraud statutes was not sufficient and so we need to pass

9    an explicit statute on this.  The jury should not be drawing

10   that inference, and there's a serious risk that they will.

11         So I think as I said, a mistake of law is looming

12   over this trial, and I'm trying to dispel it as much as I can.

13   And at the same time, there will be, I think, plentiful

14   cross-examination fodder of -- of both the compliance

15   witnesses and the CME rule witnesses.  There was at the first

16   trial.  There was, I think, some solid cross-examination on

17   that point.  So I don't think a limiting instruction would cut

18   it.

19         MS. CHURCH:  Yes, your Honor.

20         MS. JENNINGS:  Your Honor, may I just ask, with

21   respect to 27, is that also -- I just didn't hear in the Court

22   ruling.

23         THE COURT:  27, there's no objection.

24         MS. JENNINGS:  Okay.  And I guess the question would

25   just be, I think it's the same --

49

1          MS. CHURCH:  We'll withdraw it.

2          MS. JENNINGS:  Okay.  And sorry.  91, I believe.

3          MS. CHURCH:  We will withdraw that one as well, your

4     Honor.

5          THE COURT:  Okay.  Well, I mean, you want to preserve

6     it and just -- so it's not withdrawn.

7          MS. CHURCH:  Yes, your Honor.  Thank you.

8          THE COURT:  It's the same --

9          MS. CHURCH:  I appreciate the distinction.  Yes.

10         THE COURT:  So it's excluded for the same reasons, 91

11    and 27.

12         All right.  3 -- I'm sorry.  The objected to is 34.

13         MS. CHURCH:  Yes, your Honor.  34 through 36 are

14    Credit Suisse compliance policies and trainings

15    post-Dodd-Frank.  For the same reasons with regard to

16    JPMorgan, we would seek to have them admitted.  We understand

17    the Court's ruling.

18         THE COURT:  Okay.  All right.  So they're excluded

19    for the same reasons.

20         Okay.  37.

21         MS. CHURCH:  37 is slightly different, your Honor.

22    So 37 is a CME training to Credit Suisse from June of 2012.

23    This was a document that was produced to us by Credit Suisse

24    in response to a subpoena.

25         What is interesting about this document is that

1   Robert Sniegowski who has been the rules expert for the

2   government in every other witness -- in every other trial

3   prior to this one is one of the authors of this training.  And

4   so as the representative of the CME and along with others, he

5   went to Credit Suisse and gave this training.

6          Ms. Middleton, who we understand is being substituted

7   for Mr. Sniegowski, is also at the CME in his now former

8   position.  We don't yet have any 3500 material for

9   Ms. Middleton, but we understand from the government's

10  disclosure that she's going to testify to the same topics as

11  Mr. Sniegowski.

12         What is important about this particular training deck

13  is on Pages 5 -- on Page 51, she refers to the CFTC's new

14  anti-manipulation and anti-fraud rules.  And the reason why

15  that again is critical is that we expect that she will testify

16  consistently with Mr. Sniegowski that the CME rules always

17  prohibited spoofing.  The fact that the CME is training Credit

18  Suisse traders on its rules and have identified this sort of

19  conduct as being new is significant to impeach her testimony

20  that this was conduct that was always prohibited.  And Page 56

21  specifically references spoofing.

22         So this is to impeach the testimony of Ms. Middleton.

23  It's a business record.  And it demonstrates that when -- if,

24  in fact, she chooses to testify that this conduct was always

25  prohibited, it wasn't, in fact, and this was considered new

Case: 23-2849     Document: 30     Filed: 01/05/2024     Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 51 of 117 PageID #:12107

51

1    even by the CME.

2         THE COURT:  Okay.  The government's response?

3         MR. FENTON:  Your Honor, this document should be

4    excluded for the same reason that the JPMorgan and Credit

5    Suisse materials that postdate Dodd-Frank should be excluded

6    because this talks about developments subsequent to the time

7    that Mr. Jordan was trading and subsequent to the timeframe

8    for the scheme.  So it can't be relevant to his state of mind

9    and basically raises all of the same issues that your Honor

10   previously flagged as being grounds for exclusion.

11        In addition to that, there's other issues with this

12   document as well which is it cannot be used to impeach

13   Ms. Middleton because she didn't write it.  This was

14   Mr. Sniegowski's documents.  He's now retired, and he is no

15   longer working at the CME.  He's not going to be a witness at

16   trial.  So this document cannot be used to impeach her

17   testimony.  These are not earlier statements that she made.

