Nos. 23-2840, 23-2846, 23-2849

# In The United States Court Of Appeals For The Seventh Circuit

————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GREGG SMITH, MICHAEL NOWAK, AND CHRISTOPHER JORDAN,

*Defendants-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS (NO. 1:19-CR-669)
THE HON. EDMOND E. CHANG, DISTRICT JUDGE

————————

## ANSWERING BRIEF FOR THE UNITED STATES

————————

JEREMY R. SANDERS
Appellate Counsel, Fraud Section
   Criminal Division

MATTHEW F. SULLIVAN
LUCY B. JENNINGS
   Trial Attorneys, Fraud Section
   Criminal Division

NICOLE M. ARGENTIERI
   Principal Deputy Assistant Attorney
   General

LISA H. MILLER
   Deputy Assistant Attorney General

DANIEL N. LERMAN
   Attorney, Appellate Section
   Criminal Division
   U.S. Department of Justice
   950 Pennsylvania Ave., N.W.
   Washington, DC 20530
   (202) 353-7696
   Daniel.Lerman@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... vi

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES ........................................................ 1

STATEMENT OF THE CASE ........................................................... 2

      A.    Procedural History .................................................. 2

      B.    Facts ........................................................................ 3

             1.    The Precious Metals Futures Market ......................... 3

             2.    The Defendants' Schemes To Manipulate Precious Metals Futures Prices ................................. 6

             3.    Coworkers' Observations Of The Defendants' Spoofing ................................................... 12

             4.    Chat Messages Exchanged During The Defendants' Spoofing ................................................. 15

             5.    Bank Policies And CME Rules Prohibiting Spoofing ................................................... 18

             6.    Depositions And Interviews Of The Defendants Regarding Their Trading ........................................... 20

             7.    The Defendants' Trials and Convictions .................. 21

      C.    Rulings Under Review .......................................... 27

SUMMARY OF ARGUMENT ......................................................... 27

ARGUMENT ..................................................................................... 32

    I.    THE EVIDENCE WAS SUFFICIENT TO SHOW THAT SMITH AND NOWAK PLACED ORDERS WITH THE REQUISITE INTENT TO CANCEL THEM ............................... 32

      A.    Background ........................................................... 32

B.     Standard Of Review .............................................................. 33

C.     This Court Has Repeatedly Held That Spoofing Is Unlawful ................................................................................ 33

D.     The Evidence Was Sufficient To Show That Smith and Nowak Engaged In Unlawful Spoofing Conduct ........ 38

E.     The Defendants' Intent To Cancel Was "Unconditional" ...................................................................... 41

      1.    Background .............................................................. 41

      2.    Argument.................................................................. 42

F.     The Defendants' Remaining Arguments Lack Merit ......... 48

II.    THE EVIDENCE WAS SUFFICIENT TO SHOW THAT THE DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD .................................................................................... 55

A.     This Court Has Already Held That The Same Conduct Constitutes A Scheme To Defraud ...................... 57

B.     The Evidence Showed That The Defendants Misrepresented An Essential Element Of The Bargain ................................................................................ 59

C.     *Weimert* Lends No Support To Nowak's Claim ................. 62

III.   THE STATUTES OF CONVICTION ARE NOT UNCONSTITUTIONALLY VAGUE ........................................... 64

A.     Standard of Review .............................................................. 64

B.     Argument.............................................................................. 64

IV.   THE DISTRICT COURT DID NOT PLAINLY ERR OR ABUSE ITS DISCRETION IN ADMITTING A CME INVESTIGATOR'S TESTIMONY AND REPORT ...................... 65

A.     Standard of Review .............................................................. 65

B.     The District Court Did Not Plainly Err Or Abuse Its Discretion In Allowing Wika's Testimony .......................... 65

      1.     Background ............................................... 65

      2.     Wika Did Not Improperly Opine That Smith Was Guilty .................................................. 66

      3.     Wika Did Not Give Expert Testimony ..................... 73

      4.     Wika's Testimony Satisfied Rule 403 ...................... 77

C.     The District Court Did Not Abuse Its Discretion In Admitting Wika's Report .................................................... 79

      1.     Background ............................................... 79

      2.     Argument .................................................. 80

D.     Any Error In Admitting Wika's Testimony Or Report Was Harmless ......................................................... 82

V.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING TESTIMONY FROM COOPERATING WITNESSES ................................................... 85

A.     Background ......................................................... 85

B.     Standard of Review ................................................. 86

C.     The Cooperating Witnesses Did Not Improperly Opine That Smith and Nowak Were Guilty ...................... 86

D.     The Cooperating Witnesses Did Not Give Expert Testimony ......................................................... 89

E.     The District Court Did Not Abuse Its Discretion In Admitting The Witnesses' Testimony Under Rule 403 ..... 93

F.     Any Error In Admitting The Cooperating Witnesses' Testimony Was Harmless .................................................... 94

VI.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN PROVIDING SUPPLEMENTAL JURY INSTRUCTIONS ........................................................................... 95

    A.  Background .......................................................................... 95

    B.  Standard Of Review............................................................ 97

    C.  The District Court Did Not Abuse Its Discretion In Providing The *Silvern* Instruction ...................................... 97

    E.  The District Court Did Not Abuse Its Discretion In Reminding The Jury That Lawyer's Statements Are Not Evidence ...................................................................... 101

VII.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION UNDER RULE 403 IN LIMITING JORDAN'S CROSS-EXAMINATION ........................................ 104

    A.  Background ........................................................................ 104

    B.  Standard Of Review.......................................................... 106

    C.  The District Court Properly Exercised Its Discretion ..... 107

    D.  Any Error Was Harmless .................................................. 113

VIII.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING JORDAN'S STATEMENT TO THE FBI.................................................................................. 116

    A.  Background ........................................................................ 116

    B.  Standard Of Review.......................................................... 117

    C.  Argument........................................................................... 117

IX.  THE DISTRICT COURT CORRECTLY DECLINED JORDAN'S REQUEST FOR A GOOD-FAITH INSTRUCTION.......................................................................... 121

    A.  Background ........................................................................ 121

    B.  Standard Of Review.......................................................... 122

C.     Argument.............................................................................. 122

CONCLUSION................................................................................. 127

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Adkins* v. *United States*,
　960 F.3d 1352 (Fed. Cir. 2020) ..................................................... 61

*Clarett* v. *Roberts*,
　657 F.3d 664 (7th Cir. 2011) ........................................... 75, 76, 93

*Clifford* v. *Crop Prod. Servs., Inc.*,
　627 F.3d 268 (7th Cir. 2010) ...................................................... 101

*Cohen* v. *Office Depot, Inc.*,
　204 F.3d 1069 (11th Cir. 2000) ................................................... 58

*Delaware* v. *Van Arsdall*,
　475 U.S. 673 (1986) ................................................................... 107

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
　801 F.3d 758 (7th Cir. 2015) ................................................ 34, 44

*Jordan* v. *Binns*,
　712 F.3d 1123 (7th Cir. 2013) ..................................................... 81

*McDaniel* v. *Brown*,
　558 U.S. 120 (2010) ..................................................................... 55

*Morrow* v. *May*,
　735 F.3d 639 (7th Cir. 2013) ....................................................... 84

*Musacchio* v. *United States*,
　577 U.S. 237 (2016) ..................................................................... 45

*Public Service Co. of Indiana, Inc.* v. *Bath Iron Works Corp.*,
　773 F.2d 783 (7th Cir. 1985) ..................................................... 112

*Sprint/United Mgmt. Co.* v. *Mendelsohn*,
　552 U.S. 379 (2008) ................................................................... 113

*State* v. *Warren*,
　732 A.2d 1017 (N.H. 1999) ....................................................... 118

*Tribble* v. *Evangelides*,
   670 F.3d 753 (7th Cir. 2012)........................................................ 77

*United Sates* v. *Boney*,
   977 F.2d 624 (D.C. Cir. 1992)...................................................... 78

*United State* v. *Cheek*,
   740 F.3d 440 (7th Cir. 2014)........................................................ 76

*United States* v. *Agbi*,
   84 F.4th 702 (7th Cir. 2023) ........................................................ 33

*United States* v. *Askew*,
   403 F.3d 496 (7th Cir. 2005)........................................................ 65

*United States* v. *Baker*,
   49 F.4th 1348 (10th Cir. 2022) .................................................... 58

*United States* v. *Balistrieri*,
   779 F.2d 1191 (7th Cir. 1985)...................................................... 57

*United States* v. *Banks*,
   982 F.3d 1098 (7th Cir. 2020)...................................................... 99

*United States* v. *Bases*,
   2021 WL 6621284 (N.D. Ill. July 15, 2021) ................................ 92

*United States* v. *Baskes*,
   649 F.2d 471 (7th Cir. 1980)........................................................ 78

*United States* v. *Beverly*,
   913 F.2d 337 (7th Cir. 1990).......................................... 98, 99, 100

*United States* v. *Binday*,
   804 F.3d 558 (2d Cir. 2015) ........................................................ 60

*United States* v. *Blackburn*,
   992 F.2d 666 (7th Cir. 1993)........................................................ 82

*United States* v. *Blitch*,
   622 F.3d 658 (7th Cir. 2010)........................................................ 99

*United States* v. *Bogan*,
    267 F.3d 614 (7th Cir. 2001).................................................................. 87

*United States* v. *Butler*,
    71 F.3d 243 (7th Cir. 1995)................................................................... 84

*United States* v. *Byrski*,
    854 F.2d 955 (7th Cir. 1988)............................................. 98, 99, 100, 103

*United States* v. *Cardena*,
    842 F.3d 959 (7th Cir. 2016)................................................................ 101

*United States* v. *Chanu*,
    40 F.4th 528 (7th Cir. 2022) ...........................................................*passim*

*United States* v. *Collins*,
    223 F.3d 502 (7th Cir. 2000)................................................................. 98

*United States* v. *Conn*,
    297 F.3d 548 (7th Cir. 2002)................................................................. 76

*United States* v. *Cooper*,
    203 F.3d 1279 (11th Cir. 2000).............................................................. 56

*United States* v. *Coscia*,
    177 F. Supp. 3d 1087 (N.D. Ill. 2016) ........................................ 75, 88, 93

*United States* v. *Coscia*,
    866 F.3d 782 (7th Cir. 2017)...........................................................*passim*

*United States* v. *Cruse*,
    805 F.3d 795 (7th Cir. 2015)................................................................ 122

*United States* v. *Cunningham*,
    54 F.3d 295 (7th Cir. 1995)................................................................... 83

*United States* v. *Daniel*,
    749 F.3d 608 (7th Cir. 2014)................................................................. 65

*United States* v. *De Stefano*,
    476 F.2d 324 (7th Cir. 1973)............................................................... 100

*United States* v. *Dial*,
  757 F.2d 163 (7th Cir. 1985)........................................................ 37

*United States* v. *Diaz*,
  533 F.3d 574 (7th Cir. 2008)...................................................... 101

*United States* v. *Eaden*,
  37 F.4th 1307 (7th Cir. 2022) ....................... 29, 71, 72, 74, 87, 91

*United States* v. *Feldman*,
  931 F.3d 1245 (11th Cir. 2019)................................................... 59

*United States* v. *Freeman*,
  498 F.3d 893 (9th Cir. 2007)...................................................... 55

*United States* v. *Guertin*,
  67 F.4th 445 (D.C. Cir. 2023) ................................................... 56

*United States* v. *Haddad*,
  10 F.3d 1252 (7th Cir. 1993)..................................................... 119

*United States* v. *Harris*,
  942 F.2d 1125 (7th Cir. 1991)............................................... 50, 54

*United States* v. *Hosseini*,
  679 F.3d 544 (7th Cir. 2012)...................................................... 78

*United States* v. *Johnson*,
  874 F.3d 990 (7th Cir. 2017).............................. 32, 41, 122, 123

*United States* v. *Johnson*,
  945 F.3d 606 (2d Cir. 2019) ...................................................... 60

*United States* v. *Kelerchian*,
  937 F.3d 895 (7th Cir. 2019).......................................... 56, 59, 60

*United States* v. *King*,
  613 F.2d 670 (7th Cir. 1980)...................................................... 81

*United States* v. *Kramer*,
  955 F.2d 479 (7th Cir. 1992)......................................... 98, 100, 101

*United States* v. *Lewis*,
    641 F.3d 773 (7th Cir. 2011)...................................................... 117

*United States* v. *Lewis*,
    954 F.2d 1386 (7th Cir. 1992).......................................... 117, 119

*United States* v. *Locke*,
    643 F.3d 235 (7th Cir. 2011)........................ 66, 67, 70, 71, 72, 73

*United States* v. *Lunn*,
    860 F.3d 574 (7th Cir. 2017)........................................... 123, 126

*United States* v. *Memar*,
    906 F.3d 652 (7th Cir. 2018)................................................. 101

*United States* v. *Mohamed*,
    759 F.3d 798 (7th Cir. 2014).................................................. 54

*United States* v. *Morales*,
    902 F.2d 604 (7th Cir. 1990).................................................. 55

*United States* v. *Mutuc*,
    349 F.3d 930 (7th Cir. 2003)................................................. 122

*United States* v. *Noel*,
    581 F.3d 490 (7th Cir. 2009)..................................... 65, 71, 72, 83

*United States* v. *Oriedo*,
    498 F.3d 593 (7th Cir. 2007).................................................. 76

*United States* v. *Pacilio*,
    85 F.4th 450 (7th Cir. 2023) ..........................................*passim*

*United States* v. *Paladino*,
    401 F.3d 471 (7th Cir. 2005)................................................. 119

*United States* v. *Peterson*,
    823 F.3d 1113 (7th Cir. 2016)........................................... 33, 55

*United States* v. *Regent Office Supply Co.*,
    421 F.2d 1174 (2d Cir. 1970) ........................................... 56, 60

*United States* v. *Ridley,*
    826 F.3d 437 (7th Cir. 2016)......................................................... 98

*United States* v. *Rigas,*
    490 F.3d 208 (2d Cir. 2007) .................................................... 75, 93

*United States* v. *Rivas,*
    831 F.3d 931 (7th Cir. 2016)....................................................... 107

*United States* v. *Robbins,*
    197 F.3d 829 (7th Cir. 1999)....................................................... 106

*United States* v. *Rubin/Chambers, Dunhill Ins. Servs.,*
    828 F. Supp. 2d 698 (S.D.N.Y. 2011) ........................................ 93

*United States* v. *Sanders,*
    962 F.2d 660 (7th Cir. 1992)........................................ 30, 97, 98, 99

*United States* v. *Santos,*
    20 F.3d 280 (7th Cir. 1994).......................................................... 33

*United States* v. *Santos,*
    201 F.3d 953 (7th Cir. 2000)........................................................ 92

*United States* v. *Saulter,*
    60 F.3d 270 (7th Cir. 1995)..................................................... 89, 91

*United States* v. *Shellef,*
    507 F.3d 82 (2d Cir. 2007) ............................................... 56, 59, 60

*United States* v. *Silvern,*
    484 F.2d 879 (7th Cir. 1973) (en banc) ................................. 30, 96

*United States* v. *Sims,*
    329 F.3d 937 (7th Cir. 2003)........................................................ 97

*United States* v. *Sweiss,*
    814 F.2d 1208 (7th Cir. 1987)..................................................... 117

*United States* v. *Takhalov,*
    827 F.3d 1307 (11th Cir. 2016)............................................ 56, 59, 60, 62

*United States* v. *Thibodeaux,*
    758 F.2d 199 (7th Cir. 1985)........................................................ 98

*United States v. Thomas,*
    86 F.3d 647 (7th Cir. 1996)...................................................... 114

*United States* v. *Velasco,*
    953 F.2d 1467 (7th Cir. 1992)........................... 117, 118, 119, 120

*United States* v. *Vorley,*
    2021 WL 1057903 (N.D. Ill. Mar. 18, 2021) ........................ 61, 63

*United States* v. *Wantuch,*
    525 F.3d 505 (7th Cir. 2008)........................................ 82, 88, 114

*United States* v. *Weimert,*
    819 F.3d 351 (7th Cir. 2016).................................... 34, 56, 62, 63

*United States* v. *Williams,*
    819 F.3d 1026 (7th Cir. 2016)............................................ 100, 103

*United States* v. *Williamson,*
    202 F.3d 974 (7th Cir. 2000)............................................. 107, 108

*United States* v. *York,*
    852 F.2d 221 (7th Cir. 1988)..................................................... 114

*United States* v. *Zanin,*
    831 F.2d 740 (7th Cir. 1987)....................................................... 51

**Statutes and Rules**

7 U.S.C. § 6c ................................................................. 2, 18, 34, 45

7 U.S.C. § 12c ............................................................................. 82

7 U.S.C. § 13 ........................................................................ 2, 34, 44

18 U.S.C. § 1343..................................................... 2, 33, 44, 72

18 U.S.C. § 1348................................................................... 2, 34

Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010)......................... 18

Fed. R. Evid. 106 ................................................................ 117

Fed. R. Evid. 403 .................................................................. 77

Fed. R. Evid. 704 .................................................................. 66

Fed. R. Evid. 803 .................................................................. 81

**Other Authorities**

7th Cir. Pattern Criminal Jury Instruction 7.03 (2023) ................................. 96

## JURISDICTIONAL STATEMENT

The defendants' jurisdictional statements are complete and correct.

## STATEMENT OF THE ISSUES

1.      Whether the evidence was sufficient to show that Smith and Nowak placed precious metals futures orders with the requisite intent to cancel.

2.      Whether the evidence was sufficient to show that the defendants engaged in a scheme to defraud.

3.      Whether the statutes of conviction are unconstitutionally vague as applied to the defendants' conduct.

4.      Whether the district court plainly erred or abused its discretion in admitting lay witness testimony and evidence.

5.      Whether the district court abused its discretion in providing supplemental jury instructions.

6.      Whether the district court abused its discretion in limiting Jordan's cross-examination.

7.      Whether the district court abused its discretion in excluding a statement that Jordan made to an FBI agent.

8.      Whether the district court erred in declining a good-faith instruction.

## STATEMENT OF THE CASE

### A.     Procedural History

Following a jury trial in the United States District Court for the Northern District of Illinois, Gregg Smith was convicted on one count of attempted price manipulation, in violation of 7 U.S.C. § 13(a)(2); eight counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343; one count of commodities fraud, in violation of 18 U.S.C. § 1348(1); and one count of spoofing, in violation of 7 U.S.C. §§ 6c(a)(5)(c) and 13(a)(2).  SSA.42.[1] Michael Nowak was convicted on one count of attempted price manipulation, in violation of 7 U.S.C. § 13(a)(2); ten counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343; one count of commodities fraud, in violation of 18 U.S.C. § 1348(1); and one count of spoofing, in violation of 7 U.S.C. §§ 6c(a)(5)(c) and 13(a)(2).    NSA.42. Christopher Jordan was tried separately and convicted on one count of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343.  JSA.1. Smith was sentenced to 24 months of imprisonment, SSA.43; Nowak was

---

[1] "Doc." refers to documents filed on the district court docket.  "Smith.App." refers to Smith and Nowak's appendix.   "Jordan.App." refers to Jordan's appendix.  "SSA," "NSA," and "JSA" refer to Smith's, Nowak's, and Jordan's short appendices.   "Supp.App" refers to the government's supplemental appendix.

sentenced to a year and a day of imprisonment, NSA.43; and Jordan was sentenced to six months of imprisonment, JSA.2.

### B.    Facts

The defendants manipulated the prices of precious metals futures contracts by placing "spoof" orders that they intended to cancel before the orders could be filled.

### 1.    The Precious Metals Futures Market

The defendants were traders at JPMorgan who traded precious metals futures contracts on commodities exchanges operated by the CME Group. Smith.App.1245, 1463, 1677-1678; Jordan.App.1749; Supp.App.56. Nowak was a managing director at JPMorgan, where he ran the precious metals trading desk, working in New York and London. Smith.App.1677, 1706, 1885. Smith was an executive director at JPMorgan, where he sat next to Nowak when he worked the New York office. Smith.App.1677, 1706. Nowak and Smith both worked at JPMorgan during the relevant time period here, namely, between 2008 and 2016; before JPMorgan, Smith worked at Bear Stearns, which was acquired by JPMorgan in mid-2008. Smith.App.1690-1694, 1725. Jordan was a precious metals trader at JPMorgan's New York office between 2006 and 2009. After he was terminated by JPMorgan in 2009, Jordan moved to Credit Suisse, where he worked from March 2010 to August 2010. Supp.App.56-58, 61.

The trading scheme at issue involved precious metals futures contracts. Smith.App.1459; Supp.App.55. A futures contract is a contract to buy or sell something at a set time and price in the future. Smith.App.1247; Supp.App.26. The defendants' trading largely involved gold and silver futures, which were traded on COMEX, a commodities exchange operated by the CME Group. Smith.App.1245, 1263-1264; Supp.App.42-43. Traders accessed the CME exchanges using the CME's Globex electronic trading platform, which allowed them to place "bid[s]" to buy or "offer[s]" to sell a certain number of futures contracts, or "lots," at a certain price. Smith.App.1250, 1253, 1257; Jordan.App.1357; Supp.App.33-34.[2] Some traders entered their orders manually, while others used a computer algorithm that placed orders based on its programmed trading strategy. Smith.App.1263; Supp.App.42. Traders on Globex could not see the identities of other traders (though each trader had a unique ID visible to CME). Smith.App.1251, 1269-1270; Supp.App.35. Rather, the platform would display the top ten price levels to buy and the top ten price levels to sell a product in what is known as the "order book." Smith.App.1262; Supp.App.40. The price difference between the best bid on the buy side of the market (*e.g.*, a bid to buy gold at $10 per ounce) and the best offer on the sell side of the

---

[2] A single futures contract for gold is for 100 ounces and a contract for silver is for 5,000 ounces. Smith.App.1248; Supp.App.53.

market (*e.g.*, an offer to sell gold at $12 per ounce) in the order book is known as the "bid-offer" or "bid-ask" spread (in that case, $2). Smith.App.1488-1489; Supp.App.41.

