No. 23-2849

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee*,

*v.*

**CHRISTOPHER JORDAN**,

*Defendant-Appellant.*

_____

On Appeal from the U.S. District Court for the
Northern District of Illinois, Hon. Edmond E. Chang
No. 1:19-cr-00669-4

_____

**REPLY BRIEF OF APPELLANT CHRISTOPHER JORDAN**

_____

Megan Cunniff Church
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 450-6716

James J. Benjamin, Jr.
Parvin D. Moyne
Anne M. Evans
AKIN GUMP STRAUSS HAUER
 & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000
jbenjamin@akingump.com

*Counsel for Appellant Christopher Jordan*

# TABLE OF CONTENTS

*Page*

INTRODUCTION ..................................................................................1

ARGUMENT ........................................................................................3

    I.    THE DISTRICT COURT ERRED BY CONSTRAINING
          JORDAN'S CROSS-EXAMINATION OF THE
          GOVERNMENT'S COMPLIANCE AND CME WITNESSES ..........3

          A.    The Excluded Evidence Had Significant Probative Value
              Because It Would Have Contradicted the Testimony of
              the Government's Witnesses ........................................................3

          B.    The Excluded Evidence Did Not Present a Significant
              Risk of Jury Confusion ..................................................6

          C.    The Error Was Not Harmless ........................................8

    II.    THE DISTRICT COURT ERRED BY DENYING JORDAN'S
          MOTION TO ADMIT A RELEVANT, EXCULPATORY
          PORTION OF HIS ORAL STATEMENT TO THE FBI ...................12

    III.    THE DISTRICT COURT ERRED BY DENYING JORDAN'S
          REQUEST FOR A GOOD-FAITH INSTRUCTION .........................17

CONCLUSION ....................................................................................23

CERTIFICATE OF COMPLIANCE ......................................................25

CERTIFICATE OF SERVICE ..............................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arizona v. Fulminante*,
499 U.S. 279 (1991)..................................................................16

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988)..................................................................15

*Morissette v. United States*,
342 U.S. 246 (1952)........................................................2, 13, 14

*Neder v. United States*,
527 U.S. 1 (1999)................................................................11, 16

*Public Service Co. of Indiana v. Bath Iron Works Corp.*,
773 F.2d 783 (7th Cir. 1985) ...........................................5, 8

*Ruan v. United States*,
597 U.S. 450 (2022)..................................................................14

*Thompson v. City of Chicago*,
722 F.3d 963 (7th Cir. 2013) ...............................................8

*United States v. Boswell*,
772 F.3d 469 (7th Cir. 2014) ...............................................4

*United States v. Brandon*,
50 F.3d 464 (7th Cir. 1995) .................................................20

*United States v. Chanu*,
40 F.4th 528 (7th Cir. 2022) ................................................20

*United States v. Chaparro*,
956 F.3d 462 (7th Cir. 2020) ....................................4, 9, 16

*United States v. Filer*,
56 F.4th 421 (7th Cir. 2022) ..........................................13, 14

*United States v. Glover*,
101 F.3d 1183 (7th Cir. 1996) ............................................12

*United States v. Lundberg*,
    990 F.3d 1087 (7th Cir. 2021) ........................................................................2, 13

*United States v. Velasco*,
    953 F.2d 1467 (7th Cir. 1992) ....................................................................12, 15

## Other Authorities

Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* §
    6:85 (4th ed. Aug. 2023 update) ...........................................................................9

William J. Bauer Pattern Crim. Jury Instrs. 6.10 (7th Cir. 2020)...........................23

## INTRODUCTION

This consolidated appeal arises from two separate trials with very different characteristics. Unlike his co-defendants – and every other trader who has been prosecuted for spoofing by the U.S. Department of Justice – all of Christopher Jordan's relevant trading occurred before August 2010. Jordan was tried only on a single count of wire fraud affecting a financial institution. There were no cooperators. And the key battleground at Jordan's trial – in contrast to the trial of his co-defendants – *was not* whether Jordan placed orders with the unconditional intent to cancel them before execution; it was whether he acted with the criminal intent to defraud. In its opposition, the government primarily addresses unrelated issues that pertain only to Jordan's co-defendants.

In its limited discussion of Jordan's trial, the government downplays and short-changes the key disputed issue of *mens rea*. According to the government, it was not necessary to prove that Jordan knew that his actions were wrongful; instead, it was sufficient merely to show that Jordan intended to mislead computer algorithms about his trading intentions. Opp. 113, 115, 118-19, 121.[1] This crabbed

---

[1] "Opp." refers to the government's answering brief; "Br." refers to Jordan's opening brief; "Tr." refers to the trial transcript, relevant portions of which are included in the separate Circuit Rule 30(b) Appendix filed with our opening brief; "App." refers to the Circuit Rule 30(a) Appendix that was bound with our opening brief; "GX" and "DX" refer to government and defense exhibits, respectively; "ECF No." refers to proceedings in the district court that are not included in either appendix; and "*Chanu* Tr." refers to proceedings at trial in *United States v. James Vorley and Cedric Chanu*, No. 18-cr-35 (N.D. Ill. 2020).