18        And in addition to that, the specific language that's

19   being pointed out on Page 51 concerns CFTC rules.

20   Ms. Middleton is going to be testifying about the CME rules, I

21   think in particular Rule 403.2 and what that meant at the time

22   that Mr. Jordan was trading, which is what is relevant in this

23   case and not what happened subsequent to that time.

24        THE COURT:  Yeah, as the defense brief points out,

25   you can impeach by contradiction.  It doesn't have to be your

**App. 060**

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 52 of 117 PageID #:12108

52

1    own prior statement.  But, yeah, there is the same concern.
2    The same Dodd-Frank concerns arise from this evidence.  Page
3    55 and 56 are describing the Dodd-Frank prohibitions.  And
4    then as Mr. Fenton points out, Page 51 is the CFTC's new
5    rules.  I mean, they are new chronologically, so I don't think
6    that that's a concession necessarily in any event.  So I think
7    this has the same problems.
8              By the way, is it possible that -- so Erin Schwartz
9    is listed as an author.
10             MS. CHURCH:  We don't believe she's the same person,
11   your Honor.  We did look into that.
12             THE COURT:  Well, aside from that, it wouldn't
13   necessarily be necessary because you can impeach by
14   contradiction.  So this raises the same issues and the same
15   problems as the other documents, so this is excluded as well.
16   All right.  That's 37.
17             Okay.  39, so this is a First New York document,
18   though.
19             MS. MOYNE:  Your Honor, in light of the Court's
20   rulings with respect to the other First New York documents, we
21   withdraw 38 and 39.  It's a compliance policy and training
22   deck.
23             THE COURT:  Okay.  There had been no objection to 38
24   but, yeah, it will be withdrawn, again, the caveat being if it
25   arises as 404(b) somehow.  So that's 38 and 39.

1          Okay.  40.

2          MS. CHURCH:  Yes, your Honor.  This is the CME's

3    notice of disciplinary action against Martell.  So by way of

4    background, we subpoenaed the CME for public disciplinary

5    actions involving spoofing under Rule 432.  This is the very

6    first CME disciplinary action under Rule 432 for spoofing

7    conduct, and it occurred in 2011 -- excuse me, 2012.

8          And this is critical for our cross of Ms. Middleton

9    who we expect will testify that, you know, the CME's rules and

10   regulations, one of the methods of informing traders of what

11   conduct is and is not allowed is through these sorts of

12   enforcement actions, and this was 2012.  I understand that

13   some of the conduct was from earlier in the period because

14   that was when the enforcement action was announced, but this

15   is the very first under Rule 432.

16         And then Defense Exhibit 41 is the CME enforcement

17   action from 2013 for Coscia.  And again, this would be used

18   with Ms. Middleton on cross-examination and is another Rule

19   432 enforcement action for spoofing-related conduct.

20         And what's critical here, your Honor, is the rules,

21   the specific sections of Rule 432 that the CME looked at for

22   taking action against Mr. Martell and Mr. Coscia aren't the

23   same ones that the government has pointed to here.  These are

24   not manipulation.  This is not fraud.  This is not

25   misrepresentation.  These are very, very broad, general

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 54 of 117 PageID #:12110

54

1    prohibitions and guidance on how someone is supposed to

2    conduct themselves as a trader on the CME.  Certainly, they do

3    not prohibit placing an order with the intent to cancel.

4         And so we think it's absolutely important that the

5    jury understands that even with the rules, regulations, and

6    Rule 432, which the government agrees is what was at issue

7    during this time period, there was no enforcement action prior

8    to 2012 to provide notice to an individual like Mr. Jordan

9    that this sort of conduct was prohibited by the CME's rules

10   and certainly that they didn't constitute fraud.

11        THE COURT:  Okay.  Setting aside the assertion that

12   the subsections did not certainly apply, what's the

13   government's response?

14        MR. FENTON:  Well, your Honor, I think to the extent

15   that the defense wants to cross-examine Ms. Middleton about

16   whether there were any public actions that were taken against

17   spoofers in the time period when Mr. Jordan was trading at

18   JPMorgan or Credit Suisse, they certainly can do that.  It's

19   within the scope of relevance, and it would be relevant to her

20   testimony.  With respect to events that took place after he

21   stopped trading, that's simply not relevant for all of the

22   reasons that apply to all of the exhibits that we previously

23   discussed.