Futures contract prices are determined largely by supply and demand. Smith.App.1271-1272; Supp.App.47-48. If there is more demand than supply for a product (a greater "buying interest[]"), the price for that product will generally go up; if there is more supply than demand (a greater "selling interest"), the price will go down. Smith.App.1272, 2747-2750; Supp.App.48. Orders communicate buying and selling interest to the market, and thus affect the market price for a futures contract. Smith.App.1305; Supp.App.49. And larger quantity orders will have a greater effect on price than smaller orders. Smith.App.3737-3738; Supp.App.48. Because of the impact that large orders can have on the market, Globex allows traders to place "iceberg" orders, which show only a partial amount of the full order. Smith.App.1259; Supp.App.39. Thus, if a trader wants to sell 100 gold contracts, he can place an iceberg order that shows an offer for one contract at a time, rather than for all 100 contracts, so that the trader does not "drive the price down." Smith.App.1259; see Supp.App.79.

A trader is allowed to cancel a Globex order before it is filled. Smith.App.1256-1257. But a fundamental assumption on the CME exchanges is that every order placed into the order book is a "legitimately

bona fide" order—that is, placed with the "intent to trade." Smith.App.1378, 1385-1386, 3456; see Jordan.App.1547. That is because an order placed without the intent to trade communicates "false information" that "deceive[s] the marketplace" about actual supply and demand. Smith.App.1377, 1386, 2765, 3457; see Jordan.App.1552; Supp.App.69. Accordingly, the CME's rules required that every order must be a "bona fide" order "entered with the intent" to buy or sell—and not placed with the intent to cancel. Smith.App.1378, 1380, 1402, 1407, 1435; see *United States* v. *Chanu*, 40 F.4th 528, 533 (7th Cir. 2022) ("traders are prohibited from placing orders that they *intend* to cancel before execution"). Market participants likewise assumed that "all of the orders in the marketplace . . . represent genuine interest to buy or sell." Smith.App.3738-3740; see Supp.App.72-73.

## 2. The Defendants' Schemes To Manipulate Precious Metals Futures Prices

a. The defendants engaged in "spoofing," which involves placing orders "without the intention of execution in order to mislead other investors by injecting misleading information on demand and supply into the market." Smith.App.3458; see Smith.App.1768; Supp.App.69. Spoofing typically (but not always) involves four steps. *First*, the trader places an order that he intends to trade. Smith.App.1382, 1656, 2539; Jordan.App.1754;

Supp.App.69-70. That "genuine" order often takes the form of an iceberg order. Smith.App.1512-1513, 1656; Jordan.App.1385-1386.

*Second*, the trader places visible "spoof" orders on the other side of the market, often by "rapidly placing orders at different price levels." Smith.App.1657; Jordan.App.1385. Thus, if the genuine order is an order to buy, the spoof order will be a large sell order, or series of smaller sell orders at deescalating prices, "in a quantity that's sufficient to push the market down." Smith.App.1383, 2544-2545, 3458-3459; Supp.App.67. The "spoof order" is "never intended to be traded"; to the contrary, "[b]efore they were even placed" the "intent was to cancel" the orders. Smith.App.1385, 1657, 2544-2546; Jordan.App.1385-1386. The purpose of the spoof order is to "drive the market" price toward the price of the "order that you intended to trade" by "send[ing] false information to other market participants" about "supply and demand" and the trader's "intent to trade." Smith.App.1383, 1394, 1401, 1654, 1657-1658, 1669, 2543-2544; see Supp.App.69-70.

*Third*, the illusion of market activity created by the spoof order causes other traders to react to the false signal about supply and demand, "driving the price" toward the "genuine order" and allowing the trader "to get a fill at a higher [or lower] price than where [the commodity] was trading at the time" he placed the genuine order. Smith.App.1657-1658, 1786, 2545-2547;

7

Supp.App.69-70.  The trader is thus able to execute the genuine order at his desired price.  Smith.App.1384, 1658; Supp.App.69-70.

*Fourth*, "once the spoof order elicits the reaction that it desires from other market participants[,] the spoofer would quickly cancel the order because the objective of the spoof order is to elicit that reaction," not to be executed.  Smith.App.3458; see Jordan.App.1385-1386.  "Typically you cancel as soon as you achieve the execution that you desire on the one side of the market, because if you leave your [spoof] order resting for any lengthy period of time, you might actually be executed on it," which is "the last thing that you want to do."  Smith.App.1383-1384; Jordan.App.1385-1386.

b.  The defendants' "trading patterns" underlying their convictions fit the spoofing pattern described above.  Smith.App.3465; Supp.App.88.  In one trading episode (depicted below and charged in Count 7), Smith placed an order to buy one gold contract at $1,673.40 per ounce (for a total value of $167,340), shown in green below.  Smith.App.484, 3467-3468.  That bid price was below the prevailing market mid-price (the blue line in the chart) and the bid-offer spread (the blue shaded area).  See Smith.App.3468.  No traders offered to sell to Smith at that price.  Smith.App.3469.  Then, while his buy order was still pending, Smith placed 23 layered spoof orders to sell a total of 230 contracts at deescalating prices (for a total value of $38,503,700), shown in red below.  Smith.App.484, 3469-3470.  After the spoof orders pushed the

8

market down, Smith filled his bid at the intended purchase price. Smith.App.484, 3469.  He then canceled the spoof orders "without any fills" on them, and the price for gold shot back up.  Smith.App.484, 3469.



Smith.App.484.

In another trading episode (depicted below and charged in Count 15), Nowak placed an iceberg order to sell five gold contracts at $1,725.70 per ounce, above where the market was trading.  Smith.App.640.  He then placed 28 layered spoof orders to buy a total of 140 contracts at escalating prices, driving the market price up to the level of his genuine sell order.  After the

spoof orders drove the market up, Nowak executed his sell order at the intended price—and then quickly canceled all the spoof orders (with the quickest one remaining active for just 422 milliseconds).  Smith.App.640.



Smith.App.640

Smith and Nowak often spoofed by placing layered spoof orders in rapid succession.  See Smith.App.2608, 3014-3015.  But spoofing could also be accomplished by placing a "single large order," an approach that Jordan typically employed.  Smith.App.1661-1663.  The chart below depicts one such episode.  Jordan placed an iceberg order to buy 15 silver contracts at $17.265

per ounce.  Jordan.App.1159; Supp.App.78-79.  He then placed a single order to sell 105 contracts at $17.270 per ounce.  Jordan.App.1159.  That large spoof order depressed the price of silver, allowing Jordan to fill his bid at the intended purchase price.  Jordan.App.1159; Supp.App.81-82.  Jordan then canceled his 105-lot spoof order before it could be executed, and the price for silver immediately bounced back up.  Jordan.App.1159.



Jordan.App.1159.

Because the defendants canceled their spoof orders so quickly, very few were actually filled.  In a set of 100 trading episodes shown at trial, for

example, the spoof orders placed by Smith had a fill ratio (*i.e.*, the percentage of contracts filled) of 0.18%, compared to a 79.11% fill ratio for Smith's corresponding genuine orders.  Smith.App.3485-3486; Supp.App.2.  Nowak's trading showed the same pattern:  Out of 100 trading episodes, the spoof orders had a fill ratio of 0.22%, while the genuine orders had a fill ratio of 90.11%.  Smith.App.3486-3487; Supp.App.3.  And out of a set of 68 episodes shown at Jordan's trial, the spoof orders had a fill ratio of 0.00%, while the genuine orders had a fill ratio of 83.89%.  Supp.App.17, 93-94.

### 3.  Coworkers' Observations Of The Defendants' Spoofing

a.  Smith's and Nowak's coworkers witnessed their spoofing.  John Edmonds sat next to Smith and Nowak on the JPMorgan trading desk for much of the period between 2008 and 2016.  Smith.App.1706, 1794.  He also sat near Jeffrey Ruffo, a salesperson (and codefendant below) who came to JPMorgan with Smith after the Bear Stearns acquisition.  When Ruffo brought in orders from his hedge-fund clients, Smith would typically fill them.  Smith.App.1691, 1698, 1706, 2616.  Edmonds "learned" to spoof— which at the time they called "clicking" based on the sound the mouse made from the rapid placement of layered spoof orders—from watching Smith and Nowak do so.  Smith.App.1670, 1730, 2458.  The "first thing" that Smith told Edmonds was that "[s]howing size moves the market," a lesson that Edmonds

took to heart when he himself engaged in spoofing by "showing size . . . rapidly bidding up the price with those fast clicks." Smith.App.1783; see Smith.App.1729.

Edmonds saw Smith spoof with his "own two eyes" at "least three or four times a day, if not more." Smith.App.1671.[3] Indeed, "literally every time" a "hedge fund order would come in from Jeff [Ruffo], Gregg [Smith] would be spoofing" to fill the order. Smith.App.1698-1699. The first time Edmonds saw Smith spoofing, Ruffo had instructed Smith to place an order to sell 100,000 ounces of gold. Smith entered the sell order, but then entered "a ton of orders" to buy gold—the spoof orders—by "rapidly clicking" in order "to drive the price higher," thus allowing Smith to sell the gold at the desired price. Smith.App.1725-1728. That "didn't make sense" to Edmonds because the client "wanted to sell" gold, not buy it. Smith.App.1727-1728. Then, after filling the sell order, Smith "immediately canceled" all the spoof "orders on the buy side." Smith.App.1729.

Edmonds also saw Nowak engage in spoofing while they sat "[r]ight next to" each other at JPMorgan. Smith.App.1670, 1885. Specifically,

---

[3] When one trader was executing orders, the other traders put their "pencils down" (*i.e.* stopped trading)—in part so that they would not "get in the way of the spoofing." Smith.App.1733, 1762-1763. As a result, Edmonds and others were "paying attention" to Smith's and Nowak's trading. Smith.App.1733, 1762-1763.

Edmonds saw Nowak "enter and rapidly cancel orders on the buy side of the market while he was trying to execute [a] client order on the sell side"—all in order to "drive the price to the other side of the market where he wanted to trade." Smith.App.1885-1887.

b.  Christian Trunz worked "side by side" with Smith—his "mentor"—first at Bear Stearns in 2007 and then at JPMorgan's New York office until 2013. Smith.App.3012. Like Edmonds, Trunz saw Smith spoof "all the time" by placing orders in a "layering pattern" through "rapid succession clicking." Smith.App.3014. Trunz understood that "those trades were deceptive" and were "used to bring out a reaction from those algorithms to get what we needed done." Smith.App.3016. Trunz learned to spoof from watching Smith do so, and Trunz also engaged in spoofing to "lure[]" market participants into "believing that that was real demand when it was false demand." Smith.App.3017-3018.

Trunz was able to hear hedge-fund client orders come in through Ruffo and therefore knew how Smith would need to trade to execute the orders. Smith.App.3018. And "[m]ore often than not" when Smith executed those orders for Ruffo, Smith was "spoofing." Smith.App.3021-3022. Trunz saw Smith get "angry" and "throw his glasses against the screen" when a spoof order that Smith placed with the intent to cancel got executed.

14

Smith.App.3046-3047; see also Smith.App.1736-1738 (Edmonds heard Smith complain "[t]hey're fucking hitting me" when his spoof orders were executed).

Trunz also "saw Nowak spoof" while they worked "back to back" at JPMorgan.  Smith.App.3031-3032, 3121.  Nowak used the "same clicking and layering" strategy that Trunz and Smith used and, as Trunz later explained, there was no "legitimate" reason for Nowak to place and cancel orders on the opposite side of the market from those he intended to execute other than to "spoof the market."  Smith.App.3032, 3121, 3138-3139, 3142.

c.  Corey Flaum sat alongside Ruffo and Smith at Bear Stearns. Smith.App.2535-2537, 2597-2599.   He saw Smith engage in spoofing "[s]everal times per week" in the gold and silver futures market. Smith.App.2600-2601.  Specifically, Flaum saw Smith "place orders on one side of the market even though he was filling an order on the other side" through "rapid-fire clicking"—and then "cancel" the "spoofing orders" that were "opposite" to the "genuine order."  Smith.App.2602-2603.

### 4. Chat Messages Exchanged During The Defendants' Spoofing

While the defendants engaged in spoofing, they or their colleagues exchanged Bloomberg chat messages with their clients and other members of the JPMorgan trading desk.  See Smith.App.1838-1839.  On December 12, 2011, for example, a client messaged Ruffo instructions to sell one million

ounces of silver (200 futures contracts) at $31 per ounce. Smith.App.1842-1843, 1846. Smith then entered legitimate iceberg orders to sell silver. Smith.App.1848. At the same time, however, Smith placed 119 layered orders to *buy* a total of 1,190 contracts (for 5.95 million ounces of silver). Smith.App.1848. As Edmonds later explained, there was no "legitimate reason" to place those orders on the buy side when "you had to fill a client order to sell a million ounces"; rather, Smith placed the orders "on the buy side to drive the price to where he wants to sell." Smith.App.1849. Smith ultimately sold a net total of 200 contracts (as the client instructed), while canceling all but 38 of the 1,190 buy contracts. Smith.App.1848.[4]

And on February 24, 2009, Trunz sent a message to Oliver Bean, a JPMorgan salesperson in London, informing him that Smith is "bidding up on the futures trying to get some off." Smith.App.1870, 3096. At the time of the message, Smith had placed orders to buy 353 gold contracts on the opposite side of orders to sell gold contracts. Smith.App.1873. After Smith sold 23 contracts, he then canceled all but three of the buy orders. Smith.App.1873. Trunz later explained that he sent the message about Smith "bidding up on the futures" to "relay[] the information" that Smith's

---

[4] On May 24, 2010, Smith placed (and canceled) orders to sell 99 silver contracts after Ruffo was instructed to buy 200 contracts. Smith.App.1854-1855. As Edmonds explained, Smith entered those "orders on the sell side to drive the price lower so that way he can buy." Smith.App.1855.

bids corresponded to "fake volume" and were placed to "manipulate and deceive the algorithms to execute where we wanted to sell for his client." Smith.App.3095-3097; see also Smith.App.1874.

Nowak sent chat messages during his trading. On March 21, 2013, for example, Nowak sent a message to Stuart Piller, JPMorgan's options manager in London, stating, "[w]e should sell out 10k here." Smith.App.1920. He then updated Piller as he proceeded to sell a total of 116 lots of gold futures. Smith.App.1921-1922. As he was placing those offers to sell, however, Nowak was simultaneously entering a series of orders to buy gold. Smith.App.1924. Edmonds later explained that Nowak entered those "buy orders to try to make the market think that he is a real buyer to drive the price up so he can sell." Smith.App.1924.

In a chat with a Morgan Stanley trader on January 30, 2012, Nowak described meeting another trader who "talk[ed] about the silver market and how he used to spoof it by showing huge, huge bids and canceling" them— something, Nowak stated, that you are "totally not allowed to do these days." Smith.App.3851. The next day, Nowak placed iceberg orders to buy 15 gold contracts, followed by a series of layered orders to sell 115 contracts, which drove the market price down; after executing his buy orders, Nowak canceled all 115 sell contracts. Smith.App.633; see Smith.App.532.

17

Jordan also chatted about how he used spoofing to get his genuine orders filled, telling another trader on April 1, 2009, that "I show one lot, then when I need to get filled, I will bid or offer size in front of it, then boom." Jordan.App.1432.

### 5.    Bank Policies And CME Rules Prohibiting Spoofing

On July 21, 2010, Congress passed the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), which included an amendment to prohibited transactions under the Commodity Exchange Act, 7 U.S.C. § 6c(a)(5)(C), by categorizing spoofing as an unlawful disruptive practice.[5]  But Congress did not create the term or concept of "spoofing"; to the contrary, the Act states that the term spoofing was "commonly known to the trade."    7 U.S.C. § 6c(a)(5)(C).    And CME rules prohibited the behavior that constitutes spoofing before Dodd-Frank's enactment.    In particular, CME Rule 432 prohibits traders from attempting to engage or engaging in "the manipulation of prices of exchange futures or options contracts"; "any manipulative device, scheme or artifice to defraud"; or offering to purchase or sell "exchange futures or options contracts or any underlying commodities or securities for the purpose of upsetting the equilibrium of the market or creating a condition

---

[5] The Dodd-Frank Act went into effect in July 2011.  See Pub. L. No. 111-203, § 754, 124 Stat. 1754.

in which prices do not or will not reflect fair market values." Smith.App.1387, 1394-1396; Jordan.App.1758-1765.

Consistent with those rules, the banks that employed the defendants had policies prohibiting spoofing. A JPMorgan compliance policy promulgated in 2001, titled "Avoiding Market Manipulation," defined prohibited market manipulation to include the placement of "trades to create an artificial market price; i.e., a price not determined by supply and demand." Smith.App.3818. The policy instructed traders not to place trades "without a legitimate economic rationale; e.g., solely to raise or lower a price." Smith.App.3819. Another JPMorgan policy effective in 2012 expressly prohibited "spoofing," which it defined as "[b]idding or offering with the intent to cancel the bid or offer before execution." Smith.App.3822. After a compliance meeting at which Smith and other traders were told not to engage in spoofing because regulators were "looking into this," Smith told Ruffo, "[t]here goes the business." Smith.App.1774.

Jordan received compliance trainings at JPMorgan, including a 2009 bulletin referring traders to the "Avoiding Market Manipulation" policy that prohibited placing trades "to create an artificial market price" or to "create an artificial appearance of trading activity." Jordan.App.1595-1596, 1602-1605, 1607-1608; Jordan.App.1616-1618 (2008 and 2009 training sessions

informing traders that "[p]lacing noneconomic trades" was market manipulation).

Credit Suisse, where Jordan worked in 2010, also had policies prohibiting spoofing.  A compliance manual issued in 2006 prohibited traders from engaging in "activity that is intended to, does or is deemed to affect the price of a security artificially or to convey a misleading impression of trading activity in or the depth of the market for a security" and from "[d]isseminating . . .  any bid or offer that is not bona fide."  Jordan.App.1545-1546, 1549-1552.   Jordan attended a training in 2010 that prohibited employees from engaging in transactions to "[a]rtificially raise, depress or maintain the price of a security"; "[c]reat[ing] a false or misleading appearance of active trading in a security or of the depth and liquidity of the market for a security"; or "disseminat[ing] false or misleading information to the effect that the price of a security will or is likely to rise or fall."  Jordan.App.1557-1561.

### 6. Depositions And Interviews Of The Defendants Regarding Their Trading

In 2010, the Commodity Futures Trading Commission deposed Nowak and Jordan as part of an unrelated civil investigation.  Smith.App.2988-2989; Jordan.App.1417, 1419.  Nowak was asked whether JPMorgan traders "put up bids or offers to the market which they didn't intend to execute and then

pulled them before they got hit." Smith.App.2997. Nowak responded, "[n]o," and explained that it would not be "appropriate" for someone to "deliberately show[] very big bids and very big offers . . . without the intention of trading." Smith.App.2997-2998. Similarly, when Jordan was asked, "Did you ever show a bid or offer on Globex that you didn't intend to execute," he replied: "I would only cancel something if I changed my mind or it was put in in error, but no." Jordan.App.1422. Jordan also stated that he never "engage[d] in trading for the purpose of influencing the price on COMEX" while working at JPMorgan. Jordan.App.1423.

FBI agent Jonathan Luca investigated Jordan and interviewed him in 2018. See Jordan.App.1387, 1437. Jordan asked Luca whether he would "be going to jail," Jordan.App.1400-1401, and admitted during the interview that he placed "small iceberg orders on one side of the market and larger non-iceberg orders on the other side of the market [] which he intended to cancel," Jordan.App.1407. Jordan further stated that he "placed those orders in order to mislead the market, to outperform the algorithms, and . . . to get the best possible fills for his boss." Jordan.App.1407.

### 7.    The Defendants' Trials and Convictions

a.  A federal grand jury charged Smith, Nowak, Jordan, and Ruffo in a 27-count indictment. Smith.App.40-86. Smith was charged with one count of conspiracy to engage in racketeering; one count of conspiracy to commit price

manipulation, wire fraud, commodities fraud, and spoofing; one count of attempted price manipulation; eight counts of wire fraud; one count of commodities fraud; and one count of spoofing. Smith.App.40-86.

Nowak was charged with one count of conspiracy to engage in racketeering; one count of conspiracy to commit price manipulation, wire fraud, commodities fraud, and spoofing; one count of attempted price manipulation; ten counts of wire fraud; one count of commodities fraud; and one count of spoofing. Smith.App.40-86.

Jordan was charged with one count of conspiracy to engage in racketeering; one count of conspiracy to commit price manipulation; and one count of wire fraud. Smith.App.40-86. On April 3, 2022, the district court ordered Jordan's trial to be severed from that of his codefendants, and on October 13, 2022, the court granted the government's motion to dismiss the two conspiracy counts. Jordan.App.146, 182.

Ruffo was charged with one count of conspiracy to engage in racketeering; and one count of conspiracy to commit price manipulation, wire fraud, commodities fraud, and spoofing. Smith.App.40-86.

b.  Smith, Nowak, and Ruffo went to trial. The government introduced 100 episodes of Smith and Nowak each employing the characteristic four-step spoofing pattern, Smith.App.1464-1465, and put on three cooperating witnesses who admitted that they engaged in spoofing using the same

procedure. Smith.App.1659-1659 (Edmonds), 3166-3167 (Trunz), 2543-2547 (Flaum).

Edmonds testified that he placed layered spoof orders to create "false demand into the market which would" then "push the price higher to where [he] wanted to" sell, Smith.App.1657-1658; that there was no "legitimate nonspoofing reason" to "rapidly layer in and then cancel fully visible orders on one side of the market," Smith.App.1731; and that he saw Smith and Nowak regularly engage in the same spoofing conduct, Smith.App.1670, 1885. He also reviewed the trading episodes introduced by the government; testified that those episodes showed Smith and Nowak employing the same spoofing pattern that he used; and stated that those episodes showed Smith and Nowak placing spoof orders that they did not "intend" to execute in order to "to create false demand" and "push the market" to their intended price, Smith.App.1810-1885 (Smith), 1895-1925 (Nowak).