1

definition resembles the mental state required to prove spoofing – placing orders with the unconditional intent to cancel them before execution – but it falls well short of the specific intent to defraud that is needed to establish wire fraud. *See United States v. Lundberg*, 990 F.3d 1087, 1095 (7th Cir. 2021); *see also Morissette v. United States*, 342 U.S. 246, 250-53 (1952). And it does not align with the competitive reality of commodities trading, where traders routinely and permissibly conceal their true objectives with the goal of achieving financial gain.

At trial, the government presented extensive testimony from bank compliance officers and a CME official in an effort to show that Jordan knew that spoofing was prohibited by bank policies and exchange rules. Separately, the government exploited the district court's Rule 106 ruling to transform Jordan's exculpatory statement to Agent Luca into a "confession" of wrongdoing. As presented by the government, this evidence tended to show that Jordan knew that his behavior was wrongful. However, because of the district court's erroneous applications of Rules 403 and 106, the government's *mens rea* evidence was distorted and unreliable. And the jury's consideration of Jordan's state of mind was further compromised by the district court's refusal to administer a good faith instruction.

In its opposition, the government fails to persuasively refute any of these points. The government cannot avoid the critical importance of *mens rea* in a wire

fraud case. The district court's errors misled the jury about Jordan's state of mind and deprived Jordan of his core theory of defense. This Court should vacate the judgment of conviction and remand for a new trial.

## ARGUMENT

## I. THE DISTRICT COURT ERRED BY CONSTRAINING JORDAN'S CROSS-EXAMINATION OF THE GOVERNMENT'S COMPLIANCE AND CME WITNESSES

In its opposition, the government contends that Jordan was not entitled to confront the prosecution's compliance and CME witnesses with post-2010 policy and training documents that would have contradicted their testimony about pre-existing documents. Invoking both sides of the Rule 403 balance, the government argues that the excluded evidence: (1) had "minimal" probative value and (2) would have created a substantial risk of jury confusion. Opp. 109-13. Both arguments are wrong.

A. The Excluded Evidence Had Significant Probative Value Because It Would Have Contradicted the Testimony of the Government's Witnesses

In its case-in-chief, the government offered extensive evidence about compliance policies at JPMorgan and Credit Suisse, and about exchange rules at the CME. *See* Br. 6, 8-9, 16-23. In its opposition brief, the government prominently features that very same evidence, including in a section entitled **"Bank Policies and CME Rules Prohibiting Spoofing."** *See* Opp. 18-20; *see also id*. at 5-6, 26-27, 106, 110. According to the government, however, the

compliance evidence was relevant only up until August 2010; thereafter, according to the government, its probative value "was minimal, at best."  Opp. 109.  In support of this argument, the government points to the testimony of its witnesses about the pre-2011 policies on direct examination, and posits that this should be the end of the story.  *See id*. at 110 (summarizing direct testimony of King, Catana, and Middleton and arguing that the "post-2011 policies do nothing to call into question the witnesses' testimony that Jordan's conduct, by whatever name, fell within the scope of [the earlier-in-time] policies").

In our adversary system of justice, however, the defense has a right of cross-examination.  That right is especially sacrosanct where the cross-examination relates (as it did here) to the core theory of defense.  The defense sought to use the later-in-time documents to *contradict* the witnesses' direct testimony and to show that it was not until after Jordan left Wall Street that banks and the CME affirmatively put traders on notice that spoofing was a prohibited trading practice.  Impeachment by contradiction is a well-established forensic technique, *see United States v. Chaparro*, 956 F.3d 462, 479 (7th Cir. 2020); *United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014), and on these facts there can be little doubt that it would have been effective.  Jordan's understanding, or lack thereof, about the meaning of the applicable bank policies and exchange rules was directly relevant to his state of mind, the central disputed issue at trial.  *See* Opp. 110.  The post-

4

2010 compliance evidence would have shed critical light on this question by contradicting the testimony of the government's compliance witnesses that the 2009 and 2010 policies were sufficient to place Jordan on notice that spoofing was prohibited.