24        In addition to that, this case concerns a different

25   trading pattern.  It's not analogous simply by -- it's not the

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 55 of 117 PageID #:12111

55

1    same as what Mr. Jordan did in this case simply because it

2    involved spoofing.  If you look at the facts, I mean, this is

3    different.  So I think that there is also a risk of jury

4    confusion as well because the jury is essentially left

5    comparing, you know, these two actions, and they're looking at

6    two different time periods involving, you know, different

7    standards.

8         But the bottom line is, none of this would have

9    informed Mr. Jordan's state of mind because it all happened

10   after he stopped trading.

11        MS. CHURCH:  That's precisely the point, your Honor.

12   It happened after he stopped trading.  And the timing analysis

13   for Coscia is different than the Dodd-Frank analysis.

14   Dodd-Frank is not mentioned anywhere in this particular notice

15   of disciplinary action.  It's the same rule that the CME's

16   witnesses are going to say applied to trading during the

17   entirety of Mr. Jordan's trading period for the trades that

18   are at issue in this case.  And the fact that this second came

19   out in 2013 is certainly indicative of what was, you know,

20   understood to be prohibited conduct at the time Mr. Jordan was

21   trading.

22        The CME has taken the responsibility, we're going to

23   have someone from the market outreach department who goes

24   around instructing traders about what is and isn't allowed.

25   And the fact that these disciplinary actions, which are a very

**App. 064**

Case: 23-2849   Document: 30   Filed: 01/05/2024   Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 56 of 117 PageID #:12112

56

1   significant tool for the CME to provide this instruction to

2   traders, didn't happen until 2012 and 2013 absolutely goes to

3   what was under -- commonly understood, what was communicated,

4   and what Mr. Jordan would have known.

5           THE COURT:  Yeah, you can get those points out by

6   just crossing the witness that -- as to when were the first

7   enforcement actions that targeted spoofing but, yeah, and what

8   you can't get out and what this might provide is the

9   particular subsections.

10          MS. CHURCH:  But there's nothing about Dodd-Frank,

11  your Honor, and there is -- the real risk, I think, for having

12  a CME witness who may or may not recall -- Ms. Middleton, at

13  the time that these notices of disciplinary action were being

14  issued, was not in her current position.  I think she just

15  graduated from being an intern at the CME.  And there's very

16  real risk she'll not know, not remember.

17          She wasn't, you know, in that position at that time

18  which certainly would prejudice our ability to thoroughly

19  cross-examine her on what CME's rules were at that time.

20          THE COURT:  So who would your sponsoring witness be?

21          MS. CHURCH:  They would be -- we would have a 902(11)

22  from the CME.  We would put them in through Ms. Middleton that

23  these are the source of notices of disciplinary action as

24  issued by the CME when they take an enforcement action against

25  a trader.  We can publish them through her, your Honor.

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 57 of 117 PageID #:12113

57

1          MR. FENTON:  Your Honor, if I can make two additional

2    points.

3          THE COURT:  All right.

4          MR. FENTON:  The first point is that this is somewhat

5    misleading and I think could lead to jury confusion because if

6    you look at the file number, this investigation did indeed

7    begin in 2010 which is the relevant time period.  The

8    action -- you know, this document is not published until 2012,

9    but nevertheless the investigation began in 2010 which I think

10   is an important fact that could get lost on the jury.

11         The other thing is that the particular subsection

12   under which the CME chose to prosecute is simply just not

13   relevant here.  I think the fact that the rule prohibits it

14   and there are various subsections that apply, that's certainly

15   relevant to argue, you know, that somehow the fact that they

16   decided to proceed under one subsection and not another and

17   that, therefore, there's some sort of inference that should be

18   drawn with respect to Mr. Jordan's state of mind is very

19   convoluted.  And I think the subsection that was chosen is

20   certainly not relevant to what he knew or his conduct.

21         MS. CHURCH:  Your Honor, the government has walked

22   its witnesses through various subsections of Rule 432 and --

23         THE COURT:  Right, let me just interrupt.  So if I

24   can get an education on, "the panel" that is being referred to

25   is comprised of who?