Trunz admitted that he engaged in spoofing to "deceive other market participants" about supply, demand, and trading intent, Smith.App.3036-3037, and testified that he saw Smith and Nowak engage in spoofing at JPMorgan (and saw Smith do the same at Bear Stearns). Smith.App.3014, 3031-3032. He explained that Smith and Nowak used the "exact same strategy" that he used when spoofing; that those episodes demonstrated their "strategy to deceive and place false volume into the marketplace"; and that he

was not "aware of any reason other than spoofing that" Smith and Nowak would have engaged in the trading patterns depicted in the episodes. Smith.App.3063-3108 (Smith), 3137-3145 (Nowak).[6]  Flaum, too, testified that Smith's trading episodes were "carbon copies" of Flaum's own spoofing, and that he could not recall any instance of trading on "both sides of the market" in the way that Smith did that was not spoofing.  Smith.App.2614, 2637.

The government put on finance expert Kumar Venkataraman, who reviewed Smith's and Nowak's trading.  Smith.App.3462-3463.  Based on his analysis, Venkataraman concluded that "the trading strategy used by the defendant[s] appears to be designed to not fill the red [spoof] orders but, instead, use these red orders to push the price to get fills on the green [genuine] orders which are on the opposite side" of the market. Smith.App.3465, 3467.  Venkataraman based that opinion, in part, on the fact that "this type of strategy is being used again and again." Smith.App.3479.  Venkataraman further testified, after comparing the trading episodes of Edmonds, Trunz, Smith, and Nowak, that "[t]he broader strategy is the same."  Smith.App.3533.

---

[6] Trunz testified that, during a compliance review, Nowak instructed Trunz in a "coaching moment" to remember that "every order you put in the market, you intended to trade on."  Smith.App.3155-3156.

Robert Sniegowski, the former director of the CME's Rules and Regulatory Group, testified that CME rules prohibited spoofing "because it conveys inaccurate information and results in artificial price movements." Smith.App.1375, 1386.  He further testified that "a pattern of the same type of [trading] activity is typically a stronger indication of an actual violation of the rules."  Smith.App.1451-1452.  And Brian Wika, from the CME investigations group, confirmed that investigators look for "a pattern" of entering and then canceling large orders after executing trades on the other side of the market and recounted that a CME investigation into Smith's trading practices revealed just such a pattern—specifically, "a total of 3,093 successful spoof orders entered in" July and August 2013.  Smith.App.2748, 2752, 2778.

David Pettey of Susquehanna International Group testified that his firm's trading algorithm assumed "that all of the orders in the marketplace that it sees represent genuine interest to buy or sell."  Smith.App.3738-3739. He further testified that spoof orders placed by Smith and Nowak "trigger[ed]" the algorithm's "decision to trade" on those orders. Smith.App.3743, 3746.

The jury convicted Smith and Nowak on each of the substantive counts but acquitted them on the conspiracy counts.  It acquitted Ruffo on both conspiracy counts.  SSA.42; NSA.42; Doc.831.

c. Jordan was tried separately. The government introduced 68 trading episodes in which Jordan employed the four-step spoofing pattern between 2009 and 2010. Supp.App.77-78. Venkataraman testified that those episodes were consistent with similar patterns identified in Jordan's broader trading activity, Supp.App.87-88; that Jordan's "trading strategy appears designed not to fill the" large spoof orders, but rather to use them to fill the genuine orders on the opposite side, Jordan.App.1836; and that there was no "rational economic reason" for Jordan to place those spoof orders other than to cause the market to respond to "fake supply" and "false information" about his intent to trade and supply and demand, Jordan.App.1836; Supp.App.76, 97.

Agent Luca testified about the admissions that Jordan made during the 2018 interview and stated that he understood Jordan's admissions to mean that Jordan "was placing fake trades with the intent to cancel them in order to mislead the market into believing there was a false sense of supply or demand." Jordan.App.1408.

Erin Middleton, the director of rules and regulatory outreach at CME, testified that CME rules required orders to be placed with the "true intent to buy or sell" and that those rules prohibited the practice of spoofing, because spoofing "conveys false information to the market" regarding the trader's intent to buy or sell. Jordan.App.1752, 1755-1756. Compliance witnesses from Credit Suisse (David King) and JPMorgan (Mark Catana) testified that

spoofing was likewise always prohibited at their banks.   Jordan.App.1548-1549, 1552, 1613-1614, 1620.   And Travis Varner from Quantlab Financial testified that his firm's trading algorithm assumed that "all the orders are bona fide" and reflected "genuine" trading interest, Supp.App.72-73; that spoofing, which sends "false signals to the market about supply and demand," would deceive the algorithm, Supp.App.73-75; and that spoof orders placed by Jordan triggered Quantlab's decision to trade with him, Jordan.App.1826.

The jury convicted Jordan on the sole wire-fraud count.  JSA.1.

### C.    Rulings Under Review

The defendants appeal from their judgments of conviction.  The specific rulings challenged on appeal are set forth in the argument section below.

## SUMMARY OF ARGUMENT

1.    The evidence was sufficient to sustain Smith's and Nowak's convictions.  This Court has held that "placing orders on opposite sides of the commodities market with the intent to cancel amounts to a 'deceitful' scheme" by means of false and misleading representations, and thus constitutes wire fraud, commodities fraud, and spoofing.  *United States* v. *Chanu*, 40 F.4th 528, 540-541 (7th Cir. 2022); see *United States* v. *Pacilio*, 85 F.4th 450, 458-464 (7th Cir. 2023); *United States* v. *Coscia*, 866 F.3d 782, 798 (7th Cir. 2017).  That is exactly what the defendants did here when they

placed spoof orders that they intended to cancel in order to send a false signal to the market about supply, demand, and trading intent.

The defendants contend that the evidence was insufficient to show that they placed orders with the "unconditional" intent to cancel. But *Coscia*, *Chanu*, and *Pacilio* all defined fraudulent spoofing conduct to entail placing orders with the "intent to cancel," and the statutes of conviction contain no unstated "unconditional" element. In any event, the evidence at trial showed that the defendants placed their spoof orders with the "unconditional" intent to cancel. Indeed, the spoof orders had no purpose other than to fool the market.

2. The defendants contend that there was insufficient evidence to sustain their fraud convictions because the government failed to show that they made misrepresentations about an essential element of the bargain, and thus failed to prove a "scheme to defraud." But this Court held in *Coscia*, *Chanu*, and *Pacilio* that spoofing materially indistinguishable from the defendants' conduct "amount[s] to a scheme to defraud by means of false representations or omissions." *Chanu*, 40 F.4th at 541. That is fatal to the defendants' claim. And the defendants' spoofing scheme went to the value of the bargain itself by mispresenting a key characteristic of the commodity—its market value.

28

3.   The statutes of conviction are not unconstitutionally vague as applied to the defendants' conduct.  As Nowak acknowledges (Nowak.Br.55-56), that claim is foreclosed by Circuit precedent.

4.   a.  The district court did not plainly err or abuse its discretion in allowing CME employee Brian Wika to testify at Smith and Nowak's trial about the CME's investigation into Smith's trading.  Wika did not improperly opine that Smith was guilty of the charged offenses.  Rather, he testified that the investigation revealed that Smith's trading activity did not reflect an intent to trade.  Although Wika characterized spoofing as "manipulative," this Court's "precedents have repeatedly upheld a witness's use of the term 'fraudulent' when testifying in fraud cases." *United States* v. *Eaden*, 37 F.4th 1307, 1313 (7th Cir. 2022).  Nor did Wika impermissibly provide expert, rather than lay testimony.  Wika's testimony was based on his own perceptions as the preparer of the CME report, and it was not based on scientific or technical knowledge, but rather stated rudimentary principles of supply and demand.

b.  The district court did not abuse its discretion in admitting Wika's report either, for largely the same reasons.  The portions of the report concluding that Smith had violated the CME rules were redacted from the version admitted at trial, and the report satisfied the business-records exception to the rule against hearsay.

29

5. The district court did not abuse it discretion in allowing testimony from three cooperating witnesses at Smith and Nowak's trial. The witnesses did not improperly opine on the defendants' guilt, but instead described the practice and effect of spoofing, including the fact that it fools the market. And they properly testified as lay rather than expert witnesses, because their testimony about the defendants' trading was grounded in personal knowledge they accumulated through their own trading and observing Smith's and Nowak's trading.

6. a. The district court did not abuse its discretion in providing the jury in Smith and Nowak's trial the standard instruction from *United States* v. *Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc), after the jury indicated that it had not reached a verdict. This Court has "previously described the *Silvern* instruction as perfectly content-neutral and [carrying] no plausible potential for coercing the jury." *United States* v. *Sanders*, 962 F.2d 660, 676 (1992) (quotations omitted).

b. The district court did not abuse its discretion by reminding Smith and Nowak's jury that "lawyers' statements and arguments are not evidence" in response to a note about a juror who had made early decisions based on the lawyers' opening statements. The court's response was a correct statement of the law and simply reiterated what the jury had already been instructed before deliberations.

7.  The district court did not abuse its discretion under Rule 403 by limiting Jordan's ability to cross-examine bank and CME witnesses with evidence of post-2011 rules and compliance policies that postdated the trading at issue.  Jordan had ample opportunity to cross-examine the witnesses on the point that he was trying to make—namely, that the CME rules and compliance policies in effect when he worked at the banks did not use the term "spoofing."  The probative value of the post-2011 compliance policies was minimal because the relevant question under the wire-fraud statute is not whether Jordan intended to violate bank policies or CME rules, but rather whether he intended to make a misrepresentation to the market.  And allowing Jordan to use the post-2011 rules and policies would have created a substantial risk that the jury would wrongly conclude that the wire-fraud statute did not prohibit spoofing until after those policies were enacted.

8.  The district court did not abuse its discretion in excluding Jordan's statement to an FBI agent that he did not think that spoofing was "wrong." Jordan sought to use that statement under Rule 106 to clarify his admission that he placed orders that he "intended to cancel" to "mislead the market." But Jordan's statement that he did not think that spoofing was "wrong" was not necessary to clarify any misleading impression from his admission.  The relevant state of mind was Jordan's intent to deceive the market, not whether he knew that it was "wrong" to do so.

31

9.  The district court correctly declined Jordan's request for a good-faith instruction.  "A good faith instruction is not required where," as here, "lack of good faith is part of the charge."  *United States* v. *Johnson*, 874 F.3d 990, 1002 (7th Cir. 2017).

## ARGUMENT

## I.   THE EVIDENCE WAS SUFFICIENT TO SHOW THAT SMITH AND NOWAK PLACED ORDERS WITH THE REQUISITE INTENT TO CANCEL THEM

### A.   Background

After the verdicts, Smith and Nowak moved for judgments of acquittal based on insufficient evidence.  Docs.706, 707, 708.  They also filed a motion for a new trial arguing, among other things, that the verdict was against the manifest weight of the evidence.  Docs.710, 711.  The district court denied the motions.  Smith.App.229-269.  It held that "[t]he combined weight of the evidence of the four-step trading strategy, the traders who worked with the Defendants, and Venkataraman's expert testimony all readily support the guilty verdicts."  Smith.App.238.  "Indeed," the court continued, "even if the evidence was not viewed in the light most favorable to the guilty verdicts, the weight of the evidence solidly supported the convictions given the circumstantial evidence of the unconditional intent to cancel."  Smith.App.238.

Jordan also moved for a judgment of acquittal and for a new trial. Docs.834, 835, 837, 838.  The district court denied the motions.  JSA.20-47.

## B.     Standard Of Review

"De novo review applies to the denial of a motion for judgment of acquittal; practically speaking, however, the standard of review is that for sufficiency of the evidence."  *United States* v. *Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016).  This Court "will overturn a conviction for insufficient evidence only if, viewing the evidence in the light most favorable to the government, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States* v. *Agbi*, 84 F.4th 702, 708 (7th Cir. 2023) (quotations omitted).

"A district court's refusal to grant a motion for a new trial under Fed. R. Crim. P. 33 is reviewed for an abuse of discretion."  *United States* v. *Santos*, 20 F.3d 280, 285 (7th Cir. 1994).

## C.     This Court Has Repeatedly Held That Spoofing Is Unlawful

The wire-fraud statute prohibits the use of a wire communication in interstate commerce to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  The statute reaches "not only false statements of fact but also misleading half-truths and knowingly

33

false promises." *United States* v. *Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). The commodities-fraud statute similarly makes it unlawful to execute a scheme to defraud. 18 U.S.C. § 1348.

The Commodity Exchange Act makes it a violation for any "person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity," 7 U.S.C. § 13(a)(2), including by creating an "artificial price" for a contract for a commodity for future delivery, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764-765 (7th Cir. 2015); see Smith.App.4622. The Act also prohibits "spoofing," which it defines as "bidding or offering with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(c).

This Court has repeatedly held—first in *United States* v. *Coscia*, 866 F.3d 782 (7th Cir. 2017), and then in *United States* v. *Chanu*, 40 F.4th 528 (7th Cir. 2022), and *United States* v. *Pacilio*, 85 F.4th 450 (7th Cir. 2023)— that the spoofing conduct at issue here violates the fraud and anti-spoofing statutes.

1. In *Coscia*, the defendant placed large spoof orders opposite small orders on CME exchanges in 2011 and used a preprogrammed algorithm to quickly cancel the spoof orders before they were filled. *Coscia*, 866 F.3d at 788-790. This Court affirmed Coscia's convictions for commodities fraud and

spoofing. *Coscia*, 866 F.3d at 785. The Court first held that the spoofing statute is not unconstitutionally vague, because "prosecutors can charge only a person whom they believe a jury will find possessed the requisite specific intent to cancel orders at the time they were placed." *Id.* at 794. The Court next held that the trial evidence—including evidence that "35.61% of [Coscia's] small orders were filled, whereas only 0.08% of his large orders were filled"—showed that Coscia "knowingly entered bids or offers with the present intent to cancel the bid or offer prior to execution," in violation of the spoofing statute. *Id.* at 795-796.

This Court rejected Coscia's argument that, "because 'his orders were fully executable and subject to legitimate market risk,' they were not, as a matter of law, fraudulent." *Coscia*, 866 F.3d at 797. It explained that Coscia "designed a scheme to pump and deflate the market through the placement of large orders," and held that the "scheme was deceitful because, at the time [Coscia] placed the large orders, he intended to cancel the orders." *Ibid.*

2. This Court revisited spoofing in *Chanu*. Cedric Chanu and James Vorley were precious metals traders at Deutsche Bank who traded precious metals futures contracts on CME exchanges. *Chanu*, 40 F.4th at 532. Specifically, they "placed orders for precious metals futures contracts on one side of the market that, at the time the orders were placed, they intended to cancel prior to execution"—though unlike Coscia, Chanu and Vorley placed

35

their trades manually.  *Id.* at 533, 540.  Based on their implementation of that scheme, Chanu and Vorley were convicted on several counts of wire fraud.  *Id.* at 538.

This Court affirmed.  *Chanu*, 40 F.4th at 532.  It framed the question presented as "whether placing manual 'spoofing' orders—here, precious metals orders that [the defendants] intended to withdraw before being filled—can amount to wire fraud."  *Ibid.*  Answering that question in the affirmative, the Court first held that manual spoofing constitutes a "scheme to defraud."  *Id.* at 540-541.  The Court explained that "*Coscia* establishes that placing orders on opposite sides of the commodities market with the intent to cancel amounts to a 'deceitful' scheme, aiming 'to manipulate the market for [the trader's] own financial gain.'"  *Id.* at 540 (quoting *Coscia*, 866 F.3d at 797).

The Court next held that "real, at-risk orders placed with the intent to cancel amount to 'means of false or fraudulent pretenses, representations, or promises' as stated in" the wire-fraud statute.  *Chanu*, 40 F.4th at 541.  "By obscuring their intent to cancel, through an orchestrated approach," the Court held, "Chanu and Vorley advanced a quintessential 'half-truth' or implied misrepresentation—the public perception of an intent to trade and a private intent to cancel in the hopes of financial gain."  *Ibid.*

36

3.   The Court addressed spoofing for a third time in *Pacilio*.   John Pacilio and Edward Bases were precious metals traders at Bank of America Merrill Lynch who traded futures contracts on CME exchanges.   *Pacilio*, 85 F.4th at 456.    Like the defendants in *Chanu*, Pacilio and Bases "manipulat[ed] the market through the [manual] placement of large orders that are unintended to be executed."   *Ibid.*   They were each convicted on several counts of wire fraud, and Pacilio was also convicted of commodities fraud.   *Id.* at 458.

This Court affirmed.   *Pacilio*, 85 F.4th at 468.   It first held that the defendants had notice that their spoofing conduct was prohibited by the federal fraud statutes.   *Id.* at 460-461.   The Court explained that it has long "held that placing orders in the commodities market in a way that gives a 'misleading signal' can be an 'active misrepresentation'" under the fraud statutes.   *Id.* at 460 (quoting *United States* v. *Dial*, 757 F.2d 163, 169 (7th Cir. 1985)).   And it held that "Pacilio's and Bases's conduct is indistinguishable from that deemed illegal in other cases": "By placing spoof orders they intended to cancel before execution, they sent misleading signals to the market that the demand for a given commodity was much higher, effecting an increase in the market price."   *Ibid.*

The Court found sufficient evidence of the defendants' fraudulent intent.   *Pacilio*, 85 F.4th at 462-464.   The Court explained that a codefendant

37

"testified how he, Pacilio, and Bases carried out the spoofing scheme by placing orders they intended to cancel for the sole purpose of 'manipulat[ing] the price to the level you wanted it,' admitted that spoofing placed 'false information' into the market 'as to demand, supply,' and 'intent' to trade, and stated defendants both placed spoof orders 'frequently' in the precious metals futures market." *Id.* at 462. "The government also submitted evidence of numerous trades where defendants placed an iceberg order followed by a visible spoof order which was cancelled immediately after executing the iceberg order." *Ibid.* That evidence, the Court held, was sufficient to show that the defendants "*intended* to deceive or cheat another" within the meaning of the fraud statutes. *Id.* at 463.

### D.     The Evidence Was Sufficient To Show That Smith and Nowak Engaged In Unlawful Spoofing Conduct

Nowak contends that the evidence was insufficient to sustain any of his convictions because the government failed to show that he engaged in spoofing, which he says "required the government to establish that he placed trades with an unconditional intent to cancel." Nowak.Br.23; see Nowak.Br.23-40. Smith also contends, largely through incorporation of Nowak's arguments, that the government failed to prove the requisite intent

to cancel.  Smith.Br.60-62.[7]  The sole question on their sufficiency claim is therefore whether the evidence showed that the defendants "knowingly entered bids or offers with the present intent to cancel the bid or offer prior to execution," *Coscia*, 866 F.3d at 795, thus sending "misleading signals" about supply, demand, and trading intent to the market.  *Pacilio*, 85 F.4th at 460.[8]  It did.

*First*, the government "submitted evidence of numerous trades where defendants" engaged in the characteristic four-step spoofing pattern.  *Pacilio*, 85 F.4th at 462-463; see Smith.App.1464-1465.  As Venkataraman testified, that "trading strategy used by the defendant[s] appears to be designed to not fill the [layered spoof] orders but, instead, use these red orders to push the price to get fills on the [genuine] orders which are on the opposite side" of the market.  Smith.App.3465.  Indeed, the trading data showed that the Smith's and Nowak's "large-side" spoof orders had fill ratios of 0.18% and 0.22%, respectively, while their "small-side" genuine orders on the opposite side of the market had fill ratios of 79.11% and 99.11%, respectively.

---

[7] Jordan joins only "Point II of Nowak's brief."  Jordan.Br.52.

[8] Nowak contends that "[e]ach of [his] convictions" requires the same showing.  Nowak.Br.23.  He therefore does not draw any distinction between his attempted-price-manipulation conviction (which was not the subject of this Court's prior spoofing decisions) and his other convictions.

Smith.App.3485-3487; Supp.App.2-3; see *Coscia*, 866 F.3d at 795-796 (relying on fill ratios as evidence of intent).

*Second*, the cooperating witnesses "testified how" they and the defendants "carried out the spoofing scheme by placing orders they intended to cancel for the sole purpose of manipulat[ing] the price" and "that spoofing placed false information into the market as to demand, supply, and intent to trade." *Pacilio*, 85 F.4th at 462 (quotations omitted). Specifically, Edmonds, Trunz, and Flaum testified that they engaged in spoofing by "rapidly placing orders at different price levels" with the "intent . . . to cancel them" in order to "drive the price to" that of the genuine order by sending a "false" signal about supply and demand. Smith.App.1657. They further testified that specific examples of the defendants' trading showed that the defendants used the "exact same strategy"—and that they were not "aware of any reason other than spoofing" to engage in that strategy. Smith.App.3063, 3133.

*Third*, the cooperating witnesses "stated defendants both placed spoof orders 'frequently' in the precious metals futures market," *Pacilio*, 85 F.4th at 462. The witnesses saw the defendants "enter and rapidly cancel orders on the buy side of the market while [the defendants were] trying to execute [a] client order on the sell side" in order to "drive the price higher." Smith.App.1885-1889, 3014-3015.

40

*Fourth*, the evidence "further included contemporaneous chat messages" exchanged during the defendants' trading episodes that corroborated the cooperating witnesses' testimony and provided additional evidence of the defendants' intent. *Pacilio*, 85 F.4th at 462-463. Those chats showed that Smith and Nowak both placed (and then canceled) orders on the opposite side of the market from the legitimate orders that they intended to execute. Smith.App.1842-1843, 1846-1855.

"Because [the defendants] focus[] on intent, this makes [the Court's] job relatively easy." *Pacilio*, 85 F.4th at 463 (quoting *United States* v. *Johnson*, 874 F.3d 990, 1000 (7th Cir. 2017)). The defendants' conduct was "indistinguishable from that deemed illegal in other cases*." Id.* at 460. And the evidence was more than sufficient to show that the defendants engaged in spoofing by "placing orders on opposite sides of the commodities market with the intent to cancel." *Chanu*, 40 F.4th at 540.