As discussed in our opening brief, *see* Br. 23-24, this Court encountered a closely analogous scenario in *Public Service Co. of Indiana v. Bath Iron Works Corp.*, 773 F.2d 783 (7th Cir. 1985), and reversed a jury verdict because the district court had erroneously prevented a party from cross-examining witnesses with later-in-time documents that contradicted their characterization of earlier-in-time documents. In seeking to distinguish *Bath Iron Works*, the government asserts that "Jordan could have (and would have) been convicted of wire-fraud irrespective of whether the bank and CME policies used the term 'spoofing.'" Opp. 113. But the government ignores the purpose for which the evidence was offered: to impeach the testimony of the government's witnesses about the supposed clarity of the earlier-in-time documents. That is the same purpose for which the evidence was offered in *Bath Iron Works*. 773 F.2d at 792-93. If Jordan had been permitted to confront the government's witnesses with the later-in-time compliance documents, their testimony would have been exposed as fallacious, and a central pillar of the government's case would have crumbled.

In a further attempt to distinguish *Bath Iron Works*, the government argues that the "question under the wire-fraud act is not whether Jordan complied with bank rules, but rather whether he misled the market about his intent to trade." Opp. 113.  Having devoted much of its case-in-chief in an effort to show that Jordan knowingly violated bank policies and exchange rules, the government is poorly situated to disparage Jordan's efforts to refute this evidence.  The principle of *Bath Iron Works* applies fully to this appeal.

B. <u>The Excluded Evidence Did Not Present a Significant Risk of Jury Confusion</u>

Turning to the other part of the Rule 403 balance, the government argues that the post-2010 compliance documents "would have created a substantial risk that the jury would wrongly conclude that the wire-fraud statute did not prohibit spoofing until after those policies were enacted," Opp. 31, or that the excluded documents would have incorrectly suggested to the jury that the government was required to prove that Jordan knew that his conduct was illegal.  Opp. 111.

In making this argument, the government mischaracterizes the purpose for which the defense sought to use the post-2010 compliance evidence.  It was *not* – as the government wrongly suggests – to educate the jury about the Dodd-Frank Act or to make improper legal arguments.  At the pretrial conference, defense counsel expressly disavowed any intention even to *mention* the Dodd-Frank Act. *See* App. 51 ("We do not need to explain why [the policy] was adopted or that it

had anything to do with Dodd-Frank.").  Rather, as counsel explained, the post-2010 compliance documents were offered to impeach the government's witnesses and to rebut the government's contention that the earlier-in-time bank policies and exchange rules were "always clear."  *Id*. at 51-52.  This line of questioning would not have implicated Dodd-Frank at all, and therefore it would not have created a risk of jury confusion regarding Dodd-Frank or associated questions of law.

In its opposition, the government argues that prejudicial testimony about what it calls "the Dodd-Frank quagmire" would have been inevitable.  Opp. 111-12.  The government implies that even if the defense had stayed away from any questions that could have implicated Dodd-Frank, *it* nevertheless would have affirmatively chosen to elicit testimony about the passage of Dodd-Frank, to explain to the jury the reason that the banks and the CME changed their policies, rules, and training materials after 2010.  *See* Opp. 112 (arguing that it would have been "misleading to show that the policies had changed without explaining *why* they changed – namely, to incorporate Dodd-Frank's anti-spoofing provision.").

But this supposed conundrum, if it actually materialized, would have been the product of the government's own tactical decision-making.  The reasons for the changes in compliance policies over time were not at issue.  The defense pledged to avoid the topic entirely, and there was no requirement for the government to educate the jury on this point.  For example, the government could have avoided

7

the issue by trying to establish, on redirect examination, that it is not uncommon for policy language to change even if the underlying prohibitions remain the same. *See Bath Iron Works*, 773 F.2d at 791 (plaintiffs were free to argue that they "may simply have decided to err on the side of caution in preparing the 1983 plans"). And if the government had elected to ask questions about Dodd-Frank, the district court could have addressed any potential jury confusion via a cautionary instruction. *See* Br. 26. In short, the government's self-created "quagmire" scenario does not justify the wholesale exclusion of highly probative defense evidence. *See Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) (courts should "tolerate some risk of prejudice" for highly probative evidence) (citations omitted).

C. <u>The Error Was Not Harmless</u>

The government argues that the exclusion of the post-2010 compliance evidence was harmless because Jordan was able to establish, on cross-examination, that the earlier-in-time policies did not contain the word "spoofing" or any description of the practice of spoofing. Opp. 114; *see also id*. at 108. But this line of cross-examination was, at best, only partially effective because the jury was not able to see the black-and-white contrast between the language of the pre-2011 and post-2010 policies. And notwithstanding the cross-examination, the compliance witnesses stood firm in their testimony about the supposedly clear interpretation of

8

the pre-2011 policies, and the defense was unable to properly impeach them.  *See* Br. 18-23.  Had the defense been permitted to confront the witnesses with contradictory documents, "the prosecution's case would have been significantly less persuasive in the minds of the average juror."  *Chaparro*, 956 F.3d at 482 (citations omitted); *see also* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:85 (4th ed. Aug. 2023 update) ("Contradicting a witness is a recognized method of impeachment . . . It is much at home in an adversary system and is probably essential to fairness and balance in presenting and appraising testimony and other evidence.").