Case: 23-2849   Document: 30   Filed: 01/05/2024   Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 58 of 117 PageID #:12114

58

1        MS. CHURCH:  Members of the CME business conduct
2   committee.
3        THE COURT:  Okay.  And then the panel's decision is
4   final?
5        MS. CHURCH:  Yes, your Honor.
6        THE COURT:  Okay.  And the way these disciplinary
7   actions work is there are some other -- well, I assume there
8   is, outside of the panel some entity at -- within CME
9   initiates the disciplinary action and proposes which rules and
10  subsections are violated?
11       MS. CHURCH:  Yes, your Honor.  And I would expect
12  both Mr. Scheerer and Ms. Middleton to be able to explain that
13  process to the jury given their positions and their testimony.
14       THE COURT:  Okay.  And so, yes, this is much more
15  tightly relevant than -- and imposes many fewer 403 problems
16  than what we've been discussing with regard to Dodd-Frank.
17  And I do remember at the first trial the government eliciting
18  the particular subsections as they really had to.  I mean, you
19  can't just throw 402 and hope it sticks to the wall.
20       And, yeah, there were some that were quite broadly
21  worded.  So this would, to the extent that the conduct is
22  similar -- and it does appear from the findings that they're
23  similar.  There's no hearsay problem because this is an 80 --
24  well, no, CME is a private, but it is a business record of the
25  CME.  So, yeah, it would fit under that in terms of any kind

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 59 of 117 PageID #:12115

59

1    of hearsay issue.

2              It's pretty concise, and it does go toward impeaching

3    the CME witness on what subsections are violated by spoofing.

4    And if it differs -- I mean, it even differed from, I think,

5    panel to panel here.  She can try to explain the structure of

6    the disciplinary action and that the -- if this is accurate,

7    the panel was choosing from the proposed violations and that

8    conduct can violate multiple subsections, she can try to

9    explain all of that as well, but it relevant to whether 402 --

10   432 was -- yeah, was genuinely addressing spoofing.

11             So, yeah, I think these are relevant, and you can

12   examine the CME witness on these.

13             MR. FENTON:  Your Honor, can I make one additional

14   point?

15             THE COURT:  All right.

16             MR. FENTON:  This is also the result of a negotiated

17   settlement.  And if you look at the findings, it talks about

18   the fact that this is a negotiated settlement.  It's, the

19   trader here neither admitted nor denied the findings and the

20   conclusions.  So the selection of the subsections is the

21   result of negotiation.

22             THE COURT:  It doesn't look like that.  It looks like

23   the panel found -- and maybe Ms. Middleton will, you know,

24   explain differently but, yeah, Martell and Coscia can deny it

25   all they want and not admit all they want, but the panel made

1    certain findings, and it seems pretty clear that they're

2    categorizing the conduct, and that's not -- yeah, that's not

3    just the product of settlement.

4         MR. FENTON:  But my point is that this subsection

5    that they chose to settle under is the product of the

6    settlement.  So the terms of the settlement include the no

7    admit/no deny coupled with the subsection to which they agree

8    to resolve the matter.  And in the public notice, the public

9    disclosure, there's an outline of what the CME believes was

10   the misconduct, the facts that underlie.  And then you've got

11   the no admit/no deny and then you've got the resolution, you

12   know, under a particular subsection.

13        So the point that I'm making is simply that the

14   subsection that's chosen is not necessarily a reflection of

15   what the CME believes, you know, is the exclusive subsections

16   that spoofing would violate but it's a reflection of what the

17   parties agreed upon in order to resolve this matter.

18        THE COURT:  Yeah, I mean, she can explain that if

19   that's accurate.  I mean, if the -- yeah, and so you can

20   redirect on that, but I think it's still relevant that the

21   panel agreed to settle on -- as to certain subsections.  And

22   again, it's not even -- it's not quite clear to me that that's

23   really what they were doing.

24        So I don't think that undermines the admissibility.

25   Maybe it will go towards explaining the choice of the

1    subsection, but I think these are otherwise admissible.

2         MR. FENTON:  Would your Honor be willing to reserve

3    judgment to allow us to develop the facts a little further

4    with Ms. Middleton?

5         THE COURT:  You can, but then you're going to have to

6    push that out to the defense.  And if it completely undermines

7    the admissibility then, yeah, then I'm happy to reconsider it.