## E. The Defendants' Intent To Cancel Was "Unconditional"

### 1. Background

The district court's draft jury instructions defined spoofing as "placing an order to buy or sell with the unconditional intent to cancel the order before it is filled." Doc.647 at 57. The government objected to the "addition of 'unconditional' in front of 'intent to cancel.'" Smith.App.4567-4568, 4570. The court overruled the objection, Smith.App.4571, and instructed the jury

(for the spoofing count) that "Spoofing is the practice of bidding or offering with, at the time that the order was placed, the unconditional intent to cancel the bid or offer before execution," Smith.App.4634. The court did not include "unconditional" in its instructions on the price-manipulation and fraud counts. See Smith.App.4622, 4624-4632.

## 2.    Argument

The defendants' principal contention on appeal is that "a defendant engage[s] in spoofing only if the defendant places orders to buy or sell with an *unconditional* intent to cancel"—and that the evidence at trial failed to "support an inference that [the defendants] placed orders with an unconditional intent to cancel." Nowak.Br.24, 29; see Smith.Br.60. That argument is doubly flawed. The statutes of conviction do not contain an "unconditional" element. And, in any event, the evidence at trial amply showed that the defendants had the "unconditional" intent to cancel their spoof orders.

a.    Nowak contends that the "unconditional" intent requirement "follows directly from" *Coscia*, Nowak.Br.24, which stated in a footnote that the defendant "did not place orders with the intent to cancel *under certain circumstances*—he placed orders with the present intent to *always cancel* the

42

large orders," *Coscia*, 866 F.3d at 795 n.45.[9]  But the purpose of that passage and its surrounding text was to distinguish, for purposes of Coscia's fair-notice argument, between "legal trades such as 'stop-loss orders,'" which are "designed to be executed upon the arrival of *certain subsequent events*," and spoofing, which requires "an intent to cancel the order *at the time it was placed*."  *Id.* at 795.  That language did nothing to insert an unstated "unconditional" element to the fraud, price-manipulation, or spoofing statutes.  To the contrary, the Court in *Coscia* went on to conclude that the defendant's "scheme was deceitful because, at the time he placed the large orders, *he intended to cancel the orders*."  *Id.* at 797 (emphasis added).

Indeed, this Court said nothing about the defendants' "unconditional" intent to cancel in either *Chanu* or *Pacilio*, which held that materially identical conduct was fraudulent.  Rather, the Court framed the unlawful conduct simply as "placing spoof orders on opposite sides of the commodities market with the *intent to cancel*," *Chanu*, 40 F.4th 540 (emphasis added), and "placing orders they *intended to cancel before execution*," *Pacilio*, 85 F.4th at

---

[9] Nowak states that the government has "repeatedly acknowledged" that it had to prove an "unconditional" intent to cancel.  Nowak.Br.24.  That is wrong.  As noted, the government objected to the use of "unconditional" in the jury instructions on spoofing, and the district court overruled the objection.  The fact that the government then subsequently used the court's formulation when arguing to the jury and defending the jury's verdict, see *ibid.*, is not an admission that "unconditional" is an element of the statutes of conviction.

460 (emphasis added).  That is hardly surprising, because the question in those cases (as here) was whether spoofing constituted a "scheme to defraud by means of false representations or omissions."  *Pacilio*, 85 F.4th at 459 (quoting *Chanu*, 40 F.4th at 539).  And the Court held that it did, because "[b]y obscuring their intent to cancel, through an orchestrated approach, [the defendants] advanced a quintessential 'half-truth' or implied misrepresentation—the public perception of an intent to trade and a private intent to cancel in the hopes of financial gain."  *Chanu*, 40 F.4th at 541; see *Pacilio*, 85 F.4th at 460 (the defendants "sent misleading signals to the market that the demand for a given commodity was much higher").

    In other words, the relevant question is whether the defendants' conduct was intentionally *misleading* or *manipulative* under the applicable statutes.  And the evidence showed that it was:  The defendants' spoofing conduct was intended to "trick" the market by the placement of "fake trades that wanted to look like they were real" in order to "manipulate" for their own financial "gain."  Smith.App.1649, 1721, 1768, 1850, 2762.  That satisfies the fraud statutes' requirement of a deceitful scheme through "false or fraudulent pretenses," 18 U.S.C. § 1343; the price-manipulation statute's requirement of attempted "manipulat[ion]" by creating an "artificial price" of a commodity, 7 U.S.C. § 13(a)(2); *In re Dairy Farmers*, 801 F.3d at 764-765; and the spoofing statute's requirement of "bidding or offering with the intent

to cancel," *id.* § 6c(a)(5)(c).  Whether or not those offers were "unconditional" is beside the point because, in all events, the defendants placed "orders on opposite sides of the commodities market with the intent to cancel" by means of false or fraudulent pretenses.  *Chanu*, 40 F.4th at 540.

Indeed, the district court's instructions on the price-manipulation and fraud counts did not contain any added "unconditional" term but instead recited the familiar elements of those offenses.  Smith.App.4622, 4624-4632. The defendants did not object to those instructions below and they do not do so on appeal.  And while the instructions for the spoofing count did contain the "unconditional" term, a reviewing court addressing a sufficiency claim "considers only the legal question whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found *the essential elements of the crime* beyond a reasonable doubt." *Musacchio* v. *United States*, 577 U.S. 237, 243 (2016) (quotations omitted; emphasis added).  Thus, the only question—for all counts—is whether the evidence showed that the defendants "plac[ed] orders on opposite sides of the commodities market with the intent to cancel."  *Chanu*, 40 F.4th at 540.  For the reasons stated, it did.

2.  In any event, the evidence at trial was sufficient to show that the defendants "place[d] orders to buy or sell with an unconditional intent to cancel."  Nowak.Br.24 (emphasis omitted).

The cooperating witnesses testified that their "intent was to cancel" the spoof orders "[b]efore they were even placed." Smith.App.1657; see Smith.App.1780 ("I decided to cancel them before I even placed them."). They further testified that the defendants did the same exact thing—namely "placed orders that [they] didn't intend to trade"—with no "legitimate reason" other than spoofing the market. Smith.App.1649, 1768, 1849; see Smith.App.1730-1731, 1811, 1912, 3145. Indeed, the evidence showed that the defendants placed, and then rapidly canceled, the spoof orders on the other side of the market from legitimate client orders that they intended to (and did) execute. That evidence was sufficient to show that the defendants "possessed the requisite specific intent to cancel orders at the time they were placed," *Coscia*, 866 F.3d at 794—and that their intent to cancel was "unconditional." If there is no "legitimate" reason for an order that you place with the intent to cancel (other than to fool the market), then that cancellation is not "conditioned" on anything—other than fraud.

Other evidence confirmed the point. The trading data showed that the defendants' spoof orders were placed and canceled rapidly—often within less than a second. As Edmonds testified, "it's impossible to make a [trading] decision in that short period of time." Smith.App.1781; see Smith.App.3064 (it would be "impossible" for Smith's client to change its mind in "208 milliseconds"), 1889-1890 (speed of Nowak's spoofing shows he "decided to

46

cancel" the orders "[b]efore they were entered").  Thus, the "reasonable (and strong) inference" from the rapid placement and cancellation of the spoof orders is that "the Defendants already (and unconditionally) intended to cancel" the orders at the time that they were placed.  Smith.App.234.  The fact that Smith got "angry" and complained that "[t]hey're hitting me" when his spoof orders were executed (counter to plan) is further evidence that the defendants placed their spoof orders with the unconditional intent to cancel them.  Smith.App.1736-1738, 3046-3047.  So too is the evidence that Smith taught Edmonds that "size moves the market."  Smith.App.1729-1730.

Indeed, the defendants do not identify any legitimate way in which their trades were actually "conditional."  Nowak states that "[a] trader who enters an order intending to cancel if the order is not immediately executed by an algorithmic trader has a lawful conditional intent" because the "trader is not changing his mind 'in those two seconds.'"  Nowak.Br.33.  The "most that can be inferred from Mr. Nowak's rapid cancellations, then, is that he intended from the outset to cancel on certain conditions."  *Ibid.*  As noted, however, the evidence showed that the defendants did not place the spoof orders with the intent that they be executed in "two seconds."  Rather, the evidence showed that they placed the orders with the intent (and design) that they *not be executed*.  And they did so with the purpose of misleading the market about supply and demand to push the market toward the price of the

47

genuine trades on the other side of the market that they *did* intend to execute. That is the very definition of fraudulent spoofing.[10]

The defendants' "unconditional" argument thus amounts a rehash of the argument—squarely rejected in *Coscia*, *Chanu*, and *Pacilio*—that spoof orders are not misleading because they are "fully executable and subject to legitimate market risk." *Coscia*, 866 F.3d at 797; see *Chanu*, 40 F.4th at 540-541 (rejecting defense that spoof orders are "real orders" that were "tradable") (quotations omitted); *Pacilio*, 85 F.4th at 463 (rejecting defense that the defendants were "willing" to trade). That rejected argument is essentially what the defendants argue here: that their intent to cancel the spoof orders was not "unconditional" because the orders *could* be "immediately executed by an algorithmic trader" (Nowak.Br.33)—even though the defendants' intent was to avoid that exact result.

## F. The Defendants' Remaining Arguments Lack Merit

1. Nowak contends that "the government identified *no* direct evidence of [his] state of mind when he placed the orders." Nowak.Br.29. "But direct

---

[10] Nowak suggests (Nowak.Br.32-33) that the district court erred in considering the "speed" of the defendants' cancellations as evidence of their fraudulent intent. But the speed of cancellation was part and parcel of their spoofing scheme. Indeed, the CME rule on which Nowak elsewhere relies (Nowak.Br.32) expressly states that "[t]he duration for which the order is exposed to the market" is an indication of unlawful spoofing. Smith.App.1452.

evidence of intent is often unattainable, and specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself." *Pacilio*, 85 F.4th at 464 (quotations omitted). Thus, *Pacilio* upheld a commodities-fraud conviction even though the cooperating witness "did not testify to Pacilio's intent in the later time frame covering the commodities fraud." *Ibid.* Here, the cooperating witnesses *did* testify that the defendants placed their spoof orders with the intent to cancel them.

Nowak states that the chats here were less inculpatory than in *Chanu* and *Pacilio*. Nowak.Br.29. As Edmonds explained at trial, however, he would not "expect to find any chats where [he] or one of these defendants said, 'I'm intending to cancel, I'm intending to cheat,'" because a "chat like that would easily get flagged." Smith.App.1878-1879. And even so, the chats *did* demonstrate the defendants' unconditional intent to cancel: They showed that the defendants rapidly placed and canceled spoof orders on the opposite side of the market from the client orders that they intended to execute. Nowak also admitted in a chat that "showing huge, huge bids and canceling" was "not allowed"—and then proceeded to do just that. Smith.App.633, 3851; see Smith.App.532. The chats therefore corroborated the witnesses' testimony that the defendants placed spoof orders with the intent to cancel in

49

order to "deceive the algorithms" and "drive the price[s]" toward that of their genuine orders.  Smith.App.1820-1821, 3063.

2.     Nowak contends that the evidence that he traded in the four-step spoofing pattern did not support a finding of his intent to cancel the spoof orders.  Nowak.Br.30.  But in *Pacilio*, this Court held that the evidence was sufficient to sustain the defendants' fraud convictions in part on the ground that the government "submitted evidence of numerous trades" that followed that same four-step spoofing pattern.  *Pacilio*, 85 F.4th at 462 (citing "trades where defendants placed an iceberg order followed by a visible spoof order which was cancelled immediately after executing the iceberg order").

Nowak nevertheless argues that the trading evidence here "is 'equally consistent with a theory of innocence as with a theory of guilt,'" because "[t]he government's own witnesses agreed that there is nothing unlawful about the trading pattern itself."  Nowak.Br.30-32 (quoting *United States* v. *Harris*, 942 F.2d 1125, 1129-1130 (7th Cir. 1991)).  That argument mischaracterizes the witnesses' testimony, the other evidence at trial, and the law.

To begin with, the two witnesses cited by Nowak (Nowak.Br.32) did not, in fact, testify that the defendants' trading pattern was equally indicative of legitimate trading.  To the contrary, when asked on cross whether there is "anything wrong with Mr. Smith placing layered orders on one side of the market and having a small order on the other," Wika

answered that he *was* "suggesting the pattern is somehow improper" and that this was "a spoofing pattern."  Smith.App.2903.  True, when later asked whether a specific trading episode "can be a perfectly legitimate trading strategy," Wika answered, "[i]t's possible it can be" before getting cut off.  Smith.App.2909.  On redirect, however, he clarified that "the order pattern combined with the cancellation rates and durations all would signify that" Smith was engaged in "spoofing activity."  Smith.App.2980.  Wika thus stood by his "conclusions about Mr. Smith's trading activity"—namely, "that this is not legitimate."  Smith.App.2980, 2982.

Sniegowski agreed on cross that a trading pattern that he was shown "can be a perfectly legitimate trading strategy so long as when you place both orders, you intended to execute."  Smith.App.1427.  But he, too, clarified on redirect that, "if you can show a historical pattern of activity that . . . basically follows the same pattern, that lends more credence to the . . . view that the activity was not bona fide," and that the "duration of cancellation" also provides "indicia of spoofing."  Smith.App.1452.

"The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt."  *United States* v. *Zanin*, 831 F.2d 740, 745 (7th Cir. 1987).  But here, Wika and Sniegowski did not testify that that there was an innocent explanation for the defendants' conduct; rather, they testified that the defendants' trading patterns—coupled with the

51

cancellation rates, duration, and trading history—all demonstrated *illegitimate* spoofing conduct. Thus, even Wika's and Sniegowski's testimony, standing alone, was not "equally consistent with a defendant's innocence." Nowak.Br.36.

Nowak also protests that, "if 'looking at the pattern alone' says nothing about Mr. Nowak's mental state, then repetition of that trading pattern says nothing about it either." Nowak.Br.32 (citation omitted). But Wika and Sniegowski both testified that repetition *does* suggest an intent to cancel. Smith.App.1449-1452, 2748, 2763. Thus, the defendants don't really argue that the witnesses' testimony was equally consistent with innocence; rather, they simply *disagree* with the testimony that they engaged in spoofing conduct—and the jury's decision to credit that testimony.

That factual disagreement with the jury's conclusion is unfounded. As Venkataraman testified, "[r]epeating the same strategy that does not work over months, over periods, over years" shows that "the intent of this trading strategy . . . is not to fill the red [spoof] orders," but rather is "designed to do something else, which is to push the price to get fills on the [genuine] green orders on the opposite side." Smith.App.3466-3467. Indeed, while Nowak cites the CME's anti-spoofing rule in support of his contention that "there is nothing unlawful about the trading pattern itself," Nowak.Br.32, that rule expressly states that, in determining whether a trader had engaged in

52

unlawful spoofing, market regulators consider "[t]he market participant's *historical pattern of activity*"—the very factor that he contends would be irrational for jury to consider. Smith.App.1451 (emphasis added). Nowak is also wrong to say that a behavior that can be equally consistent with innocence necessarily remains so when repeated. The fact that a defendant's car was found idling outside a bank that was just robbed may be equally consistent with guilt or innocence. But if that car was found idling outside 10 banks that were just robbed, the same conduct would be inculpatory.

Wika's and Sniegowski's testimony regarding the trading patterns was not the only evidence at trial in any event. As noted, the three cooperating witnesses testified that they saw the defendants engage in spoofing—which they defined as placing orders with the intent to cancel in order to mislead the market about supply and demand. And, contrary to Nowak's assertion (Nowak.Br.34), those witnesses didn't testify *solely* based on the trading charts. Rather, the witnesses testified that they knew the trades that the defendants intended to execute and then saw the defendants place spoof orders on the other side of the market—only to cancel them immediately after executing the intended orders. That is spoofing. Indeed, Nowak himself stated that "showing huge, huge bids and canceling" them is something that a trader is "totally not allowed to do these days." Smith.App.3851. He

53

therefore recognized that the very trading pattern that he now says the jury should have ignored *is* indicative of unlawful spoofing.

This case is thus a far cry from *Harris* (Nowak Br. 36-37), where "[a]ccording to the government" the defendant's conduct in picking up checks at his wealthy patron's office could be inculpatory or exculpatory. *Harris*, 942 F.2d at 1129. It is also distinguishable from *United States* v. *Mohamed*, 759 F.3d 798, 810 (7th Cir. 2014), where the Court held that the government "presented no evidence that [the defendant] had taken any steps to sell" his stolen cigarettes "*in* Indiana," as required to convict. Here, the witnesses testified that the defendants' trading patterns *did* show that they placed orders with the intent to cancel them. And that testimony was corroborated by multiple other witnesses who testified that the defendants did just that. The jury was entitled to credit that testimony, which, along with the other evidence, was more than sufficient to establish the defendants' guilt. See *Pacilio*, 85 F.4th at 463 ("[O]nce a jury has weighed the evidence and has found guilt beyond a reasonable doubt, a challenge to the sufficiency of the evidence proving intent is exceedingly difficult to win") (quotations omitted).

3. Nowak suggests that the court's "evidentiary errors reinforce that Mr. Nowak lacked an unconditional intent to cancel." Nowak.Br.39. To the extent that he contends that those alleged errors support his sufficiency claim, that contention is without merit. When determining whether the

54

evidence was sufficient to sustain a conviction, "a reviewing court must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *McDaniel* v. *Brown*, 558 U.S. 120, 131 (2010) (per curium); see *United States* v. *Freeman*, 498 F.3d 893, 908 (9th Cir. 2007). And as explained below, the district court made no evidentiary errors.

4.   Nowak also contends that, "[i]n the alternative" to ordering a judgment of acquittal, "the Court should reverse and remand for a new trial on all counts because the evidence at least leaves a strong doubt as to Mr. Nowak's guilt." Nowak.Br.24 (quotations omitted). For the reasons stated, that contention lacks merit. The evidence at trial showed that defendants' conduct was "indistinguishable from that deemed illegal in other cases." *Pacilio*, 85 F.4th at 460. Nowak thus has not shown that the district court abused its discretion in concluding that no "miscarriage of justice has occurred." *United States* v. *Morales*, 902 F.2d 604, 606 (7th Cir. 1990); see *Peterson*, 823 F.3d at 1122.

## II.  THE EVIDENCE WAS SUFFICIENT TO SHOW THAT THE DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD

Nowak contends that his convictions for wire fraud and commodities fraud should be reversed because "there is insufficient evidence that he made any misrepresentation about an essential element of the bargain."

Nowak.Br.40-41. In support, he relies on a series of out-of-circuit cases that have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States* v. *Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (quoting *United States* v. *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)); see *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970); *United States* v. *Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023); cf. *United States* v. *Kelerchian*, 937 F.3d 895, 912 (7th Cir. 2019); *Weimert*, 819 F.3d at 357.

In essence, Nowak argues that while his misrepresentations may have induced counterparties to enter into transactions that they would have otherwise avoided, those counterparties ultimately got what they bargained for: a futures contract "at the price mutually agreed to by the parties." Nowak.Br.48. Thus, he contends, there was no "scheme to defraud." Nowak.Br.41. Smith and Jordan join Nowak's argument.[11] That argument fails for several reasons.

---

[11] Courts have held that sufficiency claims are "too individualized to be generally adopted" on appeal by codefendants, *United States* v. *Cooper*, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000), though this Court has addressed

### A.    This Court Has Already Held That The Same Conduct Constitutes A Scheme To Defraud

Nowak's argument is foreclosed by this Court's decisions in *Coscia*, *Chanu*, and *Pacilio*.  Nowak contends that his spoofing conduct does not amount a "scheme to defraud" under the federal fraud statutes because he made no misrepresentation about an essential element of the bargain. Nowak.Br.41.    But this Court has already held that materially indistinguishable spoofing conduct "amount[s] to a scheme to defraud by means of false representations or omissions" under the federal fraud statutes. *Chanu*, 40 F.4th at 541; see *Coscia*, 866 F.3d at 797; *Pacilio*, 85 F.4th at 462-464.  That is fatal to Nowak's claim.

Nowak protests that, "in *Chanu*, the Court did not address whether conduct like that alleged here involves an essential element of the bargain; the Court did not even mention that requirement."  Nowak.Br.53.  Rather, he says, the Court was responding to "different arguments raised by the defendants in that case."  *Ibid.*  That is irrelevant—and incorrect to boot.  It

---

sufficiency claims adopted by codefendants where the parties were "similarly situated," *United States* v. *Balistrieri*, 779 F.2d 1191, 1211 n.23 (7th Cir. 1985).  Jordan was tried separately from Nowak and Smith, however, and so he cannot rely on Nowak's contention that "[t]he [e]vidence" at *Nowak and Smith's* trial was insufficient to convict them of engaging in a "scheme to defraud" to show that the evidence at *his trial* was insufficient. Nowak.Br.47.  Jordan has thus waived any such claim, which is without merit in any event.

is irrelevant because there is no way to reconcile this Court's categorical holding that spoofing *does* amount to a "scheme to defraud," *Chanu*, 40 F.4th at 541, with Nowak's contention that spoofing does *not* amount to a "scheme to defraud," Nowak.Br.41. The Court's holdings in *Coscia*, *Chanu*, and *Pacilio* necessarily encompass—and reject—Nowak's argument.

It is of no moment whether the Court expressly considered or "mention[ed]" the benefit-of-the-bargain argument that Nowak presses here. Nowak.Br.53. A panel's holding is the law "regardless of what might have happened had other arguments been made to the panel that decided the issue first." *United States* v. *Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022) (ultimately quoting *Cohen* v. *Office Depot, Inc.*, 204 F.3d 1069, 1076 (11th Cir. 2000)). This Court held in *Coscia*, *Chanu*, and *Pacilio* that spoofing conduct constitutes a "scheme to defraud"—full stop. That is the law.