Separately, the government argues that any error was harmless because the district court administered a jury instruction to the effect that compliance policies and CME rules are not the same thing as the law.  Opp. 114-15.  This is a red herring.  The defense sought to use the post-2010 compliance evidence to impeach the government's witnesses and thereby to undermine the government's *mens rea* evidence.  The cautionary instruction addressed a different issue and did not remedy the prejudice that Jordan suffered as a result of the district court's erroneous Rule 403 ruling.

Finally – and boldly – the government postulates that the exclusion of the compliance evidence was harmless because of the supposedly "overwhelming" evidence against Jordan.  Opp. 115.  This argument is grossly overstated.  It is true

that Jordan's spoofing conduct was uncontested, but Jordan was not charged with spoofing: he was charged with wire fraud affecting a financial institution. As the government elsewhere concedes in its brief, spoofing is merely the "actus reus" of wire fraud; the government is also required to prove *mens rea*. *See* Opp. 73. And at Jordan's trial, on the issue of criminal intent, the government's evidence was thin, and the case was hotly contested.

The evidence at trial showed that: (a) trading was a highly competitive activity in which traders were permitted to conceal and disguise their true objectives; (b) markets were in a state of transition in 2009 and 2010; and (c) algorithms presented novel execution problems for manual traders such as Jordan. *See* Tr. 268-70 (A1356-58), 281, 292-93, 331, 341, 345-47 (A1363-64), 356 (A1366), 361 (A1371), 364-66 (A1374-76), 420, 565 (A1457), 630 (A1494), 637 (A1501), 679-80, 1100-02, 1104, 1107-08, 1212-13 (A1864-65), 1220. The proof at trial also showed that Jordan's spoof orders were placed at the top of the order book and were fully at risk of execution; that they were canceled at a rate far below the market average; and that they were executed at a rate far above the market average for similarly sized orders. *See* Br. 7 n.4; Br. 43 n.10; Tr. 427-28, 430-35, 619 (A1483), 1200-01, 1205-08 (A1857-60).[2] This evidence amply refuted the

---

[2] In its opposition, the government states that based on a narrow sample of 68 episodes that it presented to the jury during its case-in-chief, Jordan's large-side orders had a fill rate of 0.00% and his small-side orders had a fill ratio of 83.89%. Opp. 12. The government also

assertions of Professor Venkataraman and Agent Luca that Jordan's orders constituted "fake supply" and "fake trades." *See* Opp. 26.

For its part, the government called no cooperating witnesses and offered no chats to suggest that Jordan believed that his behavior was wrongful. (If anything, the limited chats in evidence showed the opposite, as Jordan was fully transparent about the spoofing strategy, including with his boss at JPMorgan, Ray Eyles, *see, e.g.*, Tr. 676, 685-86 (A1530, 1536-37)). None of the compliance witnesses ever spoke to Jordan about spoofing, and two of them had never even laid eyes on him until they walked into the courtroom. Br. 27. In short, the evidence against Jordan decidedly *was not* "overwhelming." Had Jordan been able to properly impeach the compliance witnesses with the post-2010 documents, the tenor of the trial would have changed significantly, and it is far from "clear, beyond a reasonable doubt, that a rational jury would have found" Jordan guilty absent the error. *Neder v. United States*, 527 U.S. 1, 18 (1999).

---

reproduces an example of a chart that it showed to the jury depicting one of the 68 sequences. Opp. 11. The government omits that during the defense case, Professor Mark Ready of the University of Wisconsin applied screening criteria that could be indicative of spoofing (and that captured all 68 of the government's sequences) and identified a larger sample of 1,292 trading sequences that reflected potential instances of spoofing by Jordan during the relevant time period. Tr. 1189-90, 1205 (A1855-57). After analyzing this larger sample set, Professor Ready determined that Jordan's large-side orders were at least partially executed 9.4% of the time, DX 95 (A910-42); Tr. 1206-16 (A1858-68). Professor Ready also walked through counterexamples of charts that were identical to the government's examples except for the fact that Jordan's large side order was executed. DX 95 (A910-42); Tr. 1220-26.