8         MR. FENTON:  All right.  Thank you, your Honor.

9         THE COURT:  Okay.  But, by the way, you might -- in

10   order to really undermine it, it might not be Ms. Middleton

11   who can supply the information.  You'd have to actually talk

12   to members of this committee and see what their take on that

13   is.

14        Okay.  42.

15        MS. CHURCH:  So this is the market regulation

16   advisory notice from the CME Group regarding the adoption of

17   the new Rule 575.  And we certainly understand that there may

18   be issues in light of your Honor's ruling about Dodd-Frank and

19   this relevance, and so I don't want to belabor the point, but

20   what is critical here for us is that Rule 575 is the first

21   time there is any reference in any of the CME rules that we

22   have found -- and we have searched, Judge -- about the CME's

23   rules requiring that all orders be bona fide.

24        And the reason this has been an issue is that the

25   government's witnesses in each of the prior trials have said

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 62 of 117 PageID #:12118

62

1    that the CME has always required that orders be bona fide.

2    This was not a defined term anywhere by the CME or the CFTC

3    which is why what was commonly understood by traders was -- is

4    of significance, and that's why we proposed Professor

5    Markham's testimony regarding that.

6         Mr. Fenton in the last trial, I think at Page 661 of

7    the July 11th transcript, asked Mr. Sniegowski about Rule 575

8    specifically.  So that is why we believe that it is relevant.

9    It will impeach the testimony of Mr. Scheerer and

10   Mr. Sniegowski if they testify that the CME's rules always

11   require that orders be bona fide when it never appeared before

12   this -- until Rule 575 was adopted.

13        THE COURT:  All right.  The government's response?

14        MR. FENTON:  Thank you, your Honor.  This introduces

15   all of the same issues as the Dodd-Frank, all the same

16   problems that the Dodd-Frank issue introduces as well with

17   respect to events that developed after Mr. Jordan stopped

18   trading or after, I'm sorry, the end of the scheme.  So for

19   those reasons, it should be excluded.

20        But in addition to that, questions about what the

21   rules, the applicable rules at the time said and did not say

22   are, that is fertile ground for cross-examination as your

23   Honor pointed out with respect to, you know, the earlier

24   compliance trainings and policies and procedures, and the same

25   would be true here.

Case: 23-2849    Document: 30    Filed: 01/05/2024    Pages: 142
Case: 1:19-cr-00669 Document #: 749 Filed: 10/27/22 Page 63 of 117 PageID #:12119

63

1          The last point that I would make is that Rule 75 --

2    Rule 575 was authored by Mr. Sniegowski.  He testified in the

3    previous trial.  He's not going to be testifying in this

4    trial.  So again, this cannot necessarily be used to directly

5    impeach him.  It's not a prior statement that is inconsistent

6    with any testimony that he would be providing at trial.

7          THE COURT:  Yeah, I think given the time period of

8    the -- the relevant time period in this case is distinct from

9    the first trial, this is irrelevant and also poses all the 403

10   problems that I've discussed before and adding in that this

11   appears to at the bottom of Page 1 reflect, you know, a rule

12   change and reaction to the CFTC's regulation.

13         So we have to throw the CFTC's interpretation into

14   this as well.  So for those similar reasons as the Dodd-Frank

15   problem, this is excluded.

16         All right.  44.

17         MS. CHURCH:  Sure, your Honor.  We can take Defense

18   Exhibits, I think, 44, 45, and 46 together.  These are

19   business records from the CME's -- actually, from its website.

20   They're printouts from the CME's website.  So Defense Exhibit

21   44 is the glossary that is currently on its website.

22         45 is the timeline of achievements that discusses

23   essentially the formation and transition from the various --

24   you know, I think we've heard about the Egg and Butter Board

25   at each of the prior trials, through pit trading, to

1                    C E R T I F I C A T E

2              I, Judith A. Walsh, do hereby certify that the

3       foregoing is a complete, true, and accurate transcript of the

4       proceedings had in the above-entitled case before the

5       Honorable EDMOND E. CHANG, one of the judges of said court, at

6       Chicago, Illinois, on October 26, 2022.

7

8       /s/ Judith A. Walsh, CSR, RDR, F/CRR_____     October 27, 2022

9       Official Court Reporter

10      United States District Court

11      Northern District of Illinois

12      Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25