In any event, this Court did consider—and reject—Nowak's "bargain" argument. The defendants in *Chanu* argued on appeal that the "charged scheme is not fraud" because "the alleged misrepresentation did not go to the essential elements of the bargain" and did not "harm" other traders—the same argument that Nowak advances here. Appellants' Br., *United States* v. *Chanu*, 2021 WL 4995592, at *40-41 (Oct. 15, 2021). In support, they cited *Takhalov* and *Shellef*—the same cases Nowak cites here. Yet this Court held that the defendants' spoofing conduct satisfied all the essential elements of a

58

"scheme to defraud." *Chanu*, 40 F.4th at 541. Indeed, in doing so, the Court expressly stated that the conduct was designed to help the defendants' banks "while 'hurt[ing]' other market participants,'" thus rejecting the defendants' *Takhalov*-based argument. *Id.* at 542; see *Takhalov*, 827 F.3d at 1313.

## B. The Evidence Showed That The Defendants Misrepresented An Essential Element Of The Bargain

Even if this Court had not squarely rejected Nowak's argument, and even if the *Takhalov* line of cases is good law in this Circuit,[12] the evidence was sufficient to show that the defendants misled market participants about an essential element of the bargain.

The *Takhalov* principle stems from a line of Second Circuit decisions holding that a "scheme to defraud" refers to schemes that misrepresent "'an essential element of the bargain'" and excludes schemes in which the victims "'received exactly what they paid for'" and simply "'enter[ed] into transactions they would otherwise avoid.'" *Takhalov*, 827 F.3d at 1314 (quoting *Shellef*,

---

[12]  *Takhalov* has been the subject of criticism even within the Eleventh Circuit. Judge Pryor described the *Takhalov* opinion as "puzzling," with "no obvious basis in the common law of fraud." *United States* v. *Feldman*, 931 F.3d 1245, 1265 (11th Cir. 2019) (Pryor, J., concurring). Nowak states that *Kelerchian* applied the *Takhalov* rule, Nowak.Br.46, but the passages of *Kelerchian* he cites simply refer to the "'cases'" from "the Second Circuit"— without adopting those cases. *Kelerchian*, 937 F.3d at 912 (quoting *Shellef*, 507 F.3d at 108). Indeed, *Kelerchian* went on to say that it would "not attempt" in that money-laundering case "to establish a comprehensive guide on the scope of the mail and wire fraud statutes." *Id.* at 913.

507 F.3d at 108). Those same courts have made clear, however, that "deceit [that] affected . . . the benefits or the burdens and agreement" *is* actionable fraud. *Kelerchian*, 937 F.3d at 913 (quoting *United States* v. *Binday*, 804 F.3d 558, 570 (2d Cir. 2015)); see *Takhalov*, 827 F.3d at 1313 ("misrepresentation [that] goes to the value of the bargain" is fraud). And that is just what the defendants' deceitful scheme was intended to do here.

The defendants' victims did not receive what they bargained for. Their spoofing was designed to manipulate the price and liquidity of futures contracts on the commodities exchanges so that their victims would pay or accept prices that were artificially inflated or deflated. And there is no question that the purchase price of a futures contract is an essential element of the bargain. See *United States* v. *Johnson*, 945 F.3d 606, 613-614 (2d Cir. 2019); see also *Regent Office Supply*, 421 F.2d at 1179. Thus, the defendants *did* make "a misrepresentation about an essential element of the bargain," Nowak.Br.49—namely, about the supply and demand for (and consequently the value of) the futures contracts that they tricked counterparties into buying or selling. The defendants' scheme went "to the value of the bargain" itself by misrepresenting a key "characteristic[]" of the commodity, *Takhalov*, 827 F.3d at 1313-1314—its market value.

The district court in *Chanu* reached that same conclusion. See *United States* v. *Vorley*, No. 18-cr-35, 2021 WL 1057903, at *18-19 (N.D. Ill. Mar. 18,

2021).  And here, as in *Chanu*, "[s]everal witnesses testified in support of the proposition that the defendants' spoofing worked because their large, visible orders implicitly misrepresented that [they] had a genuine intent to trade," and "that misrepresentation signaled a shift in supply and demand in the market which, in turn, affected other market participants' evaluation of the fair market value of futures contracts."  *Id.* at *19; see Smith.App.1810-1885, 1895-1905, 3014, 3031-3032.  Witnesses further testified that, by deceiving the victims about the economic calculus of the transactions, the defendants' spoofing "benefit[ted]" the defendants and their banks, and "harmed" the counterparties to their spoofing scheme.  Smith.App.1700, 1812-1813, 2549.

Nowak offers examples of what he says are legitimate, if unsavory, business practices that would be encompassed by the government's fraud theory.  Nowak.Br.51.  But this Court has already provided the apt analogy: It characterized spoofing as "market manipulation akin to 'pump and dump' schemes that the government prosecutes under the mail and wire fraud statutes."  *Pacilio*, 85 F.4th at 461 (quoting *Coscia*, 866 F.3d at 797); see *Adkins* v. *United States*, 960 F.3d 1352, 1355 (Fed. Cir. 2020) ("A 'pump-and-dump' scheme" entails "touting [ ] a company's stock . . . through false and misleading statements to the marketplace").  Under the defendants' theory, however, a pump-and-dump scheme would fall outside the scope of the fraud statutes.  After all, such schemes involve "'arms-length' deal[s]'" in which the

61

victims (on Nowak's understanding) "'received exactly what they paid for,'" Nowak.Br.49 (quoting *Weimert*, 819 F.3d at 366, and *Takhalov*, 827 F.3d at 1314)—shares of stock at an agreed-upon price. But the victims of a pump-and-dump scheme do not, in fact, get exactly what they paid for because the stock price was artificially inflated by the schemers' misrepresentations to the market. The same is true here.

## C.    *Weimert* Lends No Support To Nowak's Claim

Nowak contends that the jury's verdict "directly conflicts with this Court's decision in *Weimert*." Nowak.Br.50. It does not.

In *Weimert*, the Court held that "deception" about "parties' negotiating positions" is "not material for purposes of mail and wire fraud." *Weimert*, 819 F.3d at 364. In reaching that conclusion, the Court observed that, in the type of arms-length commercial negotiation at issue there, "parties . . . do not expect complete candor about negotiating positions" from their counterparties, and analogized deception about a party's negotiating position to "statements about a party's opinions, preferences, priorities, and bottom lines," which have generally been treated as immaterial. *Id.* at 358. But *Weimert* reaffirmed that the "fraud statutes reach a seller's or buyer's deliberate misrepresentation of facts or false promises that are likely to affect the decisions of a party on the other side of the deal." *Id.* at 357. The district court in *Chanu* thus held that the defendants' "misrepresentations of their

intent to trade were not just a sharp negotiating tactic, but material falsehoods likely to affect other market participants' trading decisions." *Vorley*, 2021 WL 1057903, at *18.

On appeal, the *Chanu* defendants renewed their contention that placing orders with the intent to cancel is merely a deception about their negotiating position, and thus immaterial under *Weimert*. *Chanu*, 2021 WL 4995592, at *38-39. This Court rejected that argument. The Court explained that *Weimert* "outlin[ed] the bounds of criminalizing deceptive misstatements or omissions about a buyer or seller's negotiating position," and held that the evidence showed that the defendants' spoofing conduct was designed to "'help'" their bank while "'hurt[ing] other market participants.'" *Chanu*, 40 F.4th at 542 (citing *Weimert*, 819 F.3d at 357). Thus, the Court concluded, "there is no question the traders' implied misrepresentations [regarding their intent to trade] were material." *Ibid.*

There is therefore no merit to Nowak's contention that the jury's verdict "conflicts" with *Weimert*, Nowak.Br.22, 50, or his suggestion that *Coscia*, *Chanu*, and *Pacilio* likewise "conflict" with *Weimert*, Nowak.Br.50. *Chanu* expressly applied *Weimert* and held that placing orders with the intent to cancel constitutes a material misrepresentation under *Weimert*.

What is more, Nowak's "benefit of the bargain" argument is predicated on the fraud statutes' "scheme to defraud" element, not the materiality

63

element.  Nowak.Br.41.  But *Weimert*'s holding regarding negotiating positions is a materiality holding.  *Weimert* thus stands for the limited proposition that, in some circumstances, a misstatement about negotiating position will not be material.  It does not call into question this Court's later, more specific holdings in *Coscia*, *Chanu*, and *Pacilio* that spoofing amounts to a scheme to defraud.

## III.  THE STATUTES OF CONVICTION ARE NOT UNCONSTITUTIONALLY VAGUE

### A.   Standard of Review

This Court reviews "a challenge to a statute's constitutionality, including vagueness challenges, de novo."  *Coscia*, 866 F.3d at 791.

### B.   Argument

Nowak briefly contends that the statutes of conviction are unconstitutionally vague as applied to his spoofing conduct.  As Nowak acknowledges, "this Court has twice rejected similar vagueness challenges to convictions based on spoofing."  Nowak.Br.55; see *Pacilio*, 85 F.4th at 458-461 (fraud statutes); *Coscia*, 866 F.3d at 790-795 (spoofing statute).  His claim is thus foreclosed by Circuit precedent.

## IV.   THE DISTRICT COURT DID NOT PLAINLY ERR OR ABUSE ITS DISCRETION IN ADMITTING A CME INVESTIGATOR'S TESTIMONY AND REPORT

### A.   Standard of Review

The court "review[s] evidentiary rulings for an abuse of discretion." *Pacilio*, 85 F.4th at 464. "Reversal is warranted only where the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States* v. *Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (quotations omitted).

Where a defendant fails to object to the admission of evidence, this Court reviews for plain error. *United States* v. *Noel*, 581 F.3d 490, 498 (7th Cir. 2009). "To reverse a conviction under the plain error standard, [the Court] must find that (1) an error occurred; (2) it was 'plain,' meaning obvious or clear; (3) it affected [the defendant's] substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States* v. *Askew*, 403 F.3d 496, 503 (7th Cir. 2005).

### B.   The District Court Did Not Plainly Err Or Abuse Its Discretion In Allowing Wika's Testimony

#### 1.   Background

Before trial, the government proposed to introduce testimony by CME investigator Brian Wika regarding his investigation into Smith's trading activity. See Doc.404 at 2. Smith moved to exclude the testimony, arguing

65

that it was irrelevant and failed the requirements for expert testimony. Doc.335 at 11.

The district court denied the motion. Smith.App.103. Smith moved to reconsider, Doc.539 at 2-4, 8-13, and the court denied the motion, explaining that Wiki's testimony was lay testimony "about his role in the CME investigation of Defendant Smith's trading," Smith.App.126.

Wika testified about his role at CME "investigat[ing] cases involving potential spoofing"; explained how spoofing works; stated that spoofing was prohibited by the CME rules; and described his "work on [the] investigation," for which he was tasked with "determin[ing] whether or not there was a [CME] rule that was violated" by Smith's trading. Smith.App.2747-2753, 2764.

## 2.  Wika Did Not Improperly Opine That Smith Was Guilty

"The Federal Rules of Evidence limit—but do not bar—lay witnesses' ability to testify as to their opinions and inferences, even about ultimate issues in the case." *United States* v. *Locke*, 643 F.3d 235, 239 (7th Cir. 2011). Indeed, Rule 704 expressly provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "In some situations, even lay opinion testimony as to the mental state of another is indeed competent." *Locke*, 643 F.3d at 239-240 (quotations omitted). Thus,

in evaluating challenges to a lay witness's opinion testimony, this Court does not ask whether the testimony implicated the defendant's intent, but rather "ask[s] whether the district court rightfully could have determined, in its broad discretion, that these lay witnesses' testimonies were helpful to the jury" under "Rule 701 and appropriate under Rule 403's balancing test." *Id.* at 240. The district court did not abuse that broad discretion in admitting Wika's testimony at trial.[13]

a. Smith first contends that Wika incorrectly "defined spoofing as merely placing orders without 'intent to trade,'" whereas "spoofing requires the *unconditional* intent to cancel an order." Smith.Br.27. But Smith never objected to Wika's description of spoofing on that basis. Rather, he objected only to the prosecutor's question regarding "why does the CME prohibit spoofing" and otherwise let Wika testify, without objection, that spoof orders are not "bona fide" orders because "there is not an intent to trade at the time of placement." Smith.App.2750-2751; see Smith.App.2750 (earlier testifying, without objection, that spoofing entails the placement of "orders without the intent to trade"). And Smith cannot show that the district court erred, plainly or otherwise, in allowing Wika to describe spoofing in that manner.

---

[13] Nowak joins Smith's evidentiary challenges. See Nowak.Br.39. Any such challenge to Wika's testimony fails for the reasons stated.

Wika was not offering a "legal definition[]" of spoofing.  Smith.Br.27. He was explaining why, in his and the CME's view, "spoof orders" are not "bona fide orders."  Smith.App.2751.  Smith does not contend that Wika and the CME did not actually view spoofing as entailing the placement of orders without the intent to trade, and Wika was not required to testify that he and the CME believed spoofing to be anything other than what they in fact believed it to be.

Indeed, because Wika was testifying about the CME's investigation into Smith's spoofing conduct, it was necessary—and thus "helpful"—for him to explain what he and the CME were looking for.  See Smith.App.2748 (explaining that he was "[l]ooking for a pattern" of entering large orders and then canceling them after filling orders on the other side).  Smith may dispute whether placing orders "without the intent to trade," Smith.App.2750, provides sufficient evidence to convict.  But the district court did not err in allowing Wika to testify about what he and the CME considered to be the hallmarks of spoofing conduct.

What is more, defense counsel repeatedly asked Wika on cross whether certain orders "demonstrated an intent to trade" without ever asking him whether they demonstrated an *unconditional* intent to trade. Smith.App.2896; see Smith.App.2894 ("intent to trade"), 2896 ("intent to transact"), 2909 ("intention to execute"), 2919 ("intent to execute"), 2920

68

("intent to trade"), 2921 ("intent to execute"), 2928 ("intent not to trade"). Defense counsel thus recognized that the relevant question was "intent to trade" and not "unconditional intent to cancel."

b.  Smith further contends that Wika improperly "opined that Smith was guilty." Smith.Br.25. In support, he points to Wika's description of spoof orders as "deceptive," "manipulative," and "mislead[ing]." Smith.Br.26-28. Thus, Smith says, Wika provided inadmissible testimony that "he had determined Smith's guilt." Smith.Br.28. That contention is wrong as a matter of fact and as a matter of law.

As a threshold matter, Smith again failed to preserve that challenge. He argued before trial that Wika's report constituted impermissible *expert* testimony about his mental state (and stated in a footnote that Wika's testimony also improperly addressed Smith's "intent"). Doc.549 at 2 & n.2.[14] But he never objected before or during trial to Wika's description of spoofing as deceptive or manipulative, including during the testimony challenged here. See Smith.App.2751 ("[o]bjection just on the cumulative basis of this"). And Smith has not shown any abuse of discretion, let alone plain error, in the district court's decision to allow the testimony.

___

[14] In its order admitting Wika's report, the district court stated that Wika's proposed testimony that Smith placed orders with the intent to cancel them "is not on the ultimate issue of guilt," Smith.App.128.

"[A] witness's opinion that the facts in a case meet the elements of the charged crime will likely constitute unhelpful testimony because it merely tells the jury what result to reach." *Locke*, 643 F.3d at 241. But Wika did not testify that Smith's conduct met "the elements" of the charged offenses. Rather, he testified that the CME's investigation revealed that Smith had engaged in spoofing and that the CME considers spoofing to violate its rules. In the course of that testimony, Wika necessarily described how he and the CME understood spoofing and its effect on the market. Thus, when asked how spoofing was "prohibited under [CME] Rule 432," Wika responded that "spoofing activity is manipulative in nature and does not reflect genuine buy or sell interest." Smith.App.2764. And when asked why spoofing works, Wika responded that, by "signal[ing] to the marketplace that there is buying interest[]," spoofing sends "false signals" to the market. Smith.App.2749. It was helpful to the jury for Wika to explain the CME's view of spoofing and how it violates the CME rules while testifying about a CME investigation into Smith's spoofing.

Smith suggests that Wika's use of terms such as "manipulative," and "mislead[ing]" to describe spoofing amounts to a statement that Smith was guilty of the charged offenses. See Smith.Br.27-28 (quotations omitted). But in the four instances that Wika used these terms, he was explaining his understanding of spoofing, generally, and not opining about Smith's trading,

70

specifically.  See Smith.App.2750-2751, 2764.  In any event, this Court has made clear that the use of such terms—even those that mirror the statutes of conviction—does not render a witness's testimony inadmissible.  See *United States* v. *Eaden*, 37 F.4th 1307, 1313 (7th Cir. 2022) ("Our precedents have repeatedly upheld a witness's use of the term 'fraudulent' when testifying in fraud cases.").  In *Locke*, the defendant asserted that a witness's "use of the words 'fraud' and 'misrepresentation'" improperly conveyed a witness's "legal standards" and thus "told the jury what conclusion to reach."  *Locke*, 643 F.3d at 241 (quotations omitted).  This Court rejected that argument.  In doing so, it distinguished the Court's opinion (on which Smith relies) in *Noel*, which held that a detective's testimony that "various photographs found on the defendant's computer . . . fit the statutory definition of child pornography" "'amounted to nothing more than a statement that the photos were illegal.'" *Id.* at 240 (quoting *Noel*, 581 F.3d at 496-497).  The Court explained that "the testimony Locke challenges is far afield from the unhelpful, bare-legal-conclusion testimonies in *Noel*," where the witness "opined on the application of the exact statutory elements involved in the case*." Id.* at 241.  "Rather, each witness explained why the loan in question would have been disapproved by using 'fraud' or 'misrepresentation' in a colloquial sense, employing the vernacular of their financial professions." *Id.* at 242.

So too here.  The prosecutor's questions "did not invoke any of the wire fraud statute's language, and they did not call for opinions on whether its elements were fulfilled."  *Locke*, 643 F.3d at 241-242.  Rather, the prosecutor's questions, and Wika's answers, used the "vernacular of [his] financial profession[]"—and of the CME's rules—to characterize Smith's trading conduct and describe why he believed that that conduct ran afoul of those rules.  *Id.* at 242; see *Eaden*, 37 F.4th at 1313 (witness describing claims as "fraudulent" was properly "expressing with a layperson's vernacular that those submissions were false").  That is a far cry from *Noel*, where the expert witness "offered only conclusory statements" that the defendant's conduct "met the federal definition of child pornography."  *Noel*, 581 F.3d at 496.  In addition, to avoid any potential confusion, at the end of Wika's direct examination the district court instructed the jury that CME rules are not necessarily the same as federal law.  Smith.App.2874-2875.

Smith criticizes the district court's determination that Wika was not offering an opinion "'that Smith had the intent to defraud'" but rather that Smith was "'placing orders without an intent to execute them.'"  Smith.Br.30 (quoting Smith.App.128, 2754-2755).  Smith conflates the trading "intent" communicated by spoofing with the "intent" element in the fraud statutes.  Wika did not testify that Smith had the requisite "inten[t] to devise" a scheme "to defraud," 18 U.S.C. § 1343—though "even if [he] had, such

72

testimony is not necessarily inappropriate," *Locke*, 643 F.3d at 242. Rather, he testified that his investigation determined that Smith placed orders without the *intent to trade*—part of the actus reus of the charged offenses. See *Chanu*, 40 F.4th at 541 (by "obscuring th[e] intent to cancel," spoofing advances a misrepresentation). Wika also testified that spoof orders are "entered with an intent to mislead." Smith.App.2751. But again, that is simply a description of the relevant conduct: There is no way to describe how or why spoofing works *without* explaining that spoofing misleads the market about "buying interest or selling interest." Smith.App.2751.

### 3.     Wika Did Not Give Expert Testimony

Rule 701 provides that opinion testimony by a lay witness must be (1) "rationally based on the witness's perception" and (2) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," which governs expert testimony. Smith contends that Wika's testimony ran afoul of both requirements. That contention is also without merit.

a. Wika's testimony was based on his perceptions as the CME investigator and preparer of the report. Smith protests that Wika's testimony was based on a "post-hoc review of evidence" because the investigation was prompted by a complaint made to the CME in 2012 and Wika joined the investigation in 2014 or 2015. Smith.Br.33; see Smith.App.2752. That is irrelevant. Courts have admitted similar testimony

73

under Rule 701 where an investigator testified about investigations into a defendant's prior conduct. In *Eaden*, for example, this Court affirmed the admission under Rule 701 of a lay witness's testimony "that, in reviewing over 200 [claims] submissions from" the defendant to a company, "he discovered factual inaccuracies in more than 75 percent"—inaccuracies that he described (after the fact) as "fraudulent." *Eaden*, 37 F.4th at 1312-1313.

Here, Wika was "testifying about his role in the CME investigation." Smith.App.126; see Smith.App.2753-2754, 2864 (Wika describing his investigation). And he testified about a report that he personally prepared in 2015 as part of that investigation—not about data or evidence that was prepared for the 2022 trial. That is "fact testimony." Smith.App.126. Indeed, the report was admitted as a CME business record created in the ordinary course of business, see Smith.App.128, and the district court instructed the prosecutor to focus at trial on "Wika's direct factual knowledge in the investigation at issue" to avoid duplication of other witness testimony, Smith.App.2751-2752.

b. Wika's testimony was not based on scientific or technical knowledge exclusively within the realm of expert testimony. Rather, as the district court in *Coscia* held with respect to testimony by commodities traders, Wika's testimony "contained rudimentary statements about supply and demand,

concepts that are relatively easy to grasp." *United States* v. *Coscia*, 177 F. Supp. 3d 1087, 1095-1096 (N.D. Ill. 2016).

Smith protests that Wika's testimony involved statistics and a view of spoofing based on his industry experience. Smith.Br.33-34. But even "[a] witness's specialized knowledge . . . does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.'" *United States* v. *Rigas*, 490 F.3d 208, 224 (2d Cir. 2007); see *Clarett* v. *Roberts*, 657 F.3d 664, 671 (7th Cir. 2011). Here, Wika testified that he wrote a report about his CME investigation. The mere fact that that report included terminology that the CME itself uses does not convert Wika's testimony regarding the report into expert testimony.