## II.     THE DISTRICT COURT ERRED BY DENYING JORDAN'S MOTION TO ADMIT A RELEVANT, EXCULPATORY PORTION OF HIS ORAL STATEMENT TO THE FBI

As outlined in our opening brief, "the test of admissibility under Rule 106 is conjunctive." *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996).  First, the proponent must demonstrate that the omitted statement is relevant; and second, the district court must admit the statement if it "qualifies or explains the evidence offered by the opponent." *United States v. Velasco*, 953 F.2d 1467, 1474-75 (7th Cir. 1992).  Jordan's statement to Agent Luca – "Jordan did not think what he was doing was wrong" – readily satisfies both prongs of this test.  The government's contrary arguments (Opp. 118-120) are wholly without merit.

As its lead argument, the government contends – remarkably – that Jordan's statement was not relevant to his mental state.  Without any supporting authority, the government asserts that "the relevant state of mind is Jordan's intent to deceive the market – not his knowledge that it was 'wrong' to do so."  Opp. 118; *see also id*. at 118-19 ("Jordan's self-serving claim that he did not know he was doing anything 'wrong' does nothing to undermine his admission that he intentionally misled the market by spoofing."); *id*. at 115 ("The question under the wire fraud statute is whether Jordan intentionally misled the market by placing orders with the intent to cancel them."); *id*. at 121 ("Jordan's apparent defense – that he did not think it was 'wrong' to do so – is no defense at all.").

12

The government appears to have a stunning misunderstanding of the applicable *mens rea* requirement.  The government's formulation might be sufficient to establish spoofing, but it does not accurately reflect the mental state that is required for wire fraud.

To establish wire fraud, "the government must show a 'willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another.'"  *United States v. Filer*, 56 F.4th 421, 434 (7th Cir. 2022) (citations omitted).  The "intent to defraud 'requires more than knowledge of 'shadowy dealings,' superficial participation, or the exchange of money.'"  *Lundberg*, 990 F.3d at 1095.  As a bedrock requirement, the government must prove that a defendant understood that his or her conduct was wrongful:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion.  It is as universal and persistent in mature systems of law as belief in the freedom of human will and a consequent ability and duty of the normal individual to choose between good and evil.

*Morissette*, 342 U.S. at 250; *see also id*. at 251-52 ("Crime, as a compound concept, generally constituted only from a concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil."); *id*. at 252 (through jury instructions on the requirement of criminal intent, courts "have sought to protect those who were not

13

blameworthy in mind from conviction of infamous common-law crimes"); *see also Ruan v. United States*, 597 U.S. 450, 457 (2022) ("as a general matter, our criminal law seeks to punish the 'vicious will'") (quoting *Morissette*, 342 U.S. at 251)); *see also id*. at 465-66 (*mens rea* requires an individualized assessment of a defendant's subjective mental state). Consistent with those principles, the language that this Court has used to define the *mens rea* requirement of wire fraud – a "specific intent to deceive or cheat," *Filer*, 56 F.4th at 434 – requires a subjective awareness of wrongfulness. At a bare minimum, evidence that a defendant "did not think what he was doing was wrong" is plainly *relevant* in a wire fraud case. *See Morissette*, 342 U.S. at 247 (noting importance of evidence that defendant acted "in broad daylight, in full view of passers-by, without the slightest effort at concealment" and, when questioned, "voluntarily, promptly, and candidly told the whole story to the authorities"). The government's argument to the contrary is at odds with foundational principles of criminal law.[3]

Separately, the government argues that the omitted portion of Jordan's statement was inadmissible under Rule 106 because it did "not clarify any

---

[3] Tellingly, the government's position is irreconcilable with the arguments that it made to the jury in the separate trial of Smith and Nowak, and in the *Chanu* case. *See* Br. 44 (government argument that if Smith and Nowak were innocent, they would have said "I didn't think I was doing anything wrong" or "I thought this was okay type of trading" when questioned); *see also Chanu* Tr. 327 ("It is the burden of the United States during this trial to prove beyond a reasonable doubt that the defendants joined the conspiracy and committed the 16 instances of wire fraud knowing that what they were doing was wrong, and we gladly accept this burden.").

misleading impression."  Opp. 118; *see also id*. at 119 ("Jordan's statement to the
FBI – that he placed orders with the intent to cancel – required no further
clarification or explanation."); *id*. at 120 ("The excluded statement 'did not alter
the fact that [Jordan] admitted committing the acts with which he was charged.'")
(quoting *Velasco*, 953 F.2d at 1476).  This is plainly wrong.  The omitted portion
would have contradicted the government's misleading argument to the jury that
Jordan's statement to Agent Luca was a "confession" of wrongdoing.  *See* Br. 43
(before the jury, the government characterized Jordan's statement to Luca as a
"confession" no fewer than 21 times).  Remarkably, the government continues to
propagate that very same misimpression in its appeal brief, plucking out of context
Jordan's question to Agent Luca "whether he would 'be going to jail,'" Opp. 21,
and highlighting Luca's testimony about his "understanding" of Jordan's
admissions, which went beyond the language that Jordan actually used and
imported Luca's own loaded phrase, "false sense of supply or demand."  Opp. 26.