Smith makes much about the "'statistical'" nature of Wika's report, which he says is "something untrained laypersons could not perform." Smith.Br.33, 35. But the "statistical analysis" portion of the report merely showed figures like the "cancellation rates and durations" of Smith's orders. Smith.App.2783-2784. Such calculations—dividing the number of orders canceled by the total orders placed—is not beyond the ken of a lay witness. See *Coscia*, 866 F.3d at 789 (exchange compliance officer providing lay testimony about fill ratios and cancellation rates).

75

c.  The  cases  on  which  Smith  relies  (Smith.Br.34-36)  are distinguishable.  In *United States* v. *Conn*, 297 F.3d 548, 554-555 (7th Cir. 2002), the Court held that an officer's testimony based on his "training and experience" that a defendant's guns were not "collector's items" constituted expert testimony.  But the Court went on to hold that the testimony was admissible expert testimony in any event.  *Id.* at 556-557.  And, unlike the testimony at issue in *Conn*, Wika's testimony here could not "have been offered by any individual with specialized knowledge," *id.* at 555:  Only Wika could have testified about his own report regarding Smith's conduct.

In *United States* v. *Oriedo*, 498 F.3d 593, 603-604 (7th Cir. 2007), the Court held that an officer's testimony about how drug dealers package crack cocaine was expert testimony because he relied on his "wealth of . . . experience as a narcotics officer."  But this Court's officer-testimony cases have drawn a line between testimony "based on personal knowledge obtained from the investigation of [the] defendants" (lay testimony), and testimony from "expertise having derived from [the witness's] involvement in other drug investigations" (expert testimony).  *United State* v. *Cheek*, 740 F.3d 440, 447 (7th Cir. 2014) (drug code-word testimony).  Wika's testimony fell on the lay side of that line:  He was testifying, based on his experience, about a report that he had prepared regarding his investigation into Smith's trading.  See *Clarett*, 657 F.3d at 671 (police officer's testimony that "it would

be physically impossible to discharge [a] Taser multiple times just one second apart" was lay testimony because it "was limited to his own experience in operating the Taser").

In *Tribble* v. *Evangelides*, 670 F.3d 753, 758 (7th Cir. 2012), the court concluded that a prosecutor's testimony about court cases dismissed for lack of probable cause was "not testimony about [the Section 1983 plaintiff's] case" but rather "an opinion about probable cause hearings at [the court] in general." *Id.* at 759. Here, however, there is no question that Wika testified about *Smith's* case; he described the CME's investigation into, and his report regarding, Smith's conduct.

### 4.    Wika's Testimony Satisfied Rule 403

Smith contends that Wika's testimony violated Rule 403, which provides that the district court "may exclude relevant evidence if its probative value is substantially outweighed" by a risk of unfair prejudice or confusion. Smith never objected to Wika's testimony on Rule 403 grounds during trial, and his pre-trial Rule 403 objection argued only that Wika's testimony was "needlessly cumulative," a contention that he does not appear to renew on appeal. See Doc.539 at 6. But even for preserved Rule 403 challenges, "[t]he balancing of probative value and prejudice is a highly discretionary assessment, and [the court] accord[s] the district court's decision great deference, only disturbing it if no reasonable person could

agree with the ruling." *Pacilio*, 85 F.4th at 465 (quotations omitted); see *United States* v. *Hosseini*, 679 F.3d 544, 556 (7th Cir. 2012). Smith cannot show that the district court abused its "sound discretion," let alone plainly erred, in allowing Wika's testimony. *United States* v. *Baskes*, 649 F.2d 471, 481 (7th Cir. 1980).

Wika's testimony that he and the CME determined that Smith's conduct violated the CME's rules against spoofing was probative in a trial about Smith's spoofing—particularly where Smith's argument was that his trading was permissible. And any unfair prejudice was eliminated by the district court's instruction to the jury that a violation of the CME rules is not a "violation of the law." Smith.App.2875. Although Smith contends that Wika's testimony had little probative value because he "simply offered a layperson's legal conclusions," Smith.Br.37, that argument fails for the reasons stated above.

Smith further contends that the "risk was great that the jury would simply rely on the assurance of an expert investigator rather than carefully analyzing the underlying evidence itself." Smith.Br.37. But Wika was offered as a lay witness, not an expert. If anything, then, his testimony would be *less* likely to bias the jury through the "aura of special reliability" that can surround expert testimony. *United Sates* v. *Boney*, 977 F.2d 624, 631 (D.C. Cir. 1992) (quotations omitted). And the district court instructed

the jury that it was its duty "to decide the facts from the evidence" and to "[g]ive the evidence whatever weight you decide it deserves." Smith.App.4601, 4604.

### C. The District Court Did Not Abuse Its Discretion In Admitting Wika's Report

#### 1. Background

Before trial, Smith moved to exclude Wika's report about the CME investigation into Smith's trading. Doc.549. The report focused on two trading episodes from July 2013 and explained that "Smith would place an iceberg order on one side of the market and subsequently place layers of exposed 10 lot orders on the opposite side of the market (the exposed side) in an apparent attempt to induce other market participants to trade opposite the iceberg order." Smith.App.2762-2763, 2766. The government proposed redacting the report to exclude its "Recommendations," including the recommendation to sanction Smith for violating CME Rule 432 for "engaging in fraud." See Doc.548 at 3; see Smith.App.118.

The district court ruled that the report was admissible with the redactions. Smith.App.128; see Smith.App.2880.[15] When the government introduced the report at trial, Smith objected to its statement that Smith

---

[15] The report's "recommended charges" were thus *not* "read into evidence." Smith.Br.2, 24.

placed orders "without intent to trade." Smith.App.2755. The court reiterated that Smith's "intent to trade" was "not the ultimate issue in the case" and that the "jury will decide whether that matches up with the elements and the mental states that are required" to convict. Smith.App.2755.

### 2. Argument

a. Smith contends that Wika's report "contained the same opinions and conclusions contained in Wika's testimony" and was thus unhelpful to the jury. Smith.Br.38. That claim fails for the reasons stated. Indeed, the portions of the report concluding that Smith had violated the CME rules, including the rules against "engaging in fraud," were redacted from the version of report admitted at trial. See Smith.App.118, 328-336. And those redactions were made specifically to avoid "creating confusion with the various criminal fraud charges alleged in this case." Doc.548 at 3.

b. The district court correctly ruled that the report fell within Rule 803(6)'s business-records exception to the rule against hearsay. See Smith.App.128. Wika prepared the report as a CME employee, and the CME maintains such investigation reports in the ordinary course of the Market Regulation Department's regularly conducted activity. See Rule 803(6); Doc.548 at 1-3.

Smith does not say otherwise. Instead, he contends (Smith.Br.39) that a *different* hearsay exception—Rule 803(8)(A), which applies to "record[s] or statement[s] of a public office"—excludes the use of "factual findings from a legally authorized investigation." But Smith did not make that argument below. See Doc.549 at 5-7. And as Smith acknowledges in any event, this Court has held that Rule 803(8)(A)'s restrictions on the public-record exception do not apply to Rule 803(6)'s business-records exception. Smith.Br.39 (citing *United States* v. *King*, 613 F.2d 670, 672-673 (7th Cir. 1980)). What is more, Rule 803(8)(A)'s restrictions were intended to avoid the "collision with confrontation rights" that could arise from using certain public records against a defendant in a criminal trial, see Advisory Committee Note to Paragraph (8), Fed. R. Evid. 803, and Wika was cross-examined about the report here.

Smith further contends that Wika's report was inadmissible because it was "prepared in anticipation of litigation." Smith.Br.40. Once again, however, Smith did not press that argument below, see Doc.549 at 5-7, and thus did not meet his burden, as the opponent of a business record, of showing that the report was prepared in anticipation of litigation, see *Jordan* v. *Binns*, 712 F.3d 1123, 1136 (7th Cir. 2013). And in any event the district court did not err, plainly or otherwise, in admitting the report. The report was not "specially prepared at the behest of the FBI" or any other law-

enforcement organization "with the knowledge that any information it supplied would be used in an ongoing criminal investigation." *United States* v. *Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993).[16]  Rather, it was an internal report prepared in 2015 by the CME in response to a 2012 complaint— several years before the 2019 indictment and 2022 trial in this case.  See Smith.App.2758.[17]

### D.    Any Error In Admitting Wika's Testimony Or Report Was Harmless

Any error in admitting Wika's testimony or report did not have a substantial effect on the jury's verdict.  See *United States* v. *Wantuch*, 525 F.3d 505, 514-514 (7th Cir. 2008).  The evidence against the defendants was overwhelming.  The government introduced 200 episodes of the defendants employing the characteristic spoofing pattern; the three cooperating witnesses testified that they saw the defendants engage in spoofing; the chats showed that the defendants placed (and canceled) spoof orders on the opposite side of the orders that they were told to execute; Venkataraman

---

[16] Smith cites no record evidence for his claim that the report was prepared "pursuant to the CME's normal cooperation with the CFTC."  Smith.Br.40.

[17] Smith contends (Smith.Br.40) for the first time on appeal that the CME report was prepared pursuant to 7 U.S.C. § 12c, which authorizes exchanges to discipline members for violating "the rules of that exchange," but he offers no support for his assumption that all investigations conducted by an exchange are prepared in anticipation of litigation.

testified that the defendants' trading was consistent with spoofing; and a victim testified that the defendants' spoof orders misled his company's trading algorithm. Given that abundant evidence of guilt, any error in allowing Wika's testimony was harmless. And, for the same reason, Smith failed to show that any error with respect to his unpreserved claims affected his "substantial rights" or affected the integrity of public proceedings. See *Noel*, 581 F.3d at 498.

Smith protests (Smith.Br.42) that the evidence of his intent was "purely circumstantial." But "[c]ircumstantial evidence of intent is just as probative as direct evidence." *United States* v. *Cunningham*, 54 F.3d 295, 299 (7th Cir. 1995); see *Pacilio*, 85 F.4th at 464. Smith also states (Smith.Br.43) that Wika was the only "'expert'" to say that "Smith had spoofed." But Venkataraman (unlike Wika) was an expert, and he testified that "the trading strategy used by the defendant appears to be designed to not fill the red [canceled] orders but, instead, use these red orders to push the price to get fills on the green [executed] orders which are on the opposite side." Smith.App.3465; see Smith.App.3467. That is spoofing.

Any harm was further minimized by the district court's instructions. During (and after) Wika's testimony, the district court instructed the jury that the "CME rules are not necessarily the same as federal law" and that a violation of those rules "does not necessarily mean that there was a violation

of the law." Smith.App.2875; see Smith.App.4610. The jury was thus told that Wika was *not* opining that Smith was guilty of the charged offenses. The court further instructed the jury that it did not "have to accept [Wika's] opinions," and that it should judge his "opinions and testimony" in the "same way [it would] judge the testimony of other witnesses." Smith.App.4607.

The same goes for Smith's contention that Wika wrongly defined spoofing to include placing orders without the "intent to trade." Smith.Br.27 (quotations omitted). The jury instructions defined spoofing to require the "unconditional intent to cancel," Smith.App.4634, and the Court "generally presume[s] that juries follow instructions," *United States* v. *Butler*, 71 F.3d 243, 252 (7th Cir. 1995). What is more, several other witnesses provided that same definition of spoofing—all without the "unconditional" modifier that Smith prefers. See Smith.App.1394 (Sniegowski), 1667 (Edmonds), 3458 (Venkataraman). In light of those consistent definitions of spoofing, Wika's definition could not have affected the jury's verdict.

The fact that the jury deliberated for seven days does not compel a contrary conclusion. See Smith.Br.41. The trial spanned 16 days; three defendants were tried jointly on 26 counts; the government put on numerous witnesses and introduced financial exhibits depicting hundreds of trading episodes; and the jury convicted the defendants on all substantive counts. See *Morrow* v. *May*, 735 F.3d 639, 646 (7th Cir. 2013) (one-and-a-half days of

deliberations after a three-day trial did not suggest any errors were prejudicial).

## V.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING TESTIMONY FROM COOPERATING WITNESSES

### A.   Background

The government moved before trial to admit lay opinion testimony from Edmonds, Trunz, and Flaum.  See Doc.317.  The defendants moved to exclude the testimony.   See Smith.App.124.   The district court ruled that the proffered testimony was admissible lay opinion testimony because it was based on the witnesses' firsthand knowledge.  *Ibid.*

At trial, the defendants asked for clarification regarding whether the witnesses would be allowed to offer opinions on the defendants' orders in which they did not directly participate.   See Smith.App.135-137; Smith.App.954-955.  The court ruled that the witnesses' testimony about such orders was "based on" their perception, and thus admissible. Smith.App.136.

Edmonds, Trunz, and Flaum testified that they engaged in spoofing; that they saw the defendants engage in spoofing; that they learned how to spoof from watching the defendants do so; and that, in trading episodes shown to the jury, the defendants used the same trading strategy that the

witnesses themselves used when spoofing.  See Smith.App.1810-1885, 1895-1925, 2614, 2637, 3014, 3031-3032.

**B.    Standard of Review**

Decisions regarding the admission of evidence are reviewed for abuse of discretion.  *Pacilio*, 85 F.4th at 464.

**C.    The Cooperating Witnesses Did Not Improperly Opine That Smith and Nowak Were Guilty**

Smith contends that the cooperating witnesses' testimony was "impermissible because it consisted of legal opinions regarding Smith's intent and his guilt."  Smith.Br.45.  Nowak joins that argument.  Nowak.Br.39.  Smith's argument is largely a retread of his challenge to Wika's testimony, and it fails for the same reasons.  For example, Smith protests (Smith.Br.45) that the witnesses provided a definition of spoofing that did not contain the term "unconditional" (emphasis omitted).  But Smith never objected to the witnesses' omission of "unconditional" from their description of spoofing.  And it was not improper, let alone plainly so, for the witnesses to describe their spoofing conduct in a way that reflected their understanding of that conduct.

Smith also argues that the witnesses improperly described spoofing as fraudulent, deceitful, or manipulative.  Smith.Br.46.  But again, the witnesses were allowed to explain how they used spoofing to deceive the market.  True, the witnesses also stated that the defendant placed orders

86

that "were not intended to trade," Smith.App.1817, and thus "place[d] false volume into the marketplace," Smith.App.3063.  But this Court's "precedents have repeatedly upheld a witness's use of the term 'fraudulent' when testifying in fraud cases." *Eaden*, 37 F.4th at 1313.

Smith nevertheless protests that the cooperating witnesses were not merely using "fraud" in the "'vernacular'" sense, but instead "premised [their] conclusions on the *legal definitions* for Smith's charges" in a way that "went directly to what Smith *intended* to do."  Smith.Br.47-48.  But "lay opinion testimony as to the mental state of another is indeed competent under Rule 701," *United States* v. *Bogan*, 267 F.3d 614, 619-620 (7th Cir. 2001) (quotations omitted), and opining on the defendants' *intent to trade* is not the same as opining on their ultimate *intent to defraud* in any event.  Smith provides no support for his assumption that the witnesses were providing a conclusion as to the "*legal definitions*" of Smith's charges.  Smith.Br.48.  The witnesses were simply explaining how spoofing worked: by providing a false signal of supply and demand to the market.  Indeed, they repeatedly used colloquial terms to describe the purpose of spoofing, including "lie," "trick," "fake," "real," "push," and "move[]."  Smith.App.1652, 1659, 1668, 1768, 2259, 2595, 2610, 3096, 3099, 3123.  There would be no helpful way for the witnesses to describe how spoofing worked without stating, in so many words, that it fooled the market.

Indeed, in *Coscia* the district court allowed lay opinion testimony similar to the cooperating witnesses' testimony here—namely, testimony that the defendant's spoof "orders were placed with the intention of essentially moving the market down and then pushing the market back up." *Coscia*, 177 F. Supp. 3d at 1095 (quotations omitted).  As the court explained, such "testimony would have been pointless had [the witness] been barred from explaining his interpretation of the pattern." *Ibid.*  And the defendants here, like Coscia, "had the opportunity to challenge [the witnesses'] interpretation on cross examination." *Ibid.*

This Court's opinion in *Wantuch* is not to the contrary.  See Smith.Br.47.  The prosecutor in that case asked a witness whether the defendant "was . . . aware" that a payment that he made "was illegal," and the witness responded that the defendant knew "that everything he was doing was illegal." *Wantuch*, 525 F.3d at 512.  The Court thus held that "[t]he question posed to [the witness] to opine as to [the defendant's] knowledge of whether his actions were 'legal' demanded a conclusion as to the legality of [the defendant's] conduct, which is unhelpful to the jury." *Id.* at 514.  Here, by contrast, the witnesses did not testify that Smith knew that his conduct was "illegal" at the time that he was spoofing.

**D.    The Cooperating Witnesses Did Not Give Expert Testimony**

1.  Rule 701 allows a lay witness to provide opinion testimony that is "rationally based on the witness's perception."    Smith contends that the witnesses' opinions about the defendants' trading episodes violated that rule because they did not observe Smith participate in those episodes. Smith.Br.48.    But Rule 701's "'[r]ationally based'" requirement simply "requires that the witness's opinion be grounded in his personal knowledge." *United States* v. *Saulter*, 60 F.3d 270, 276 (7th Cir. 1995).    And here, the witnesses' testimony was grounded in such knowledge.    At trial, Edmonds viewed one of his own spoofing episodes side-by-side with Smith's; explained how the size, duration, and pattern of trades depicted in his trading episode demonstrated his spoofing strategy (which he learned from Smith); compared Smith's trading episode to his own and testified that he "trade[d] in the manner depicted on this chart for Mr. Smith"; stated that he saw "Smith trade in th[e] style" depicted in Smith's chart; and then opined that, "based on [his] experience sitting back to back with Mr. Smith and the other experience that [he] described," Smith's "strategy as reflected on the[] charts" was "driving the price down" to the price of Smith's intended order. Smith.App.1779-1790, 1803-1805, 1809-1812, 1820-1821; see Smith.App.1900

(Edmonds testifying that a trading episode from Nowak employed "a trading strategy that [he] saw Mr. Nowak use").

Flaum was likewise shown his trading episodes alongside Smith's and testified that he "trade[d] like Mr. Smith is trading here"; that when he traded in that fashion he was "spoofing"; that he saw "Smith trade like this"; that his and Smith's trading episodes were "carbon copies of each other"; that Smith's trading was "consistent with how [Flaum] spoofed"; and that when he "saw [Smith] trading like this," he understood him to be "[s]poofing." Smith.App.2613-2614.   Trunz, too, compared his trades with Smith's and stated that, "[b]ased on [his] time trading with Mr. Smith," he believed that Smith was using "the exact same strategy that [Trunz] just described" with respect to his own spoofing.  Smith.App.3061-3063; see Smith.App.3138-3139 (Nowak's trades showed the "[i]dentical" strategy that Trunz used to spoof).

The cooperating witnesses' testimony was thus "based on personal knowledge that they accumulated through their own trading, through observing Smith and Nowak spoof, and even through learning how to spoof from Smith" and Nowak.  Smith.App.136.  The district court therefore did not abuse its discretion in concluding that the witnesses had sufficient knowledge from which to "base an opinion on orders in which they did not participate." *Ibid.*   Indeed, the district court's decision is consistent with this Court's decision in *Saulter*, which affirmed the admission of lay testimony by a drug

dealer who opined on the meaning of drug-trade phrases in conversations in which he was not a participant, on the ground that "Rule 701 does not require that the witness actually have participated in the recorded conversations." *Saulter*, 60 F.3d at 276.  It is also consistent with *Eaden*, where the Court affirmed the admission of lay testimony of an investigator for a company who reviewed "over 200 [claims] submissions" by the defendant and concluded, based on that after-the-fact review, that the claims were "fraudulent." *Eaden*, 37 F.4th at 1312-1313.

Smith contends that *Saulter* is distinguishable because the witness there was "'a member in the same organization'" as the defendants and so had "personal knowledge of the words' meaning within that organization." Smith.Br.50 (quoting *Saulter*, 60 F.3d at 276).  But here, too, the cooperating witnesses were all members of the "same organization" as the defendants— the JPMorgan precious metals trading desk.  And their testimony was based on their knowledge not only of how employees traded, but also on their knowledge of how the defendants, in particular, engaged in spoofing at JPMorgan.  Smith also protests that the investigator's testimony in *Eaden* was "not challenged on personal knowledge grounds."  Smith.Br.51.  But *Eaden* expressly held that the witness's "testimony was rationally based on his own perceptions from reviewing [the defendant's] claim submissions." *Eaden*, 37 F.4th at 1313.

91

This Court's decision in *United States* v. *Santos*, 201 F.3d 953 (7th Cir. 2000), does not compel a contrary conclusion. The defendant in that case was the Treasurer of the City of Chicago and a candidate for Attorney General. Her deputy solicited campaign contributions from city contractors, and the contractors that refused to contribute were later denied city contracts. *Id.* at 957, 962. Even though the "actual cutoffs of recalcitrant contractors were ordered by [the deputy], employees of the Treasurer's office were permitted to testify that they had no 'doubt' and a 'personal feeling' that [the defendant] had ordered [the deputy] to order the cutoffs"—testimony that this Court held went beyond the witnesses' personal experience. *Id.* at 962-963. Here, in contrast, the cooperating witnesses did not simply opine that they had a "'personal feeling'" that the defendants engaged in spoofing based on the defendants "management style." *Id.* at 963. Rather, they testified that they personally observed the defendants engage in spoofing—and that the defendants' trading episodes displayed the same spoofing strategy that both the witnesses and the defendants themselves employed while spoofing.[18]

---

[18] The district court in *Pacilio* ruled that a lay witness could not testify about trades in which he was not personally involved. See *United States* v. *Bases*, No. 18-cr-48, 2021 WL 6621284, at *5 (N.D. Ill. July 15, 2021). But the court nevertheless allowed the witness to testify in detail about trading episodes where he exchanged chats with the defendant during or near the time of the defendant's trades—and to opine that the defendant's spoof orders depicted in those episodes put "false" information into the market and "helped

2.   Smith also contends that, "like Wika, [the cooperating witnesses'] testimony was based on specialized knowledge" and was thus impermissible expert testimony.  Smith.Br.49.  That argument fails for the reasons stated. The witnesses' "testimony contained rudimentary statements about supply and demand, concepts that are relatively easy to grasp." *Coscia*, 177 F. Supp. 3d at 1095-1096; see *Clarett*, 657 F.3d at 671; *Rigas*, 490 F.3d at 224; see also *United States* v. *Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 704 (S.D.N.Y. 2011) ("some degree of specific, industry-related knowledge will not disqualify lay opinion testimony").  And the witnesses' testimony was "not based on specialized knowledge" under Rule 701, "because specialized experts on spoofing do not typically obtain their knowledge through participation in a conspiracy or engaging in the spoofing themselves."  Smith.App.137.