     At every turn in this litigation, the government has relentlessly – and
wrongly – sought to transmogrify Jordan's statement to Luca from a statement of
innocence into a confession of guilt.  This is precisely the sort of unfairness that
Rule 106 is intended to prevent.  *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153,
171-72 (1988) ("when one party has made use of a portion of a document, such
that misunderstanding or distortion can be averted only through presentation of

another portion, the material required for completeness is *ipso facto* relevant and therefore admissible").  The district court gravely erred in excluding the exculpatory portion of Jordan's statement and allowing the government to misleadingly characterize Jordan's statement as a confession.[4]

The government concludes its Rule 106 discussion with a perfunctory and wholly unpersuasive argument that any error was harmless.  *See* Opp. 120-21.  As discussed at length in our opening brief, the purported "confession" was the centerpiece of the government's case and – according to the government's argument during its rebuttal summation – was enough, all by itself, to establish Jordan's guilt.  *See* Br. 42-44.  As the Supreme Court has recognized, a "confession is like no other evidence" and has a "profound impact on the jury."  *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal citations omitted).  In pointing to aspects of the district court's jury instructions, *see* Opp. 120, the government ignores the effect of the Rule 106 violation, which was to significantly distort the evidence that was presented to the jury.  The error was not harmless.[5]

---

[4] Notably, the government does not meaningfully defend the district court's groundless assertion that the omitted portion of Jordan's statement to Luca was inadmissible because it was "a purported mistake of law by Jordan."  *See* App. 39.  For the reasons stated in our opening brief, *see* Br. 40-42, the record belies this assertion.

[5] In passing, the government cites brief excerpts of Jordan's 2010 deposition testimony from a separate CFTC investigation, *see* Opp. 121, but this ambiguous evidence is plainly insufficient to establish that the Rule 106 error was harmless under the applicable legal standard.  *See Chaparro*, 956 F.3d at 482 ("The general test for harmless error at trial is whether it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'") (quoting *Neder*, 527 U.S. at 18).  *See also* Br. 8 n.5.

## III.   THE DISTRICT COURT ERRED BY DENYING JORDAN'S REQUEST FOR A GOOD-FAITH INSTRUCTION

The government defends the district court's refusal to instruct the jury on good faith by asserting that the good-faith instruction is not required "where lack of good faith is part of the charge" because "it is impossible to intend to deceive while simultaneously acting in good faith."  Opp. 122.  The government does not deny that its argument effectively asks this Court to erase the good-faith instruction in wire fraud cases in this Circuit.  That argument is as wrong as it is extreme.  The good-faith instruction remains a part of the instructional canon in this Circuit – including in its pattern jury instructions – and is warranted when the appropriate evidentiary predicate exists, as in Jordan's case.  *See* Br. 45-46.  Nothing in *Chanu* or any other decision holds otherwise.

The government's sweeping argument would imply that the good-faith instruction is no longer given in wire fraud cases, particularly after *Chanu*.  *See* Opp. 122-24.  But that is not the case.  Over the last ten years, the good-faith instruction has been given in no fewer than thirteen cases in the Northern District of Illinois alone.  *See United States v. Mapes*, No. 21-cr-345 (N.D. Ill. Aug. 24, 2023), ECF No. 127 at 28 (Kness, J.); *United States v. Courtright*, No. 20-cr-77 (N.D. Ill. July 7, 2023), ECF No. 161 at 9 (Kennelly, J.); *United States v. Shah*, No. 19-cr-864 (N.D. Ill. Mar. 24, 2023), ECF No. 613 at 8944 (Durkin, J.); *United States v. Bases*, No. 18-cr-48 (N.D. Ill. Aug. 2, 2021), ECF No. 623 at 28 (Lee, J.);