## E.   The District Court Did Not Abuse Its Discretion In Admitting The Witnesses' Testimony Under Rule 403

Smith argues that, "[a]s with Wika," the cooperating witnesses' testimony was inadmissible under Rule 403.  Smith.Br.52.  For the reasons stated with respect to Wika's testimony, the district court did not abuse its discretion concluding that the probative value of the evidence—in this

---

manipulate the price higher to get [the defendant's] sell orders filled." *Bases*, No. 18-cr-48, Doc.636 at 240-252 (N.D. Ill. July 22, 2021).

instance, testimony by coworkers who personally observed the defendants spoofing—was not substantially outweighed by the risk of unfair prejudice.

### F. Any Error In Admitting The Cooperating Witnesses' Testimony Was Harmless

Even if the district court abused its discretion in allowing the cooperating witnesses' testimony, any error was harmless. As noted, the evidence of the defendants' guilt was overwhelming. And while Smith objects to the witnesses' testimony about the defendants' trading episodes, he takes no issue with the witnesses' testimony that they saw the defendants engage in spoofing. That testimony, alone, was powerful evidence of the defendants' guilt. And still other witnesses (including Venkataraman and Wika) testified, consistent with the cooperating witnesses' testimony, that the defendants' trading patterns showed that they placed large orders with the intent to cancel in order to move the market toward their genuine orders. Any harm was further mitigated by the district court's instructions to the jury that it "may not consider any of [the witnesses'] guilty pleas as evidence against the defendants" and that it should "consider the[ir] testimony with caution and great care." Smith.App.4606-4607.

Smith's argument that the witnesses' other testimony was "relatively toothless" falls flat. Smith.Br. 54. He says that his statement to Edmonds that "'size moves the market" is "factually true." Smith.Br.54; see

Smith.Br.61.   But Edmonds testified that "what [Smith] was trying to convey" by that statement was that Smith placed the large bids "on the buy side" "so that . . . the market thinks that you're a buyer" and "doesn't know you're selling."  Smith.App.1730.  Smith suggests that his repeated flashes of anger when a spoof order was executed "could be referring to unwanted executions after market conditions had changed."  Smith.Br.54.   But the witnesses expressly testified that Smith was angry *because* he was "spoofing to fill client orders."  Smith.App.1737-1738, 3046-3047.   And while Smith may have been "jok[ing]" when he said "'[t]here goes the business'" after being instructed not to engage in spoofing, any morbid humor conveyed by that comment was premised on the fact that he and the other traders were spoofing as a matter of course.  Smith.Br.54; Smith.App.1774.

## VI.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN PROVIDING SUPPLEMENTAL JURY INSTRUCTIONS

### A.   Background

1.   The jury began its deliberations in Smith's and Nowak's trial at 3:46 p.m. on Friday, July 29, 2022.  See Smith.App.4959-4962.  On Monday, August 8, 2022, at 10:10 a.m., the foreperson submitted a note stating:  "At this point in time, we have not reached a unanimous decision for any of the defendants' charges.  Please advise."  Smith.App.4966; see Doc.674, at 10.  Defense counsel asked the court to declare a mistrial.  Smith.App.4967-4968.

The district court declined. Smith.App.4969. Instead, it gave the jury the standard instruction from *United States* v. *Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc), which tracked the Seventh Circuit's pattern instructions and told the jurors to "make every reasonable effort to reach a verdict" and discuss "their differences with an open mind," but cautioned the jurors not to "surrender your honest beliefs about the weight or effect of evidence." Smith.App.4975-4976.[19]

b.  On Tuesday, August 9, 2022, at 3:10 p.m., the foreperson sent a note stating:

> The jurors have concerns over comments made by a juror during deliberations yesterday afternoon. The juror claimed they made early decisions regarding the verdict for the defendants made at the time of opening statements and "saw everything through that lens." The same juror made comments prior to yesterday on three separate occasions where they expressed desire to be dismissed from the jury.

> Today, the juror states they no longer wish to be dismissed and yesterday's comments were taken out of context.

Smith.App.4980-4981 (cleaned up); Doc.674, at 14; Doc.758 at 42

The government asked the court to dismiss the juror and canvass the remaining jurors. Smith.App.4981-4985. Defense counsel stated that "the jury should continue deliberating." Smith.App.4981-4982. The court rejected the government's request and instead replied to the jury: "In response to your

---

[19] See 7th Cir. Pattern Criminal Jury Instruction 7.03 (2023).

note, the Court reminds the entire jury that the lawyers' statements and arguments are not evidence.  If what a lawyer said is different from the evidence as you remember it, the evidence is what counts." Smith.App.4982-4983; see Doc.758 at 42-43.  The Court explained to the parties that that language "is from the pattern instruction" and does not "improperly pick[] sides." Smith.App.4983.

At 2:55 p.m. on August 10, 2022, the jury reached a unanimous decision on all charges.  See Smith.App.268.

### B.   Standard Of Review

This Court reviews the district court's decision to provide a supplemental instruction to the jury for abuse of discretion.  *United States* v. *Sims*, 329 F.3d 937, 942 (7th Cir. 2003); *United States* v. *Sanders*, 962 F.2d 660, 677 (7th Cir. 1992).

### C.   The District Court Did Not Abuse Its Discretion In Providing The *Silvern* Instruction

Smith contends that the district court erred in providing the *Silvern* instruction.  Smith.Br.55-60.  Nowak joins the argument.  Nowak.Br.39 n.3.  Smith's claim lacks merit.

"The relevant inquiry, under *Silvern*," is "'whether "the court's communications pressured the jury to surrender their honest opinions for the mere purpose of returning a verdict."'"  *United States* v. *Kramer*, 955 F.2d

479, 489 (7th Cir. 1992) (quoting *United States* v. *Thibodeaux*, 758 F.2d 199, 203 (7th Cir. 1985) (per curiam)). "On several occasions this court has held that instructions to continue to deliberate" that departed from the standard *Silvern* instruction "were neutral and not coercive." *Ibid.* (citing cases); see *United State*s v. *Ridley*, 826 F.3d 437, 445 (7th Cir. 2016) (same). And this Court has "previously described the *Silvern* instruction," in particular, "as 'perfectly content-neutral and [carrying] no plausible potential' for coercing the jury." *Sanders*, 962 F.2d at 676 (quoting *United States* v. *Beverly*, 913 F.2d 337, 352 (7th Cir. 1990)). Indeed, this Court has held that it was not coercive for a district court to read a *Silvern* instruction to the jury "two times" after "it was read in the initial jury charge." *Id.* at 677; see *United States* v. *Byrski*, 854 F.2d 955, 962 n.11 (7th Cir. 1988).[20]

There is no dispute that the instruction provided by the district court here adhered to the "standard script" from *Silvern* and copied this Circuit's pattern instructions nearly verbatim. *Ridley*, 826 F.3d at 444 (noting that the *Silvern* "script was meant primarily as a safe harbor to help minimize appeals of instructions to divided juries"). And the district court provided the instruction only once, after the jury indicated that it was deadlocked. Under

---

[20] This Court has stated that a *Silvern* instruction should be given after a deadlock if it had already been given in the initial jury charge, as the district court did here. *United States* v. *Collins*, 223 F.3d 502, 509 (7th Cir. 2000); Smith.App.4956-4957.

98

this Court's precedent, then, the court's *Silvern* instruction had "'no plausible potential' for coercing the jury." *Sanders*, 962 F.2d at 676 (quoting *Beverly*, 913 F.2d at 352) (other quotations omitted).

Smith contends that "a *Silvern* instruction may, under certain circumstances, be unconstitutional" and argues that the instruction was coercive because it was provided after "protracted deliberations" of five-and-a-half days. Smith.Br.56-57. But Smith does not cite a single case in which this Court has held that a district court abused its discretion in providing a *Silvern* instruction—let alone that the district court did so based solely on the duration of deliberations. Instead, he relies primarily on cases in which the court *declined* to provide a *Silvern* instruction. See *United States* v. *Banks*, 982 F.3d 1098, 1103-1104 (7th Cir. 2020) (stating that "likelihood of coercion" from jury polling "would have been diminished had the judge's supplemental instruction included th[e] important warning" from *Silvern*); *United States* v. *Blitch*, 622 F.3d 658, 668-669 (7th Cir. 2010) (addressing contention that "the judge should have given the instruction we approved in" *Silvern*). And *Byrski* only cuts against his argument. See Smith.Br.57. There, the Court held that the district court did not abuse its discretion in declaring a mistrial where the jury was deadlocked after nine days of deliberations. *Byrski*, 854 F.2d at 957-959. But in doing so, the Court expressly held that it was "within the discretion of the district court" to read the jury "the *Silvern* instruction on

two separate occasions" after the jury indicated that it was deadlocked. *Id.* at 962 n.11; see *Beverly*, 913 F.2d at 352. Indeed, the district court in *Byrski* repeated the *Silvern* instruction for the first time on the sixth day of deliberations—just as the district court did (for the first and only time) here. See 854 F.2d at 957.

Moreover, as the district court explained here, "there were two and a half weeks of testimony" in the defendants' joint trial, "many new concepts for [the jury] to digest," "three retained experts," "two days of closings," "66 pages of instructions," and "27 counts." Smith.App.4969. Given the complexity and length of trial, the jury's deliberations for five and a half days prior to the *Silvern* instruction was not unexpectedly long—and does nothing to render the facially neutral *Silvern* instruction coercive. Cf. *Kramer*, 955 F.2d at 490 ("The district court's determination that the jury was not hopelessly deadlocked after only four days was certainly reasonable given the extensive length of the trial and the multiple defendants involved.").

Indeed, the jury continued to deliberate for two days after receiving the *Silvern* instruction, and this Court has "stated that a supplemental instruction is less likely to have been coercive when the jury deliberated for a long time after receiving the instruction before returning a verdict." *United States* v. *Williams*, 819 F.3d 1026, 1034 (7th Cir. 2016); *United States* v. *De Stefano*, 476 F.2d 324, 337 (7th Cir. 1973) (fact that jury deliberated "at least

100

four more hours after the supplemental charge" indicated lack of coercive effect). The fact that the jury "did not convict all Defendants of all counts" further "indicat[es] that rereading of the [*Silvern*] instruction did not pressure jurors to 'surrender their honest opinions for the mere purpose of returning a verdict.'" *United States* v. *Cardena*, 842 F.3d 959, 975 (7th Cir. 2016) (quoting *Kramer*, 955 F.2d at 489).

### E. The District Court Did Not Abuse Its Discretion In Reminding The Jury That Lawyer's Statements Are Not Evidence

Nor did the district court abuse its discretion in responding to the jury's note about the juror who "made early decisions regarding the verdict for the defendants . . . at the time of opening statements." Smith.App.4980-4981. There is no dispute that "the statements of lawyers are not evidence." *Clifford* v. *Crop Prod. Servs., Inc.*, 627 F.3d 268, 273 n.6 (7th Cir. 2010) (citing *United States* v. *Diaz*, 533 F.3d 574, 578 (7th Cir. 2008)). This Court has thus held that improper government conduct can be cured by instructions to the jury that "lawyers' statements were not evidence" and that "[i]f what a lawyer said is different from the evidence as you remember it, . . . the evidence is what counts." *United States* v. *Memar*, 906 F.3d 652, 659 (7th Cir. 2018) (quotations omitted).

That is exactly how the district court responded here. It "reminded the entire jury that the lawyers' statements and arguments are not evidence,"

and that "[i]f what a lawyer said is different from the evidence as you remember it, the evidence is what counts."  Smith.App.4982-4983.  As the district court explained, that instruction was taken from the pattern instructions, Smith.App.4983, and mirrored the instructions that the court gave the jury before and during closing arguments.  Smith.App.4604, 4641, 4792, 4795.  There is nothing "coerc[ive]" about providing the jury a correct statement of the law.  Smith.Br.60.

Smith nevertheless contends that "[t]he message the court conveyed to the jury could not have been clearer:  The holdout juror was wrong, and the others were right."  Smith.Br.58.  But the court did just the opposite:  It expressly "remind[ed] *the entire jury*" that the "lawyers' statements and arguments are not evidence."  Smith.App.4982 (emphasis added).  The court's response thus avoided singling out any juror and was couched in neutral language that has been endorsed by this Court.  The district court was "not making a finding either way on whether someone failed to keep an open mind or made a decision based on opening statements," but simply "remind[ing] [the jury] of the correct legal instruction" that it had already heard several times before.  Smith.App.4983.  Nor is there any support for Smith's claim (Smith.Br.58) that the court's response "encouraged [the juror] to flip."  The jury went on to deliberate for a full day after receiving the district court's

102

response, indicating that the note did not have any coercive effect.   See *Williams*, 819 F.3d at 1034.

Smith states that the facts here "echo" those of *Byrski*, where the district court "did not respond," Smith.Br.58-59, after receiving a note from a juror stating that he was "frustrated by the other jurors' unwillingness to discuss the evidence presented during the trial," and that the "deliberative process had been irreconcilably fractured," *Byrski*, 854 F.2d at 958.   But that note amounted to an indication that the jury was deadlocked—not that a juror had impermissibly made up his mind before deliberations based on lawyer statements.   And the mere fact that the court declined to respond to that note in *Byrski* does not suggest that the court abused its discretion in responding to the note here.   To the contrary, the district court in *Byrski* did respond, multiple times, to other notes from the jury.   *Id.* at 958-960.   Here, unlike in *Byrski*, the district court declined to "canvass" or "voir dire" the jury; ask it whether it was "still deadlocked"; or give another "baby *Silvern* instruction," as the government had requested.   Smith.App.4981-4982, 4985, 4987-4988.   The district court did not abuse its discretion in taking the

approach of simply reminding the jury, in neutral language, of its prior instructions.[21]

## VII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION UNDER RULE 403 IN LIMITING JORDAN'S CROSS-EXAMINATION

### A.    Background

1.    Jordan sought to exclude evidence of trades that he made while working at the First New York Securities firm in 2011.  See Doc.693.  Jordan argued that his 2011 trading activity had no bearing on his state of mind while he was employed at JPMorgan in 2008-2009 or Credit Suisse in 2010. *Id.* at 3.  The government responded that if the court excluded the First New York evidence it should also prohibit the defense from introducing evidence or argument related to the Dodd-Frank Act, on the ground that it would be unfair to allow the defense to present such after-the-fact evidence while precluding the government from showing that Jordan continued to engage in spoofing after Dodd-Frank's anti-spoofing provision went into effect in 2011. Doc.728 at 9.

---

[21] The defendants did not ask the district court to "not respond" to the note. Smith.Br.59.  Instead, they asked the court to respond, "I remind you to follow all of the Court's instructions," Smith.App.4991.  The court did not abuse its discretion by explaining to the jury *which* prior instruction to follow.

The district court barred the government from introducing the First New York trades.  Doc.745 at 4.  It then ruled that, "[g]iven the elimination of the First New York trades from the government's case, the existence and development of Dodd-Frank's explicit ban on spoofing is generally irrelevant." *Ibid.*  It further explained that, even if relevant, "there is an insurmountable Rule 403 problem with Dodd-Frank evidence in this context" and "a substantial risk that the jury would apply a [] mistake-of-law defense by inferring that" the wire-fraud statute "did not prohibit spoofing before Dodd-Frank." *Id.* at 5.

At a pretrial conference the next day, Jordan sought leave to introduce post-2011 compliance documents from JPMorgan, Credit Suisse, and the CME to impeach compliance witnesses and rebut the government's contention that spoofing violated bank and CME policies when he worked at the banks through 2010.  JSA.51.  The court denied the request.  It explained that "Jordan will have the opportunity to cross on the absence of explicit language in the compliance policies," and that it would create a "significant [Rule] 403 problem to then introduce these after-the-fact changes" without getting "into the Dodd-Frank quagmire" and delving into an improper "mistake of law defense."  JSA.55.

The court later issued an order reiterating that the post-2011 compliance documents should be excluded "because they represent after-the-

fact . . . evidence that poses a serious Rule 403 risk of confusing the jury into thinking that mistake of law is a defense and that the government must show willfulness in this alleged *fraud* case (which does not require a showing of willfulness)." Doc.793 at 1. The court further found that there "is no way to introduce the exhibits without injecting the Dodd-Frank Act into the case," and "distracting the jury and wasting substantial time." *Ibid.*

2. The CME's Erin Middleton testified at trial that the CME rules required orders to be placed with the "true intent to buy or sell [at] a particular price or quantity." Jordan.App.1752, 1755-1756. Credit Suisse's David King testified that bank policies prohibited traders from "placing an order with the intent to cancel." Jordan.App.1549. And JPMorgan's Mark Catana testified that the banks' anti-manipulation policies would "prohibit placing orders with the intent to cancel." Jordan.App.1612-1613.

### B. Standard Of Review

This Court "review[s] a trial court's limitation on the scope of cross-examination for an abuse of discretion," and "[a] district court's Rule 403 balancing is afforded a special degree of deference: [o]nly in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge." *United States* v. *Robbins*, 197 F.3d 829, 843-844 (7th Cir. 1999) (quotations omitted).

## C.     The District Court Properly Exercised Its Discretion

Jordan contends that the district court erred in prohibiting him from cross-examining compliance witnesses about policies that were promulgated in 2012 and later—"years after [his] departure from Wall Street," and after the conduct alleged in the indictment.  Jordan.Br.16 (emphasis added); see Smith.App.81.  That argument fails.

"Trial judges retain 'wide latitude' to impose reasonable limits on cross-examination based on concern about matters including harassment, prejudice, confusion of the issues, or interrogation that is repetitive or only marginally relevant."  *United States* v. *Rivas*, 831 F.3d 931, 934 (7th Cir. 2016) (quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986)).  "Rule 403," in particular, "grants the district court broad discretion to limit the scope and extent of cross-examination when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, misleading the jury or the needless presentation of cumulative evidence."  *United States* v. *Williamson*, 202 F.3d 974, 978 (7th Cir. 2000).  The district court did not abuse its discretion in restricting Jordan's cross-examination.

The point that Jordan hoped to make with the post-2011 compliance policies was that the policies in place before then did not expressly ban "spoofing"—and thus failed to "place traders such as Jordan on notice that spoofing was prohibited."  Jordan.Br.16.  As Jordan acknowledges

(Jordan.Br.18-22), however, he was able to cross-examine each of the witnesses on that very point. Thus, his counsel asked Catana at least *thirty-six times* on cross-examination whether various JPMorgan compliance policies during Jordan's tenure used "the word 'spoofing,'" "address[ed] spoofing," or discussed the "four-step process" of spoofing, and Catana admitted that the policies did not use the term. Jordan.App.1637, 1639-1641, 1655-1657, 1663-1664, 1666, 1668-1669, 1672-1676, 1680, 1686-1694, 1696, 1700. Jordan's counsel also repeatedly asked King on cross-examination whether "the word 'spoofing'" appeared in Credit Suisse's policies when Jordan worked there. Jordan.App.1574, 1576-1577. And Middleton acknowledged on cross-examination that the "word 'spoofing' does not appear" anywhere in CME Rule 432, and that "in 2009 and 2010 when Chris Jordan was trading at JPMorgan and Credit Suisse, the CME could have added language to Rule 432 to make it clear that spoofing was prohibited by the rule." Jordan.App.1787-1788, 1792.

Jordan thus had more than a "reasonable chance," *Williamson*, 202 F.3d at 978, to cross-examine the compliance witnesses about his theory—namely, that none of the compliance policies or rules during the time of Jordan's employment mentioned "spoofing." Jordan.Br.16. The only thing that Jordan could not do was cross-examine the witnesses about policies that were promulgated *after* Jordan had left the banks (and after the conduct at

108

issue). And the district court correctly concluded under Rule 403 that any probative value of those after-the-fact policies was outweighed by the risk of unfair prejudice and confusion of the issues.

To begin with, the probative value of the post-2011 policies was minimal, at best. Jordan asserts that "the policies and rules that were in effect in 2009 and 2010 *were not* sufficient to place traders such as Jordan on notice that spoofing was prohibited"—and that he was denied the chance to ask the jury why, if those policies were adequate, "the banks and CME amend[ed] their policies and rules . . . to specifically define and prohibit spoofing." Jordan.Br.16-17. But the banks and the CME amended their policies to refer to "spoofing" only after Dodd-Frank's enactment. And in *Pacilio*, this Court rejected the defendants' notice argument that "the passage of the Dodd-Frank Act's spoofing provisions signals that spoofing was not previously considered fraud." *Pacilio*, 85 F.4th at 461. Thus, the premise of Jordan's relevance argument is flawed: The fact that the banks and the CME started using the term "spoofing" after 2011 says nothing about whether the conduct of spoofing was prohibited before that date.

More to the point, Jordan was convicted of wire fraud, not of violating bank policies or CME rules. Indeed, the district court instructed the jury during the witnesses' testimony (and again before deliberations) that a violation of a "compliance policy or CME rules" does not mean "there was a

violation of the law." Jordan.App.1761; see Supp.App.99. Jordan is thus incorrect that the post-2011 compliance documents would have "undermined [the compliance witnesses'] testimony and rebutted the government's theory of *mens rea*." Jordan.Br.19. The question of intent under the wire-fraud statute is not whether Jordan intended to violate bank policies or CME rules, but rather whether he intended to make a misrepresentation to the market. See Doc.793 at 1.