17

*United States v. Immel*, No. 16-cr-776 (N.D. Ill. Aug. 26, 2019), ECF No. 137 at 1139 (Coleman, J.); *United States v. Batio*, No. 16-cr-425 (N.D. Ill. May 28, 2019), ECF No. 253 at 1408-13 (Pallmeyer, C.J.); *United States v. O'Brien*, No. 17-cr-239 (N.D. Ill. Mar. 22, 2018), ECF No. 260 at 1133-38 (Durkin, J.); *United States v. Memar*, No. 15-cr-345 (N.D. Ill. May 7, 2017), ECF No. 49 at 20 (Leinenweber, J.); *United States v. Lee*, No. 12-cr-109 (N.D. Ill. Mar. 13, 2017), ECF No. 173 at 1522, 1527-28, 1535-36, 1546-49 (Coleman, J.); *United States v. Hamid*, No. 15-cr-154 (N.D. Ill. July 21, 2016), ECF No. 127 at 29 (Durkin, J.); *United States v. Webb*, No. 14-cr-103 (N.D. Ill. July 8, 2016), ECF No. 99 at 25 (Kendall, J.); *United States v. Coscia*, No. 14-cr-551 (N.D. Ill. Nov. 3, 2015), ECF No. 85 at 24 (Leinenweber, J.); *United States v. Bloom*, No. 12-cr-409 (N.D. Ill. Mar. 6, 2015), ECF No. 219 at 2549-58 (Guzman, J.). This includes two spoofing cases, *Coscia* and *Bases*, in which two different district court judges, over the government's objection, found the good-faith instruction to be appropriate. *See, e.g.*, *Bases*, ECF No. 642 at 1992-93 ("I'm going to stand firm to the extent that the issue of intent is a central issue in this case. I think that the 'good faith' instruction provides a jury with some much-needed guidance."). Three of the thirteen cases went to trial after this Court's decision in *Chanu*—illustrating that *Chanu* left district courts with ample discretion to provide the good-faith instruction when the evidentiary predicate supports it. *See Mapes,* 21-cr-345 (trial commenced Aug. 7, 2023);

18

*Courtright,* 20-cr-77 (trial commenced June 26, 2023); *Shah*, 19-cr-864 (trial commenced Jan. 30, 2023).

The district courts that have given the good-faith instruction in wire fraud cases did so based on their determination that good faith was central to the theory of defense.  That is, even though good faith (or the lack thereof) was arguably already captured by the jury instructions, those district courts nevertheless recognized that good faith can be particularly important in certain cases.  For example, in *United States v. Shah*, the district court concluded that a wire fraud defendant was "certainly entitled to a good faith instruction," as "[t]hat seems to be the crux of the defense."  *Shah*, ECF. No. 613 at 8944:5–20.  The district court recognized that wire fraud "[is] not a willful-intent or a specific-intent type of case . . . [o]r not a willfulness type of case," but that the instruction was nonetheless warranted "in light of the defense *in this case*."  *Id.* (emphasis added).  Similarly, in *United States v. Batio*, the district court rejected the government's argument that the "good faith instruction isn't needed if it's covered by the jury instructions; for example, for . . . wire fraud."  *Batio*, ECF No. 253 at 1408:19-20.  The defense asserted that the cases cited by the government did not say the district court *couldn't* give an instruction, but simply that it would not be reversible or harmful error to do so.  The district court agreed, explaining, "I guess I don't regard the Court of Appeals saying that failure to give an instruction is not error as an

19

affirmative statement that the Court should not give an instruction *when it's the defendant's theory*." *Id.* at 1412:21-24 (emphasis added). The same was true in Jordan's case, where the crux of Jordan's defense was that he lacked the intent to defraud because he did not think spoofing was wrong.[6]

While *Chanu* affirmed the denial of the good-faith instruction, this Court made clear that its decision addressed "only the exclusion of a good faith instruction in the case before [the Court]," and held that its "opinion should not be read to preclude the inclusion of such an instruction in a future case." *United States v. Chanu*, 40 F.4th 528, 543 (7th Cir. 2022). The clear import of this direction was to empower district courts to provide the good-faith instruction in a future case, like Jordan's, where good faith was squarely at issue and there was a solid evidentiary predicate. *See id.* at 543 (citing *United States v. Brandon*, 50 F.3d 464, 468 (7th Cir. 1995), where the court found no error in giving the jury a good faith instruction for a defendant charged with four counts of wire fraud). The government, instead, interprets this to mean that a district court would *never* err in "*declining* to provide a good-faith instruction in another spoofing case[.]" Opp. 124. But nothing in *Chanu* supports reading the decision to create a one-way

---

[6] There is a glaring irony in the government's choice to emphasize the lack of good faith as such an intrinsic and critical part of the elements of wire fraud that the jury would already have understood the importance of intent without the instruction, while downplaying the importance of *mens rea* in defending the district court's evidentiary rulings.

ratchet, in which district courts have unfettered discretion to deny the instruction to defendants regardless of the strength of the evidentiary predicate or the centrality of the good-faith defense.