It is true that bank policies and CME rules are "relevant to demonstrate the defendants' intent to manipulate the market by placing orders with the intent to cancel, contrary to the expectation of market participants." *Pacilio*, 85 F.4th at 465. But whether or not those policies used the term "spoofing" is beside the point. The compliance policies expressly prohibited making a "bid or offer that is not bona fide," Jordan.App.1549 (King); placing "trades to create an artificial market price, *i.e.*, a price not determined by supply and demand," Jordan.App.1602 (Catana); and placing trades to "creat[e] a condition in which prices do not or will not reflect fair market values," Jordan.App.1763 (Middleton). The post-2011 policies do nothing to call into question the witnesses' testimony that Jordan's conduct, by whatever name, fell within the scope of those policies. Indeed, Jordan himself successfully moved to exclude his trades and chats from after 2011 on the ground that they "have no bearing on his trading

activity or state of mind while he" worked at JPMorgan and Credit Suisse from 2008-2010.  Doc.693 at 3.  For the same reason, the policies enacted by those banks after 2011 have no bearing on his pre-2011 state of mind either.

On the other side of the Rule 403 ledger, allowing Jordan to cross-examine witnesses with the post-2011 policies would create "a substantial risk that the jury would apply a [] mistake-of-law defense by inferring that" the wire-fraud statute "did not prohibit spoofing before Dodd-Frank." Doc.745 at 5.  After all, "the wire and commodities fraud statutes criminalized [spoofing] conduct before the passage of Dodd-Frank." *Pacilio*, 85 F.4th at 461.  But Jordan's proposed use of compliance policies promulgated after Dodd-Frank to include the term "spoofing" would invite the jury to (erroneously) conclude that spoofing was not prohibited until Dodd-Frank's enactment.  It would also risk wrongly suggesting to the jury that the government needed to show "willfulness" under the wire-fraud statutes.  Doc.793 at 1.  As the district court explained, although the government "must prove intent to defraud," that does not mean that the government "need[ed] to prove that Jordan knew that the alleged conduct was illegal." *Ibid.*

What is more, Jordan does not challenge the district court's decision to exclude testimony about Dodd-Frank.  But there would be "no way to introduce the [post-2011] exhibits without injecting the Dodd-Frank Act into

111

the case, along with the accompanying explanations of that statute." Doc.793 at 1. As Jordan explained, the post-2011 materials referencing "spoofing" were adopted in response to Dodd-Frank's anti-spoofing provision. JSA.51; see JSA.70 (discussing CME Rule 575, also promulgated in response to Dodd-Frank). Getting the jury bogged down in the "quagmire" of Dodd-Frank, JSA.55, would thus only "wast[e] substantial time" at trial, Doc.793 at 1, and distract the jury from the question that mattered—whether Jordan intended to mislead the market.

Jordan protests that he disclaimed any reliance on Dodd-Frank at trial, and simply wanted to "establish that JPMorgan's policies changed after [his] departure." Jordan.Br.24-25. But it would have been misleading to show that the policies had changed without explaining *why* they changed—namely, to incorporate Dodd-Frank's anti-spoofing provision. Nor was it "unbalanced" for the court to allow the government to introduce the pre-2011 policies while forbidding Jordan from introducing the post-2011 policies. The district court took a balanced approach, allowing evidence that corresponded to Jordan's tenure with the banks and excluding evidence (including his trading activity) that post-dated that period.

Jordan's reliance (Jordan.Br.23-24) on *Public Service Co. of Indiana, Inc.* v. *Bath Iron Works Corp.*, 773 F.2d 783 (7th Cir. 1985), is misplaced. The defendant's liability there turned on whether the defendant in fact complied

112

with 1979 manufacturing plans, and the 1983 plans excluded by the court were relevant to show that the conical heads made by the defendant would have failed even if the defendant had complied with the 1979 plans. Here, however, Jordan could have (and would have) been convicted of wire-fraud irrespective of whether the bank and CME policies used the term "spoofing." The question under the wire-fraud act is *not* whether Jordan complied with bank rules, but rather whether he misled the market about his intent to trade. And introduction of the 1983 plans in *Bath Iron Works* would not have improperly raised the specter of a mistake-of-law defense, as the admission of the post-2011 policies would have done here. In sum, Rule 403 "requires a fact-intensive, context-specific inquiry," *Sprint/United Mgmt. Co.* v. *Mendelsohn*, 552 U.S. 379, 388 (2008), and the fact that some evidence passed the Rule 403 balancing test in one case says nothing about whether the district court abused its discretion in excluding totally different evidence in this case.

### D.   Any Error Was Harmless

Any error in excluding the post-2011 compliance policies was harmless because it did not have "'a substantial and injurious effect or influence on the

jury's verdict.'" *Wantuch*, 525 F.3d at 516 n.5 (quoting *United States v. Thomas,* 86 F.3d 647, 655 (7th Cir. 1996)).[22]

First, as noted, all the compliance witnesses repeatedly testified that the bank policies and CME rules did not use the term "spoofing" at the relevant times. Jordan was thus able to argue that the contemporaneous policies did not put him on notice that spoofing was prohibited by the banks where he worked. See Jordan.App.1916, 1918-1919 (arguing at closing that "the word 'spoofing' does not appear" in the CME rules or bank policies). The post-2011 compliance policies would have added little, if anything, to that argument. They only would have shown that the banks and the CME revised their policies after Dodd-Frank's enactment to mirror Dodd-Frank's spoofing language.

Second, the jury was instructed that the bank policies and CME rules were not the law—and that Jordan could not be convicted of wire fraud for violating those policies. Again, Jordan made the same point at closing, arguing that the government's argument that spoofing violated CME Rule 432 "falls apart at every step," because the "CME's rules are not the same things as federal law." Jordan.App.1916; see also Jordan.App.1918 ("the

---

[22] Jordan appears to invoke (Jordan.Br.26) the harmless-error standard for constitutional errors, but he does not allege any such error here. See *United States* v. *York*, 852 F.2d 221, 226 n.3 (7th Cir. 1988). Any error here would be harmless under any standard.

compliance policies of JPMorgan and Credit Suisse are not the same thing as federal law"). Because the jury did not convict Jordan for violating bank policies or CME rules, the district court's exclusion of the post-2011 policies had no effect on the jury's verdict.

Third, the evidence against Jordan was overwhelming. There is no dispute that Jordan engaged in spoofing. He stated in chat messages that he would "bid or offer size in front of" the offers he "need[ed] to get filled," Jordan.App.1432; Venkataraman testified that Jordan's trading "appear[ed] designed not to fill the" large spoof orders, Jordan.App.1836; and Jordan admitted to the FBI that he placed orders that he "intended to cancel." Jordan.App.1407. Indeed, Jordan concedes that he "used a trading tactic called 'spoofing' to achieve good execution on his orders," which he defined as "placing a bid or offer with the unconditional intent to cancel the order before execution." Jordan.Br.2-3. That is the very conduct that this Court has repeatedly held to be "substantial" evidence "of a fraudulent intent." *Coscia*, 866 F.3d at 797.

Jordan's response (Br. 16, 30-31) is that he did not *intend* to defraud, because he did not know at the time that spoofing was prohibited by the bank and CME policies. But for the reasons stated, that is a non-sequitur. The question under the wire-fraud act is whether Jordan intentionally misled the market by placing orders with the intent to cancel them. The evidence

showed that Jordan did just that.

## VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING JORDAN'S STATEMENT TO THE FBI

### A.    Background

Jordan admitted in his 2018 interview with FBI Agent Luca that he placed spoof orders that he "intended to cancel" in order to "mislead the market." Jordan.App.1407. Relying on Federal Rule of Evidence 106, Jordan moved to introduce his statement, from the same interview, that he "did not think what he was doing was wrong." Jordan.App.233.

The district court denied the motion. Doc.787. It ruled that "[n]othing about Jordan saying that he did not think he was doing anything 'wrong' *factually* clarifies the to-be-introduced statement that he placed orders with an intent the cancel them." *Id.* at 2. It also explained that "[w]hat remains without Rule 106's support, then, is that Jordan is seeking to introduce a hearsay statement—a *backward*-looking statement about his state of mind (not his present state of mind at the time of the FBI interview) to prove the truth of the assertion," in violation of the rule against hearsay. *Id.* at 3.

Agent Luca testified at trial about Jordan's admission that he placed orders with the intent to cancel them to mislead the market. Jordan.App.1407.

## B.    Standard Of Review

"Rule 106 decisions are left to the sound discretion of the trial court, and will not be disturbed absent abuse of that discretion." *United States* v. *Velasco*, 953 F.2d 1467, 1475 (7th Cir. 1992).

## C.    Argument

1.  The district court did not abuse its discretion in excluding Jordan's statement to Agent Luca that he did not think that his spoofing was "wrong."

Rule 106 provides that, "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106.  That "rule of completeness is designed to avoid misleading impressions created by taking matters out of context." *United States* v. *Lewis*, 954 F.2d 1386, 1391 (7th Cir. 1992).  "Under this doctrine, a complete statement is required to be read or heard when 'it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" *United States* v. *Lewis*, 641 F.3d 773, 785 (7th Cir. 2011) (quoting *United States* v. *Sweiss*, 814 F.2d 1208, 1211-1212 (7th Cir. 1987)).  "The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Ibid.* (quotations omitted).

117

The statement that Jordan wished to supplement was his admission to Agent Luca that he placed orders that "he intended to cancel" in "order to mislead the market" and "get the best possible fills for his boss." Jordan.App.1407.   But "[w]hether or not Jordan thought he was doing something 'wrong' does not clarify any misleading impression arising out of the statement that he placed orders with an intent to cancel."  Doc.787 at 2. To the contrary, admission of Jordan's statement of his purported belief would only "have confused or misl[ed] the jury" by suggesting—wrongly— that the government needed to prove that Jordan knew that his spoofing conduct was prohibited by bank policies or law.  *Velasco*, 953 F.2d at 1475.

Jordan protests that his statement "went directly to his state of mind, which was the central contested issue of the trial."  Jordan.Br.39.  But the relevant state of mind is Jordan's intent to deceive the market—not his knowledge that it was "wrong" to do so.  This case is therefore nothing like *State* v. *Warren*, 732 A.2d 1017, 1018 (N.H. 1999), where the trial court admitted (under the state rules of evidence) the defendant's confession that he stabbed the victim but excluded his explanation that he did so because the victim had "pulled a knife" on him first.  See Jordan.Br.39.  As Jordan notes, by excising the defendant's self-defense explanation, the court in *Warren* transformed his statement "from a statement of innocence into an admission of guilt."  Jordan.Br.39.  Here, however, Jordan's self-serving claim that he

did not know he was doing anything "wrong" does nothing to undermine his admission that he intentionally misled the market by spoofing.

The other cases on which Jordan relies are distinguishable for the same reason.  See Jordan.Br.36-37.  In *United States* v. *Paladino*, 401 F.3d 471, 476 (7th Cir. 2005), and *United States* v. *Haddad*, 10 F.3d 1252, 1258-1259 (7th Cir. 1993), the excluded statements altered the meaning of the admitted statements by flipping an exculpatory statement into an inculpatory one. Here, however, Jordan's statement to the FBI—that he placed orders with the intent to cancel—required no further clarification or explanation.

This Court routinely affirms the exclusion of statements as outside the scope of Rule 106, even where the defendant argued that they were "necessary to explain his theory of the case." *Velasco*, 953 F.2d at 1476.  In *Lewis*, for example, the defendant was asked by an FBI agent whether he had obtained drugs from someone else.  The defendant replied, "If I did it, I wouldn't tell you; and I would consult with an attorney first." *Lewis*, 954 F.2d at 1390-1391.  The district court admitted the first part of the statement but not the second, and this Court affirmed on the ground that the defendant failed "to satisfy the heavy burden imposed on parties seeking to overturn a trial judge's evidentiary rulings on appeal." *Id.* at 1390.  That same conclusion applies a fortiori in this case:  In *Lewis*, the defendant's statement about consulting a lawyer was *directly* connected to his statement that he

119

wouldn't confess to an FBI agent, and thus arguably clarified the meaning of that statement. Here, in contrast, nothing about Jordan's statement that he did not think it was "wrong" to commit spoofing clarifies the meaning of his admission that he knowingly engaged in spoofing to mislead the market. The excluded statement "did not alter the fact that [Jordan] admitted committing the acts with which he was charged." *Velasco*, 953 F.2d at 1476 (quotations omitted).

2. Any error in excluding the statement was harmless. Jordan contends that his statement would have shown (if believed) that he acted with an "innocent state of mind." Jordan.Br.43 n.10. But as noted the relevant question of intent is whether Jordan *intended to defraud*—not whether he intended to violate bank policies or believed that his conduct violated the law. Accordingly, the district court instructed the jury that a violation of bank compliance policies is *not* the same as a violation of the wire-fraud statute. Supp.App.99. It further instructed the jury that "a person acts with intent to defraud if he acts knowingly with the intent to deceive or cheat the alleged victim in order to obtain money or property from the alleged victim." Supp.App.102. Jordan admitted to Agent Luca (and does not dispute on appeal) that he did just that: he placed orders with the "inten[t] to cancel" in order to "mislead" the market in the hopes of financial

120

game. Jordan.App.1407. Jordan's apparent defense—that he did not think it was "wrong" to do so—is no defense at all.

And Jordan's contention that he did not know that spoofing was "wrong" was implausible in any event. In his 2010 Commodity Futures Trading Commission deposition, Jordan denied placing orders with the intent to cancel them, Jordan.App.1422—the very conduct that he admitted to the FBI. He would not have falsely denied his spoofing conduct in 2010 if he thought there was nothing "wrong" with it. And even if the jury had believed that self-serving statement, it would have had no bearing on the verdict for the reasons stated.

## IX. THE DISTRICT COURT CORRECTLY DECLINED JORDAN'S REQUEST FOR A GOOD-FAITH INSTRUCTION

### A. Background

Jordan asked the district court to provide the jury a good-faith instruction. See Jordan.App.212. The district court declined to do so. JSA.16. It explained that "the good-faith instruction is unnecessary to advance the defense of good faith because Jordan can still argue the *absence* of an intent to defraud" and the "definition of intent to defraud allows Jordan to make exactly the argument that he advances, namely, he honestly believed that he was not making false representations by placing the alleged large-side orders." *Ibid.* The court further ruled "there is a *downside* to the good-

121

faith instruction" in this case "because it poses the risk of misleading jurors into thinking that a defense along the lines of 'mistake of law' is viable, when it is not." *Ibid.*

## B.    Standard Of Review

This Court "review[s] challenges to jury instructions de novo." *Coscia*, 866 F.3d at 799. "Defendants are not automatically entitled to any particular theory-of-defense jury instruction." *United States* v. *Cruse*, 805 F.3d 795, 814 (7th Cir. 2015) (quotations omitted). Rather, a defendant is entitled to such an instruction only if (1) it "represents an accurate statement of the law"; (2) it "reflects a theory that is supported by the evidence"; (3) it "reflects a theory which is not already part of the charge"; and (4) "the failure to include the instruction would deny the defendant a fair trial." *Ibid.* (quotations omitted).

## C.    Argument

The district court correctly denied Jordan's request for a good-faith instruction. "A good faith instruction is not required where lack of good faith is part of the charge." *Johnson*, 874 F.3d at 1002. Thus, where a jury is required to find "the intent to commit fraud," this Court has held that a defendant is "not entitled to an additional instruction for good faith." *Ibid.* As this Court has explained, "it is impossible to intend to deceive while simultaneously acting in good faith." *United States* v. *Mutuc*, 349 F.3d 930, 936 (7th Cir. 2003); see *United States* v. *Lunn*, 860 F.3d 574, 580 (7th Cir.

2017) ("an action taken in good faith is on the other side of an action taken knowingly") (quotations omitted).

Here, the district court "instructed the jury that the government was required to prove, beyond a reasonable doubt, that [Jordan] 'knowingly [devised]' a scheme to defraud 'with the intent to defraud.'" *Lunn*, 860 F.3d at 580; see Supp.App.100. "The court further instructed the jury that "'[a] person acts with intent to defraud if he acts knowingly with the intent to deceive or cheat'" the alleged victim. *Lunn*, 860 F.3d at 580; see Supp.App.102. "As a result, [Jordan's] good-faith instruction would have been at best redundant." *Lunn*, 860 F.3d at 580.

Indeed, this Court reached that same conclusion in *Chanu*, which affirmed the district court's denial of a good-faith instruction. *Chanu*, 40 F.4th at 543 (citing *Johnson*, 874 F.3d at 1002, and *Lunn*, 860 F.3d at 579-580). Jordan notes that the Court stated in *Chanu* "that its 'opinion should not be read to preclude the inclusion of such an instruction in a future case.'" Jordan.Br.48 (quoting *Chanu*, 40 F.4th at 543). But the point that the Court was making was that, "[g]iven the substantial deference afforded to a district court in formulating the language of a jury instruction," *Chanu*, 40 F.4th at 543, its holding did not compel the conclusion that a district court would err in *providing* a good-faith instruction. The Court did not suggest that a

123

district court would err in *declining* to provide a good-faith instruction in another spoofing case that, like this one, presents the same issue as *Chanu*.

Jordan contends (Jordan.Br.48) that "[g]ood faith was far less central in *Chanu* than in this case" because the *Chanu* defendants "did not challenge the testimony from the government's compliance and CME witnesses that earlier-in-time policies and exchange rules were understood to prohibit spoofing." But the defendants in *Chanu* did challenge that same testimony. After a CME representative testified that the CME rules "prohibit traders from placing orders that they intend to cancel before execution," for example, Chanu asked on cross whether "there [was] any rule in the CME Rulebook that actually told a trader in plain English you cannot place an order with the intent to cancel" between 2008 and 2013. *Vorley*, No. 18-cr-35, Doc.341 at 99, 119 (N.D. Ill. Sept. 15, 2020). After a Deutsche Bank compliance officer testified that bank policies prohibited market manipulation, including trades "designed to give a false or misleading impression as to the supply or demand," Vorley similarly asked on cross whether "Deutsche Bank's market abuse policy did not refer to the word 'spoofing' anywhere in the policy." *Vorley*, No. 18-cr-35, Doc.343 at 240, 271 (N.D. Ill. Sept. 17, 2020). And both defendants argued at closing that "Deutsche Bank's compliance policy didn't mention the word 'spoofing' or entering orders with the intent to cancel until

124

2014, long after the period charged in this case ended." *Vorley*, No. 18-cr-35, Doc.346 at 128 (N.D. Ill. Sept. 22, 2020).

*Chanu*, *Johnson*, and *Lunn* compel the conclusion that the district correctly declined to provide a good-faith instruction here. Jordan does not cite any cases holding otherwise. Instead, he appears to take issue with the district court's response to a jury note asking for "clarification" of the instruction that a person acts "knowingly" if he "is aware of the nature of his conduct." Jordan.Br.50. After explaining to the parties that the "jury is most likely asking whether the Defendant must know that his alleged conduct was in violation of federal law," the district court indicated that it would respond to the jury that "knowingly" "does not mean that the defendant must be aware of whether his alleged conduct violated federal law." JSA.17, 19.

Jordan does not challenge that response on appeal, and the district court did not abuse its discretion in providing that response, which merely referred back to its earlier instruction. See Doc.815; Jordan.App.292. But the "knowingly" note lends no support to Jordan's good-faith argument in any event. Jordan contends that, after reciting the court's response, the jury "could have mistakenly concluded that Jordan's good-faith evidence was irrelevant." Jordan.Br.52. But the court's response also reminded the jury that to convict Jordan it must find beyond a reasonable doubt all the elements of wire fraud, including that Jordan "acted with the intent to

defraud, which . . . requires that he act 'knowingly with the intent to deceive or cheat the alleged victim.'" JSA.19. That is the exact language that renders a good-faith instruction "redundant." *Lunn*, 860 F.3d at 580.

2. Jordan was not harmed by any error in declining the good-faith instruction. The evidence established that Jordan intended to defraud his victims. Indeed, he admitted to Agent Luca that he engaged in spoofing "in order to mislead the market, to outperform the algorithms, and . . . to get the best possible fills for his boss." Jordan.App.1407. That is a confession that he acted with the "intent to deceive" the market. Supp.App.102; see *Coscia*, 866 F.3d at 797. Indeed, he concedes on appeal that he "used a trading tactic called 'spoofing' to achieve good execution on his orders"—a result that was made possible precisely *because* the spoof orders misled the market about supply, demand, and trading intent. Jordan.Br.2. The jury could not have found that Jordan acted with the "intent to defraud" (as instructed) and the "intent to deceive" (as Jordan admitted) yet at the same time "honestly believed [his] actions did not involve a materially false or fraudulent" representation (as Jordan proposed in his good-faith instruction). Jordan.App.212.

126

## CONCLUSION

The Court should affirm the defendants' convictions.

Respectfully submitted.

JEREMY R. SANDERS
    Appellate Counsel, Fraud
    Section
    Criminal Division

MATTHEW F. SULLIVAN
LUCY B. JENNINGS
    Trial Attorneys, Fraud Section
    Criminal Division

NICOLE M. ARGENTIERI
    Principal Deputy Assistant Attorney
    General

LISA H. MILLER
    Deputy Assistant Attorney General

DANIEL N. LERMAN
    Attorney, Appellate Section
    Criminal Division
    U.S. Department of Justice
    950 Pennsylvania Ave., N.W.
    Washington, DC 20530
    (202) 353-7696
    Daniel.Lerman@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with this Court's March 22, 2024, order granting leave to file a consolidated answering brief of up to 28,000 words because this brief contains 27,850 words, not including items excluded in accordance with Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 13-point font in text and footnotes.


/s/ Daniel N. Lerman