This is particularly true because – contrary to what the government asserts, *see* Opp. 124-25 – the evidence in the *Chanu* trial was sufficiently different from Jordan's trial to warrant different instructions.  Most importantly, in *Chanu* the defendants were alleged to have spoofed until July 2013, some three years after the end of Jordan's relevant trading.  *Chanu* Superseding Indictment, ECF No. 127.  In contrast to the evidence at Jordan's trial, the evidence at the *Chanu* trial established that as of July 2013, the prohibition on spoofing had been communicated to traders.[7]  As another point of distinction, the district court in *Chanu* did not issue a supplemental instruction addressing the definition of "knowingly" and the applicability of mistake-of-law.

In seeking to defend the denial of the good-faith instruction, the government does not actually engage with the record in Jordan's case, instead arguing generically that the good-faith instruction is not required as a matter of law.  Opp.

---

[7] In *Chanu*, the government presented evidence that the defendants received an email in September 2012 informing them about a recent CME enforcement case arising from spoofing, along with a Power Point deck stating that as of July 16, 2011, the Dodd-Frank Act specifically prohibited spoofing.  *Chanu* Tr. 1216-24 (discussing GX 178).  The *Chanu* trial record also included the relevant provision of the Dodd-Frank Act itself, which prohibited spoofing as of July 2011.  *Chanu* Tr. 1252-56.

122-24.  The district court, too, did not deny that there was an evidentiary basis in Jordan's trial for the good-faith instruction.  Instead, the district court concluded the instruction was "unnecessary and posed a substantial risk of jury confusion" regarding mistake-of-law.  Rule 33 Order, ECF No. 931 at 23.  However, during deliberations, the district court administered a supplemental instruction that injected mistake-of-law at the last possible moment, without any explanation or context.  Br. 50-52.

In the absence of a good-faith instruction, the consequence of this supplemental instruction was to effectively nullify Jordan's theory of defense. Without any guidance on the meaning of good faith, *see* App. 16, the jury likely concluded that any evidence of Jordan's good faith was irrelevant.  Br. 46-47. Judge Lee, in concluding that a good-faith instruction was appropriate in *Bases*, identified this same issue, noting that the jury needs to "know what to do" with evidence of good faith:

> But if that's the case, then one would never offer a 'good faith' instruction, right?  And I know that's the government's position, that I should never offer a 'good faith' instruction.  But I think that to the extent there's going to be evidence about good faith, and I think the defendants at least intend to present evidence about good faith . . . I think in light of the evidence that I think will come in at trial and will be presented at trial, I think the jury needs – it would be helpful for the jury to know what to do with such evidence.

*Bases*, ECF No. 604 at 19-20.

22

The stark contrast between Judge Lee's approach and the district court's below highlights that district courts lack guidance about when the instruction is warranted in fraud cases in this Circuit.  The result is arbitrariness and inconsistency.  If the government's position were to become the law of this Circuit, the instruction's availability would be left entirely to the whim of each district judge, regardless of the evidence or the theory of defense in any particular case. This state of affairs cannot be squared with the Circuit's pattern jury instructions, which advise that the instruction "*should be used* in cases in which the government must prove some form of 'specific intent,' such as the intent to defraud."  *See* William J. Bauer Pattern Crim. Jury Instrs. 6.10, comm. comment (7th Cir. 2020) (emphasis added).  At Jordan's trial – where the defense was good faith, the requested instruction was amply supported by the evidence, and the proposed language was a correct statement of the law – the good-faith instruction should have been given.[8]

## CONCLUSION

For the foregoing reasons, this Court should vacate the judgment of conviction and remand for a new trial.

---

[8] The evidence at trial was insufficient to establish that Jordan knowingly participated in a scheme to defraud, because his trading counterparties got the benefit of their bargain.  Contrary to the government's conclusory assertion, *see* Opp. 56 n.11, Jordan preserved this argument by presenting a detailed argument in the district court that was based on the evidence adduced at his trial.  *See* ECF No. 835 at 2-5; App. 24-27.  On appeal, Jordan adopts the legal arguments made by Nowak, which are equally applicable to this aspect of Jordan's case.  *See* Br. 52-53.

Dated:  May 17, 2024

                                            Respectfully submitted,

                                            */s/ James J. Benjamin, Jr.*

Megan Cunniff Church                        James J. Benjamin, Jr.
MOLOLAMKEN LLP                              Parvin D. Moyne
300 North LaSalle Street                    Anne M. Evans
Chicago, IL 60654                           AKIN GUMP STRAUSS HAUER
(312) 450-6716                               & FELD LLP
                                            One Bryant Park
                                            New York, NY 10036
                                            (212) 872-1000
                                            jbenjamin@akingump.com

          *Counsel for Appellant Christopher Jordan*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Local R. 32(c) because this brief contains 5,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

*/s/ James J. Benjamin, Jr.*

James J. Benjamin, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  All participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ James J. Benjamin, Jr.*
James J. Benjamin, Jr.